TIMOTHY J. YOO (State Bar. No. 155531)
tjy@lnbyg.com
CARMELA T. PAGAY (State Bar No. 195603)
ctp@lnbyg.com
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile:  (310) 229-1244

Attorneys for Rosendo Gonzalez
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-17445-WB |
| PARK PLACE MASTER TENANT, LLC, | Chapter 7 |
| Debtor. | **CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSY AND TO COMPEL TURNOVER OF POSSESSION OF ITEMS RELATED TO REAL PROPERTY; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION IN SUPPORT THEREOF** |
| | Date: December 16, 2021<br>Time: 2:00 p.m.<br>Place: Courtroom 1375<br>        Roybal Federal Building<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |

1

**TO THE HONORABLE JULIA W. BRAND, UNITED STATES BANKRUPTCY JUDGE:**

Rosendo Gonzalez, the chapter 7 trustee (the "Trustee") for the bankruptcy estate of Park Place Master Tenant, LLC (the "Debtor"), hereby moves this Court for an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 9013-1(d), approving the Settlement Agreement and General Releases (the "Agreement") entered into by and between the Trustee and Colorado Boulevard-10212883, LLC ("CB1"), concerning their disputes concerning a pending state court action and certain foreclosures undertaken by CB1. The Trustee also hereby moves this Court for an order compelling the Debtor to turn over possession of all keys, access codes, and service contracts for the Hotel (as defined herein) pursuant to 11 U.S.C. § 542.

The Agreement provides, in pertinent part, as follows:

1.    Within 15 calendar days following entry of a Court order approving the Agreement or receiving possession of the commercial real property located at 880-940 East Colorado Boulevard, Pasadena, California (the "Property"), whichever is later, CB1 shall pay the Trustee the sum of $150,000 (the "Settlement Payment").

2.    Within 2 court days following entry of a Court order approving the Agreement, the Trustee shall withdraw the demurrer filed by the Debtor and stipulate to entry of judgment in the unlawful detainer action commenced by CB1 in the Superior Court of California, County of Los Angeles (the "State Court Action").  Upon request by CB1, the Trustee shall also sign a stipulation permitting the immediate appointment of a receiver to facilitate CB1's efforts to recover possession of the Property.

3.    Within 2 court days following entry of a Court order approving the Agreement, the Trustee shall turn over actual physical possession of the premises, all interior or exterior keys, keycards, key fobs, access codes, passwords, service contracts, full security system access (including passwords) a complete vendor list with contact information related to Hotel Constance (the "Hotel") to CB1.

4.    Contemporaneously with the Settlement Payment, the Trustee shall deliver a bill of sale of all of the estate's rights, title, and interest in the furniture, fixtures, and equipment located in the Hotel and anywhere else ("FF&E") to CB1.

5.    Subject to the receipt of the Settlement Payment, the Trustee shall waive all of the Debtor and the estate's rights in that certain lease between Park Place Commercial, L.P., as landlord, and the Debtor dated as of July 28, 2014, as amended (the "Master Lease") and, if requested by CB1, shall assign all of the estate's rights in the Master Lease to CB1 or its assignee.

6.    The Parties shall execute General Releases between themselves with respect to all known or unknown claims that each might have had against the other as of the date of the Settlement Payment is paid and the Bill of Sale regarding the FF&E is delivered to CB1.

This Motion is made pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure on the ground that the Trustee, in the exercise of his business judgment, has determined that the Agreement is in the best interests of the estate.  The Agreement avoids the estate's involvement in pending litigation and the need to pursue claims against CB1 while guaranteeing the receipt of a certain sum by the estate from assets whose ownership is disputed. Accordingly, the Trustee submits that the compromise is fair and reasonable and should, therefore, be approved by the Court.

Moreover, the Debtor has listed the lease of the Hotel among its assets and is in possession of the keys, access codes, and service contracts related to the Hotel, which the Trustee has to tender to CB1 under the Agreement.  Hence, turnover of such items to the Trustee is appropriate under section 542 of the Bankruptcy Code.

In support of this Motion, the Trustee will rely on these moving papers, the Memorandum of Points and Authorities and Declaration of Rosendo Gonzalez attached hereto, the pleadings and orders on file in this bankruptcy case, and such other and further evidence and argument as may be made.

1      Accordingly, the Trustee respectfully requests that the Court enter an order:

2      1.     Granting the Motion;

3      2.     Approving the Agreement;

4      3.     Authorizing and directing the Trustee and CB1 to take any other steps necessary

5             to effectuate the Agreement;

6      4.     Compelling the Debtor to turn over the keys, access codes, and service contracts

7             related to the Hotel to the Trustee no later than five days after the order granting

8             this Motion is entered; and

9      5.     Providing such other and further relief as is just and proper.

10

11     DATED: November 23, 2021              LEVENE, NEALE, BENDER, YOO &
                                             GOLUBCHIK L.L.P.
12
                                             By:/s/ Timothy J. Yoo
13                                              TIMOTHY J. YOO
                                                CARMELA T. PAGAY
14                                              Attorneys for Rosendo Gonzalez, Chapter 7 Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## FACTUAL BACKGROUND

On September 23, 2021, Park Place Master Tenant, LLC (the "Debtor") commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code [Doc 1].

On November 8, 2021, the Court entered an order converting the Debtor's bankruptcy case to chapter 7 [Doc 36].  On November 9, 2021, a Notice of Appointment of Chapter 7 Trustee was filed with the Court, reflecting the United States Trustee's appointment of Rosendo Gonzalez as the chapter 7 trustee (the "Trustee") of the Debtor's bankruptcy estate [Doc 37].

Listed in the Debtor's Schedules of Assets and Liabilities (the "Schedules") [Doc 23] are furniture, fixtures and equipment for Hotel Constance, a 161-room, full service hotel with restaurants, bar/lounge, pool and conference rooms. The foregoing furniture, fixtures and equipment are located at Hotel Constance (which is located at 908-928 East Colorado Boulevard, Pasadena, California and hereinafter referred to as the "Hotel") and anywhere else owned by the Debtor are hereinafter referred to as the "FF&E."

On October 20, 2021, the Bankruptcy Court entered its order granting relief from stay to CB1 [Doc 31] to enforce its remedies to foreclose upon and obtain possession of the commercial real property located at 880-940 East Colorado Boulevard, Pasadena, California ("Property"). CB1 foreclosed on the Property on August 24, 2021.  The Trustee's Deed Upon Sale, which names CB1 as the grantee, was recorded with the Los Angeles County Recorder's Office on August 30, 2021, as Inst. No. 20211326335 (the "Trustee's Deed").

Following up on the foreclosure and to evict the occupants of the Property, CB1 filed a complaint for unlawful detainer with Superior Court of California, County of Los Angeles on September 16, 2021, thereby commencing case number 21PDUD00856 (the "State Court Action").   In response to the complaint, the Debtor filed a demurrer, which is currently scheduled to be heard on January 5, 2022 (the "Demurrer").

CB1 asserts that as part of the foreclosure on the Property, it concurrently foreclosed on the Debtor's personal property, including the FF&E.  The Trustee disputes this assertion.

Following discussions, the Trustee and CB1 entered into a Settlement Agreement and General Releases (the "Agreement") to settle their disputes, without any admission of liability, regarding the State Court Action, the validity of the foregoing foreclosures, and the extent of the claims and liens asserted by DB1 against the Debtor and the estate.

The Agreement provides, in relevant part, as follows:

1.     Within 15 calendar days following entry of a Court order approving the Agreement or receiving possession of the Property as described in the Agreement, whichever occurs later, CB1 shall pay the Trustee the sum of $150,000 (the "Settlement Payment").

2.     Within two court days following the entry of an order approving this Agreement, the Trustee shall withdraw the Demurrer and stipulate to entry of judgment in the State Court Action.  Upon request by CB1, the Trustee shall also sign a stipulation permitting the immediate appointment of a receiver to facilitate CB1's efforts to recover possession of the Property.

3.     Within two court days following the entry of an order approving this Agreement, the Trustee shall turn over actual physical possession of the Hotel and items related to the operation of the Hotel to CB1.

4.     Contemporaneously with the Settlement Payment, the Trustee shall deliver a bill of sale of all of the estate's rights, title, and interest in FF&E to CB1.

5.     Subject to the receipt of the Settlement Payment, the Trustee shall waive all of the Debtor and the estate's rights in that certain lease between Park Place Commercial, L.P., as landlord, and the Debtor dated as of July 28, 2014 (the "Master Lease") and if requested by CB1, shall assign all of the estate's rights in the Master Lease to CB1 or its assignee.

6.     The Parties shall execute General Releases between themselves with respect to all known or unknown claims that each might have had against the other as of the date of

the Settlement Payment is paid and the Bill of Sale regarding the FF&E is delivered to CB1.

A true and correct copy of the Agreement is attached to the Declaration of Rosendo Gonzalez ("Gonzalez Decl.") as <u>Exhibit 1</u> and is incorporated herein by this reference.

**II.**

**<u>THE COMPROMISE SHOULD BE APPROVED</u>**

**A.      <u>The Bankruptcy Rules Allow The Court To Approve Compromises Of Controversies.</u>**

Rule 9019 states that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The "may" language of Rule 9019 indicates that the approval or disapproval of a proposed settlement lies within the sound discretion of the Court.  For the reasons set forth below, the Court should approve the proposed Agreement.

**B.      <u>Case Law Supports Approval Of The Proposed Settlement.</u>**

It is well-established that, as a matter of public policy, settlements are favored over continued litigation.  <u>See, e.g.</u>, <u>In re A & C Properties</u>, 784 F.2d 1377 (9th Cir. 1986); <u>In re Blair</u>, 538 F.2d 849, 851 (9th Cir. 1976); <u>In re Heissenger Resources, Ltd.</u>, 67 B.R. 378, 382 (C.D. Ill. 1986).

The focus of inquiry in reviewing and approving compromises is whether the settlement is reasonable under the particular circumstances of the case.  <u>See</u> <u>In re General Store of Beverly Hills</u>, 11 B.R. 539 (9th Cir. BAP 1981).  It is not the bankruptcy judge's responsibility to decide the numerous questions of law and fact with respect to the merits of the litigation, but rather to "canvas the issues and see whether the settlement falls below the lowest point of the range of reasonableness." <u>Heissenger Resources</u>, <u>supra</u>, 67 B.R. at 383.

Among the factors to be considered in determining whether a settlement is fair, equitable and reasonable are the following:

(a)      the probability of success in the litigation;

(b)      any impediments to collection;

(c)      the complexity, expense, inconvenience and

7

1    delay of litigation; and

2    (d)    the interest of creditors with deference to

3    their reasonable opinions.

4    See A & C Properties, supra, 784 F.2d at 1381.

5    From an analysis of the foregoing factors, the Court should conclude that the terms of

6    the Agreement are fair and equitable and well within the range of reasonableness.

7    **1.    The Probability Of Success Is Uncertain**

8    The Trustee is currently not a party to the State Court Action, nor does he have the

9    resources to undertake such litigation.  The Trustee also does not know with certainty that

10    pursuing any claims of the Debtor and /or the estate against CB1 would be successful since

11    CB1 had already foreclosed on the Property and there appears to be no rights remaining on

12    the Master Lease.  Accordingly, this element supports approval of the Agreement.

13    **2.    Impediments to Collection**

14    There is currently some dispute as to whether CB1 had foreclosed on the FF&E.  If

15    CB1 is correct, there would be nothing for the Trustee to administer (also since most of the

16    FF&E are fixtures that are attached to the Hotel).

17    On July 28, 2014, the Debtor's prior landlord Park Place Commercial ("PPC") entered

18    into a Lease with respect to the Hotel, which was amended on each of April 18, 2018 and

19    July 28, 2018 (collectively, the "Master Lease").  Pursuant to the Master Lease, the Debtor,

20    among other things, pledged all of its personal property assets to PPC as security for its rent

21    (and other) obligations to said landlord thereunder (*See* Master Lease, Paragraph 19.8).  The

22    personal property assets pledged as security for the Master Lease expressly include, but are

23    not limited to, the disputed FF&E that is the subject of and is to be transferred to CB1

24    pursuant to the Settlement Agreement.  The Master Lease also expressly contemplates,

25    approves and permits PPC to pledge its security interest in the Debtor's assets to CB1's

26    predecessor in connection with the Loan. (*See* Master Lease, Paragraph 20.1). A true and

27    correct copy of the Master Lease is attached to the Gonzalez Decl. as Exhibit 2 and are

28    incorporated herein by reference.

8

1    In July of 2018, CB1's predecessor made a loan to PPC in the principal amount of $42

2  million dollars (the "Loan").  In conjunction with the Loan, PPC executed a Deed of Trust in

3  favor of CB1's predecessor and granted CB1's predecessor a first priority security interest and

4  lien upon the Property, as well as a full and complete assignment of all rents and leases

5  arising from the Property, expressly including the Master Lease.  The Debtor's Schedules

6  estimate that PPC's claim in this case was $9,000,000, which CB1 asserts was expressly

7  secured by the FF&E at issue in the Settlement Agreement, and was one of the assets

8  specifically foreclosed upon (and now owned by CB1) pursuant to its "unified" foreclosure

9  sale that resulted in the recording of the Trustee's Deed that expressly transfers ownership

10  and title to, among other things, both the Property and PPC's secured rent claim to CB1.

11  True and correct copies of the recorded Deed of Trust and the Trustee's Deed (which caused

12  CB1 to become the sole owner of the Property and PPC's secured $9,000,000 rent claim), are

13  attached to the Gonzalez Decl. as Exhibits 3 and 4 and are incorporated herein by reference.

14    As noted above, CB1 asserts that the FF&E at issue in the Settlement Agreement is

15  already owned by CB1 pursuant to its "unified" foreclosure sale.  CB1 further asserts that if

16  its claim of ownership is technically "premature" and the FF&E is "only" pledged as

17  collateral for CB1's newly acquired $9 million rent claim, the collateral has no incremental

18  value to the Trustee and the transfer of the FF&E to CB1 (as contemplated by the Settlement

19  Agreement) followed by a release of CB1's interest in the landlord's $9 million rent claim (as

20  is, where is) is a very positive result to the estate and supports approval of the Agreement.

21    **3.    Complexity of Issues And Proceeding With Administration Would**

22       **Result In Additional Fees And Expenses For The Estate And Would Be**

23       **Inconvenient**

24    In lieu of settlement, the estate would have to get involved in the State Court Action

25  and/or otherwise pursue claims against CB1 through litigation, which could be costly and time

26  consuming, with no guarantee of a better result.  Accordingly, this element supports approval of

27  the Agreement.

28

1    **4.    Interest of Creditors**

2    The Agreement provides the estate with the certain sum of $150,000 without having to

3    engage in litigation with CB1 or in efforts to administer, maintain, secure and insure assets with

4    significantly disputed ownership.    Accordingly, this element supports approval of the

5    Agreement.

6    For these reasons, the Trustee has exercised sound business judgment in entering into the

7    Agreement.  The Trustee respectfully submits that the Agreement is in the best interest of the

8    estate.

9    **III.**

10    **THE TRUSTEE IS ENTITLED TO TURNOVER OF THE PROPERTY**

11    Section 542 of the Bankruptcy Code provides for the turnover of property of the estate

12    as follows:

13    (a) [A]n entity, other than a custodian, in possession, custody, or control,
during the case, of property that the trustee may use, sell or lease under

14    section 363 of this title . . . shall deliver to the trustee, and account for,
such property or the value of such property, unless such property is of

15    inconsequential value or benefit to the estate.

16    11 U.S.C. § 542(a).

17    Here, the Debtor is asserting control of the Hotel by locking up the premises and

18    posting a security guard.  It also has possession of the keys, keycards, key fobs, access codes,

19    passwords, service contracts, full security system access (including passwords), and a

20    complete vendor list with contact information related to the Hotel, which the Trustee has to

21    tender to CB1 under the Agreement.  Accordingly, the Debtor is _required_ to deliver such

22    items to the Trustee pursuant to section 542 of the Bankruptcy Code.

23    **IV.**

24    **CONCLUSION**

25    Based upon the foregoing, the Trustee respectfully that the Court enter an order:

26    1.    Granting the Motion;

27    2.    Approving the Agreement;

28

3.    Authorizing and directing the Trustee and CB1 to take any other steps necessary to effectuate the Agreement;

4.    Compelling the Debtor to turn over the physical possession of the Hotel and all of the keys, keycards, key fobs, access codes, passwords, service contracts, full security system access (including passwords), and a complete vendor list with contact information access codes, and service contracts related to the Hotel to the Trustee no later than five days after the order granting this Motion is entered; and

5.    Providing such other and further relief as is just and proper.

DATED: November 23, 2021    LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.


By:*/s/ Timothy J. Yoo*
TIMOTHY J. YOO
CARMELA T. PAGAY
Attorneys for Rosendo Gonzalez, Chapter 7 Trustee

## <u>DECLARATION OF ROSENDO GONZALEZ</u>

I, Rosendo Gonzalez, declare as follows:

1.      I am the chapter 7 trustee for the bankruptcy estate of Park Place Master Tenant, LLC.  This Declaration is made in support of the foregoing "Chapter 7 Trustee's Motion to Approve Compromise of Controversy" (the "Motion").  I have personal knowledge of the matters set forth herein and if called as a witness could and would testify competently thereto.  Unless the context indicates otherwise, capitalized terms herein shall have the meaning as defined in the Motion.

2.      By the attached motion, I am requesting authority to enter into and consummate the Settlement Agreement and General Release (the "Agreement") that I entered into with CB1 concerning our disputes.  A true and correct copy of the Agreement is attached as <u>Exhibit 1</u> and is incorporated herein by reference.

3.      On September 23, 2021, the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code [Doc 1].  Listed in the Debtor's Schedules of Assets and Liabilities (the "Schedules") [Doc 23] are the FF&E.  The Debtor has also listed the lease of the Hotel on its Schedules.

4.      On November 8, 2021, the Court entered an order converting the Debtor's bankruptcy case to chapter 7 [Doc 36].  On November 9, 2021, a Notice of Appointment of Chapter 7 Trustee was filed with the Court, reflecting my appointment by the United States Trustee as the chapter 7 trustee of the Debtor's bankruptcy estate [Doc 37].

5.      Immediately following my appointment, I inspected the Hotel on November 12, 2021.  I noted that the Debtor had posted a security guard.

6.      I understand CB1 foreclosed on the Property on August 24, 2021 and that a Trustee's Deed Upon Sale was recorded on August 30, 2021 (the "Trustee's Deed").  True and correct copies of the recorded Deed of Trust and the Trustee's Deed are attached as <u>Exhibits 3 and 4</u> and are incorporated herein by reference.

7.      On October 20, 2021, the Court entered its order granting relief from stay to CB1 [Doc 31] pursuant to, among other things, section 362(d)(4) to enforce its remedies to foreclose

1    upon and obtain possession of the Property.

2        8.    Following up on the foreclosure and to evict the occupants of the Property, CB1

3    commenced the State Court Action.  I am informed that in response to the complaint, the Debtor

4    filed a Demurrer.  With my consent, the parties to the State Court Action continued the hearing

5    to January 5, 2021, to provide sufficient time for this Motion to be considered.

6        9.    CB1 asserts that as part of the foreclosure on the Property, it concurrently

7    foreclosed on the Debtor's personal property, including the FF&E.  CB1's detailed assertions

8    are stated in the Motion.  While I dispute this assertion, due to the Debtor's pledge of the FF&E

9    in the Master Lease to PPC and CB1's rights against PPC, it is only a matter of time before the

10   State Court finds in favor of CB1's rights to the FF&E.  True and correct copies of the Master

11   Lease and the amendments are attached as <u>Exhibit 2</u> and are incorporated herein by reference.

12       10.   I believe that the terms of the Agreement are fair and equitable and well within

13   the range of reasonableness.  In lieu of settlement, the estate would have to get involved in the

14   State Court Action and/or otherwise pursue claims against CB1 through litigation, which could

15   be costly and time consuming, with no guarantee of a better result.  It is also possible that the

16   costs associated with retaining possession of the Hotel while litigating would be prohibitive, and

17   force me to consider simply abandoning all the property, resulting in virtually no distribution to

18   unsecured creditors.   Here, the Agreement provides the estate with a certain sum of funds that

19   will be used to pay allowed creditor claims and administrative expenses. It also likely eliminates

20   the Debtor's former landlord's estimated $9 million rent claim - which should increase the pro

21   rata share of the settlement proceeds to the allowed unsecured claimants.  Therefore, I believe

22   that I have exercised sound business judgment in entering into the Agreement at this time and

23   respectfully request that it be approved by this Court.

24       I declare under penalty of perjury under the laws of the United States of America that the

25   foregoing is true and correct.  Executed on this 23rd day of November, 2021, at Los Angeles,

26   California.

27   _____
         ROSENDO GONZALEZ

28

**EXHIBIT "1"**

## SETTLEMENT AGREEMENT AND GENERAL RELEASES

This Settlement Agreement and General Releases (the "**Agreement**") is entered into as of November 22, 2021, by and between Rosendo Gonzalez, the duly appointed Chapter 7 Trustee (the "**Trustee**") for the bankruptcy estate (the "**Estate**") of Park Place Master Tenant, LLC (the "**Debtor**"), on the one hand, and Colorado Boulevard-10212883, LLC ("**CB1**"), on the other hand. The Trustee and CB1 are referred to collectively as the "**Parties**" and each individually as a "**Party**." This Agreement is based upon the following facts, which each of the Parties confirms is entirely true and accurate in every material respect:

## <u>RECITALS</u>

A.     On September 23, 2021 (the "**Petition Date**"), the Debtor commenced a Chapter 11 bankruptcy case by filing a voluntary petition for relief under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), thereby commencing the bankruptcy case number 2:21-bk-17445-WB.

B.     On November 8, 2021, the Bankruptcy Court converted the Debtor's case to Chapter 7, and a Notice of Appointment of Chapter 7 Trustee was filed with the Bankruptcy Court, reflecting the United States Trustee's appointment of Rosendo Gonzalez as the Chapter 7 Trustee in the Debtor's case.

C.     Listed in the Debtor's Schedules of Assets and Liabilities (the "**Schedules**") are certain furniture, fixtures, personal property, equipment and other movable items located on site at the Hotel Constance, a 161-room, full service hotel with restaurants, bar/lounge, pool and conference rooms. The foregoing furniture, fixtures, personal property, equipment and other movable items located at Hotel Constance (which is located at 908-928 East Colorado Boulevard, Pasadena, California and hereinafter referred to the "**Hotel**") and anywhere else owned by the Debtor are hereinafter referred to as the "**FF&E**."

D.     On October 20, 2021, the Bankruptcy Court entered its Order granting relief from stay to CB1 [Doc 31] to enforce its remedies to foreclose upon and obtain possession of the commercial real property located at 880 – 940 East Colorado Boulevard, Pasadena, California (the "**Property**"). CB1 foreclosed on the Property on August 24, 2021. The Trustee's Deed Upon Sale, which names CB1 as the grantee, was recorded with the Los Angeles County Recorder's Office on August 30, 2021, as Inst. No. 20211326335.

E.     Following up on the foreclosure and to evict the occupants of the Property, CB1 filed a complaint for unlawful detainer with Superior Court of California, County of Los Angeles (the "**State Court Action**") on September 16, 2021, thereby commencing case number 21PDUD00856. In response to the complaint, the Debtor filed a demurrer, which is scheduled to be heard on November 22, 2021 (the "**Demurrer**").

F.     CB1 asserts that as part of the foreclosure on the Property, it concurrently foreclosed on all of the Debtor's fixtures, furniture, personal property, equipment and other

1

movable items, including the FF&E.  The Trustee disputes this assertion.

G.    The Parties desire to settle their disputes, without any admission of liability, regarding the State Court Action, the validity of the foregoing foreclosures, ownership of the FF&E, and the extent of the claims and liens asserted by CB1 against the Debtor and the Estate.

NOW, THEREFORE, in consideration of the recitals, covenants and conditions in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## <u>AGREEMENT</u>

1.    <u>Incorporation of Recitals</u>.  The recitals set forth above are incorporated herein by reference and is made part of this Settlement Agreement.

2.    <u>Payment</u>. CB1 shall pay the Trustee the sum of One Hundred Fifty Thousand Dollars ($150,000) (the "**Settlement Payment**") within (a) 15 calendar days following the entry of an order approving this Agreement or (b) the Trustee's compliance with Paragraph 4 below, whichever occurs later (the "**Settlement Payment Deadline**").  The Settlement Payment shall be made by cashier's check payable to "Rosendo Gonzalez, Chapter 7 Trustee" and delivered to the following address:

> Timothy J. Yoo
> Levene, Neale, Bender, Yoo & Golubchik L.L.P.
> 2818 La Cienega Avenue
> Los Angeles, California 90034

3.    <u>State Court Action</u>. The Trustee shall withdraw the Demurrer and stipulate to entry of judgment in favor of CB1 in the State Court Action within two court days following the entry of an order approving this Agreement.  Until this Agreement is approved, the Parties shall cooperate to postpone any hearing dates and extend related briefing schedules in the State Court Action so as to preserve each party's rights.  Upon request by CB1, the Trustee shall also sign a Stipulation in the State Court Action permitting the immediate appointment of a Receiver to facilitate CB1's efforts to recover possession of the Property.

4.    <u>Tendering Possession</u>.  Within two court days after the entry of an order approving this Agreement, the Trustee shall deliver to CB1 or any designated agent of CB1 (a) complete and actual physical possession of the Hotel, and (b) all interior or exterior keys, keycards, key fobs, access codes, passwords, service contracts, full security system access (including passwords) a complete vendor list with contact information (the "**Turnover Items**") then in his possession or control; provided, however, if the Trustee is unable to deliver to CB1 or its designated agent complete and actual possession of the Hotel and Turnover Items within the prescribed time, then the Trustee shall comply with the best efforts provisions provided in Paragraph 11 below.

5.    <u>Transfer of FF&E</u>.  Contemporaneously with the receipt of the Settlement Payment, the Trustee shall deliver a bill of sale of all of the Estate's rights, title and interest in the FF&E on an "as is" basis to CB1 in a form reasonably acceptable to CB1.

6.    <u>Master Lease</u>.  Subject to the receipt of the Settlement Payment, the Trustee hereby waives all of the Debtor and Estate's rights in that certain Lease between Park Place Commercial, L.P., as landlord, and the Debtor dated as of July 28, 2014, as amended (the "**Master Lease**").  If requested by CB1, the Trustee shall assign all of the Debtor's and the Estate's rights in the Master Lease to CB1 or its assignee.

7.    <u>Trustee's Release of CB1</u>.  Except as set forth otherwise herein, and in consideration of the mutual covenants, conditions, and promises set forth herein, upon the Trustee's receipt of the Settlement Payment as set forth in Section 2, above, the Trustee fully, finally, and forever releases, relieves, and discharges CB1 and its past and present affiliates, associated entities, parent companies, companies with shared ownership, subsidiaries, related companies, executors, administrators, predecessors (including, but not limited to, the Original Lender and the Loan Purchasers as those parties are identified in the complaint for unlawful detainer in the State Court Action), successors, assigns, agents, owners, shareholders, investors, members, representatives, managers, directors, officers, companies, partners, insurers, controlling persons, advisors, employees, attorneys, accountants, and servicers of the Loan identified in the complaint for unlawful detainer in the State Court Action (including, but not limited to, KeyBank National Association and Situs Asset Management LLC) (collectively the "CB1 Releasees"), of and from any and all actions, claims, causes of action, allegations, suits, debts, demands, liabilities, damages, losses, sums of money, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, covenants, agreements, contracts and promises, of any kind or nature, in law or in equity, which either may have or have had, whether or not they have been subject to dispute and whether or not known or unknown, suspected or unsuspected, asserted or unasserted, by reason of any matter, or cause whatsoever, arising out of any known or unknown fact, condition, or incident occurring prior to the date of the Trustee's receipt of the Settlement Payment, *provided, however,* that this release **shall not** extend to any action or claim arising out of the enforcement of this Agreement.  The Trustee makes the foregoing releases in his capacity as the Trustee and the Estate.

8.    <u>CB1's Release of the Trustee</u>.  Except as set forth otherwise herein, and in consideration of the mutual covenants, conditions, and promises set forth herein, upon the Trustee's receipt of the Settlement Payment as set forth in Section 2, above, CB1 fully, finally, and forever releases, relieves, and discharges the Trustee, the Estate, and each of their advisors, employees, attorneys, and accountants (collectively the "Trustee Releasees"), of and from any and all actions, claims, causes of action, allegations, suits, debts, demands, liabilities, damages, losses, sums of money, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, covenants, agreements, contracts and promises, of any kind or nature, in law or in equity, which either may have or have had, whether or not they have been subject to dispute and whether or not known or unknown, suspected or unsuspected, asserted or unasserted, by reason of any matter, or cause whatsoever, arising out of any known or unknown fact, condition, or incident occurring prior to the date of the Trustee's receipt of the Settlement Payment, *provided, however*, that this release **shall not** extend to any action or claim arising out of the enforcement of this Agreement.  CB1 makes the foregoing releases on behalf of itself and each of its past and present affiliates, associated entities, parent companies, companies with shared ownership, subsidiaries, related companies, executors, administrators, predecessors, successors, assigns, agents, owners, shareholders, investors, members, representatives, managers, directors, officers, companies, partners, insurers, controlling persons, advisors, employees, attorneys, and

accountants.

9.    <u>Release of Unknown Claims</u>.  The Parties understand and agree that the released claims include not only claims presently known to them, but also include all unknown or unanticipated claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character that would otherwise come within the scope of the released claims described in Section 7. The Parties understand that they may hereafter discover facts different from what they now believe to be true, which if known, could have materially affected this Agreement, but they nevertheless waive any claims or rights based on different or additional facts. The Parties knowingly and voluntarily waive any and all rights or benefits that they may now have, or in the future may have, under the terms of California Civil Code section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

10.    <u>Bankruptcy Court Approval</u>.  Promptly after the execution of this Agreement by both Parties, the Trustee shall file a motion, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, seeking the entry of the Order approving, and authorizing the Trustee to enter into, the Agreement.  If the Bankruptcy Court does not approve this Agreement then this Agreement shall be deemed null and void and of no force and effect, and the Parties shall retain all rights, claims and/or defenses that they may have against each other.

11.    <u>Further Assurances</u>.  The Parties agree to perform such acts and to prepare, execute, deliver, file, and record any documents or agreements reasonably required to perform under and satisfy the conditions in this Agreement, or to give full force and effect to this Agreement.  The Trustee acknowledges and agrees that his obligations under this Agreement include his obligation to use his ongoing best efforts to obtain from the Debtor and to turn over to CB1 both complete and actual physical possession of the Hotel and all of the Turnover Items. Should the Trustee, in consultation with his counsel, believe that such best efforts will require significant additional attorneys' fees and expenses on his part to obtain full possession of the Hotel and all of the Turnover Items to CB1's satisfaction, then the Trustee shall provide CB1 with a written budget for the estimated attorneys' fees and expenses to be incurred by the Trustee in connection with such efforts, and shall undertake them if CB1 subsequently agrees to reimburse the Trustee for the actual and reasonable attorneys' fees and expenses he incurs up to the amounts included in the written budget provided to CB1.

12.    <u>Complete Agreement</u>.  This Agreement supersedes any and all other agreements, understandings, negotiations or discussions, either oral or in writing, express or implied between the Parties concerning settlement.  The Parties to this Agreement each acknowledge that no representations, inducements, promises, agreements or warranties, oral or otherwise, have been made by them or any of them, or anyone acting on their behalf which are not embodied in this Agreement, that they have not executed this Agreement in reliance on a representation,

inducement, promise, agreement or warranty, and that no representation, inducement, promise, agreement or warranty not contained in this Agreement including any purported supplements, modifications, waivers or terminations of this Agreement shall be valid or binding, unless executed in writing by all of the Parties to this Agreement.

13.    <u>Amendment</u>.  No modification or amendment of any term or provision of this Agreement shall be valid unless such modification or amendment is in writing and has been signed by both Parties.

14.    <u>Terms Read and Understood</u>.  Each of the Parties hereby certifies that it (i) has read the entire Agreement, (ii) has conferred with legal counsel pertaining to this Agreement, (iii) fully understands all of the terms of this Agreement, and (iv) acknowledges and represents that he enters into this Agreement and all other contemplated documents of its own free will and not due to any oral representation, commitment, promise, pressure, or duress from any other party.

15.    <u>Successors</u>.  Each covenant in this Agreement shall inure to the benefit of and be binding upon the Parties and their respective heirs, successors, assigns, agents, representatives (past and present), and legal and personal representatives.

16.    <u>Construction</u>.  As used in this Agreement, the masculine and feminine gender, in the singular or plural, shall be deemed to include the others whenever the text so requires.  The term "including" in any form shall not be limiting and shall be construed to mean "including, but not limited to."  Captions and paragraph headings are inserted solely for convenience and shall not be deemed to restrict or limit the meaning of text.  The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against either of the Parties.

17.    <u>Interpretation</u>.  This Agreement and any ambiguities or uncertainties herein, shall be equally and fairly interpreted and construed without reference to the identity of the Party or Parties preparing, drafting or proposing the provisions hereof or the documents referred to herein, on the express understanding and agreement that the Parties participated equally in the negotiation and preparation of the Agreement, or have had equal opportunity to do so.  Accordingly, the Parties hereby waive the benefit of California Civil Code Section 1654 and any successor or amended statute, providing that in cases of uncertainty, language of a contract should be interpreted most strongly against the Party who caused the uncertainty to exist.  Each of the Parties has cooperated in the drafting and preparation of the Agreement.

18.    <u>Governing Law; Enforceability</u>.  This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of California, without giving effect to the principles of conflicts of law thereof, and applicable bankruptcy law.  Each of the Parties agrees that as long as the Debtor's bankruptcy case remains open, any dispute, claim or controversy arising out of or relating to this Agreement shall be heard in the Bankruptcy Court and that the Bankruptcy Court has exclusive jurisdiction thereof.  If the Debtor's bankruptcy case is closed, then any court of competent jurisdiction may resolve any dispute, claim or controversy arising out of or relating to this Agreement.

19.    <u>Severability</u>.  If any provision of this Agreement is determined to be invalid, void,

or illegal, such provision shall be construed and amended in a manner which would permit its enforcement, but in no event shall such provision affect, impair, or invalidate any other provision of this Agreement.

20. <u>Attorneys' Fees and Costs</u>. The Parties shall each bear their own attorneys' fees and costs related to the negotiation of this Agreement and the preparation and hearing of the motion to approve this Agreement set forth in Section 10, above.

21. <u>No Admission of Liability</u>. Nothing contained herein shall be deemed to be an admission of liability or wrongdoing by any Party hereto.

22. <u>No Waiver</u>. Failure to insist on compliance with any term, covenant or condition contained in this Agreement shall not be deemed a waiver of that term, covenant or condition, nor should any waiver or relinquishment of any right or power contained in this Agreement, at any one time or more times, be deemed a waiver or relinquishment of any right or power at any other time or times.

23. <u>Counterparts</u>. This Agreement may be executed in separate counterparts which, together shall constitute one and the same fully executed Agreement. Signed counterparts transmitted by facsimile or email shall be deemed originals.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered, all as of the date and year first listed above.

Rosendo Gonzalez, Chapter 7 Trustee of the
Bankruptcy Estate of Park Place Master Tenant, LLC

COLORADO BOULEVARD-10212883, LLC
A Delaware Limited Liability Company

By Tom J Floyd, VP of KEYBANK N.A.
Its MANAGER

# EXHIBIT "2"

**LEASE**

**Between**

**PARK PLACE COMMERCIAL, L.P.,**
**a California limited partnership,**

**Landlord,**

**and**

**PARK PLACE MASTER TENANT, LLC,**
**a California limited liability company,**

**Tenant.**

**Dated:  July 28,  2014**

# LEASE

**THIS LEASE AGREEMENT** (the "**Lease**") is made and entered into as of July 28, 2014, by and between **PARK PLACE COMMERCIAL, L.P.**, a California limited partnership (hereinafter referred to as "**Landlord**"), and **PARK PLACE MASTER TENANT, LLC**, a California limited liability company (hereinafter referred to as "**Tenant**").

## RECITALS

1.      Landlord currently is the owner of the land, legally described in **Exhibit A-1** attached hereto and made a part hereof, and the improvements located thereon commonly known as the Hotel Constance Building situated in Pasadena, California, and shortly to be operated as a hotel, described in **Exhibit A-2** attached hereto and made a part hereof, plus additional commercial space, together with all improvements and personal property now located thereon or to be located thereon during the Term (as hereinafter defined), (the "**Building**"), together with all appurtenances, easements, rights of way and other rights belonging to or in any way pertaining to the said premises (such real estate, improvements, personal property, appurtenances, easements, rights of way and other rights hereinafter referred to as the "**Premises**").

2.      The Building is currently subject to various contracts relating to its operation, including, without limitation, as described in **Exhibit C** hereto, (the "**Operating Contracts**"). The Operating Contracts have been previously delivered to Tenant by Landlord and all have been or are being assigned to and assumed by Tenant.

3.      Landlord intends to rehabilitate the Building in a manner that qualifies for the historic rehabilitation tax credit allowed for qualified rehabilitation expenditures incurred in connection with the "certified rehabilitation" of a "certified historic structure" (the "**Historic Tax Credit**") pursuant to Section 47 of the Internal Revenue Code of 1986, as amended (the "**Code**").

4.      Tenant desires to lease the rehabilitated Building (the "**Leased Property**"), from Landlord pursuant to the terms of this Lease, to sublease portions of the Leased Property pursuant to subleases with commercial tenants (such leases, are referred to herein as the "**Commercial Leases**") and to hold, maintain, operate, and eventually sell or otherwise dispose of its interest in the Leased Property hereunder (the "**Leasehold Interest**").

5.      Concurrently with the execution of this Lease, the parties are executing an agreement relating to the pass-through of the Historic Tax Credit arising from the rehabilitation of the Building to Tenant by Landlord (the "**HTC Pass-Through Agreement**").

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the following meanings:

"Additional Rent" shall have the meaning set forth in Section 4.3.

"Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"Affiliate" means, with respect to a specified Person, (i) any Person directly or indirectly controlling, controlled by or under common control with the Person specified, (ii) any Person owning or controlling 10% or more of the outstanding voting securities or beneficial interests of the Person specified, (iii) any officer, director, partner, trustee or member of the immediate family of the Person specified, (iv) if the Person specified is an officer, director, general partner or trustee, any corporation, partnership or trust for which that Person acts in that capacity or (v) any Person who is an officer, director, general partner, trustee or holder of 10% or more of outstanding voting securities or beneficial interests of any Person described in clauses (i) through (iv). The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Base Rent" shall have the meaning set forth in Section 4.1.

"Building" shall have the meaning set forth in the Recitals.

"Building Systems Equipment" shall have the meaning set forth in Section 8.4.

"CERCLA" shall have the meaning set forth in Section 28.1(b).

"Claim" shall have the meaning set forth in Section 28.1(a).

"Code" shall have the meaning set forth in the Recitals.

"Collateral" shall have the meaning set forth in Section 19.9.

"Commencement Date" shall have the meaning set forth in Section 3.1.

"Commercial Leases" shall have the meaning set forth in the Recitals.

"Covenants" shall have the meaning set forth in Section 8.3(b).

"Default" shall have the meaning set forth in Section 19.1.

"Designated Prime Rate" means the prime rate of interest published from time to time in the Wall Street Journal or other source as the parties may agree, adjusted as such prime rate adjusts.

"Election" shall have the meaning set forth in Section 2(a) of the HTC Pass Through Agreement.

"Entity" means any general partnership, limited partnership, corporation, joint venture, trust, limited liability company, business trust, cooperative or association.

"Environmental Laws" shall have the meaning set forth in Section 28.1(b).

"Environmental Reports" means the following environmental reports: (i) that certain Phase I Environmental Site Assessment Report performed at 908-940 East Colorado Blvd., Pasadena, CA prepared for East West Bank by Andersen Environmental dated January 4, 2011, (ii) that certain Phase II Environmental Site Assessment Report performed at 908-940 East Colorado Blvd., Pasadena, CA prepared for East West Bank by Andersen Environmental dated March 2, 2011, and (iii) that certain Phase I Environmental Site Assessment Report performed at 940 East Colorado Blvd., Pasadena, CA, prepared for Law Offices of Philip Kim, APC by Anderson Environmental dated June 18, 2014, with reliance letter dated July 11, 2014.

"Event of Bankruptcy" or "Bankruptcy" means, as to a specified Person:

(i)        the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and such decree or order is not dismissed within ninety (90) consecutive days; or

(ii)       the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the taking of action by the Person in furtherance of any of the foregoing.

"Existing Equipment" shall have the meaning set forth in Section 8.4.

"Expiration Date" shall have the meaning set forth in Section 3.1.

"FF&E" shall have the meaning set forth in Section 8.6.

"FIFRA" shall have the meaning set forth in Section 28.1(b).

"Force Majeure" means any delay or failure in performance caused by acts beyond a Person's reasonable control, including, without limitation, acts of God, war, vandalism, sabotage, accidents, fires, floods, strikes, labor disputes, mechanical breakdown, shortages or delays in obtaining suitable parts or equipment, material, labor, or transportation, acts of subcontractors, interruption of utility services, acts of any Governmental Authority, or any similar cause.

"Governmental Authority" means any state, federal, local, municipal or other governmental authority, agency, or licensing authority of any kind having jurisdiction over the particular matter to which reference is being made, including any federal, state or local taxing authority or so-called "business improvement district" or similar Entity or organization.

"Hazardous Materials" shall have the meaning set forth in Section 28.1(c).

"Historic Tax Credit" shall have the meaning set forth in the Recitals.

"HTC Pass-Through Agreement" shall have the meaning set forth in the Recitals.

"Hotel Management Agreement" means the Hotel Management Agreement dated as of September 12, 2012, by and between Landlord and Dusit Thani Public Company Limited ("Dusit Thani"), as may be amended from time to time, and as assigned by Dusit Thani to the Hotel Manager pursuant to that certain Assignment and Assumption of Hotel Management Agreement dated December 12, 2012, as further assigned by Landlord to Tenant pursuant to that certain Assignment and Assumption Agreement of Hotel Management Agreement dated as of July 9, 2014.

"Hotel Manager" means Dusit USA Management Company Inc., and its successors.

"Impositions" shall have the meaning set forth in Section 5.2.

"Landlord" shall have the meaning set forth in the heading of this Lease and shall include any successor thereto.

"Landlord's Work" shall have the meaning set forth in Section 8.1(a).

"Leased Property" shall have the meaning set forth in the Recitals.

"Leasehold Interest" shall have the meaning set forth in the Recitals.

"Lease Termination Notice" shall have the meaning set forth in Section 3.3.

"Lease Termination Payment" shall have the meaning set forth in Section 3.3(a).

"Lease Year" shall have the meaning set forth in Section 3.2.

"Manage" shall have the meaning set forth in Section 28.1(d).

"Monthly Base Rent" shall have the meaning set forth in Section 4.1.

"Mortgage" shall have the meaning set forth in Section 20.1(a).

"Operating Agreement of Tenant" means the Operating Agreement of Tenant dated as of the date hereof, as amended.

"Operating Contracts" shall have the meaning set forth in the Recitals.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits; and, unless the context otherwise requires, the singular shall include the plural, and the masculine gender shall include the feminine and the neuter and vice versa.

"Possession Date" shall have the meaning set forth in Section 3.1.

"Premises" shall have the meaning set forth in the Recitals.

"QRE" means "qualified rehabilitation expenditures" as such term is defined in Section 47(c)(2) of the Code.

"RCRA" shall have the meaning set forth in Section 28.1(b).

"Release" shall have the meaning set forth in Section 28.1(e).

"Rent" shall have the meaning set forth in Section 4.2.

"Response" shall have the meaning set forth in Section 28.1(f).

"Tenant's Investor Member" means East West Bancorp, Inc., a Delaware corporation, its successors and assigns.

"Tenant's Share of Impositions" shall have the meaning set forth in Section 5.1.

"Term" shall have the meaning set forth in Section 3.1.

"TSCA" shall have the meaning set forth in Section 28.1(b).

## ARTICLE 2
## GRANT OF LEASE; ASSIGNMENTS

### Section 2.1    Lease

Landlord hereby leases and demises to Tenant, and Tenant hereby leases from Landlord, subject to and with the benefit of the terms, covenants, conditions and provisions set forth herein, the Leased Property.

### Section 2.2    Assignment of Existing Leases

Landlord represents to Tenant that there are no existing lease agreements entered into by Landlord with respect to the Leased Property.

### Section 2.3    Assignment of Operating Contracts

(a)     Landlord represents to Tenant that prior to the date hereof Landlord entered into a technical consultancy agreement related to the planning, design and furnishing of the Leased Property.  The only Operating Agreements related to the Leased Property are reflected on Exhibit C.

(b)     Landlord hereby assigns to Tenant all its right, title and interest in and to each of such Operating Contracts and Tenant hereby assumes all of the obligations of Landlord under each of those Operating Contracts, in each case effective as of the Possession Date (as defined below).  Landlord hereby represents to Tenant that no defaults exist under any of such Operating Contracts and that all consents and notices necessary for the assignment and assumption described in this paragraph have been obtained.

(c)     Landlord covenants and agrees to indemnify, save and hold harmless Tenant from and against any and all Adverse Consequences arising out of or related to Landlord's failure to perform any of its obligations under any of the Operating Contracts prior to the Possession Date.

(d)     Tenant covenants and agrees to indemnify, save and hold harmless Landlord from and against any and all Adverse Consequences arising out of or related to Tenant's failure to perform any of its obligations under any of the Operating Contracts from and after the Possession Date.

(e)     Landlord and Tenant hereby agree that upon termination of the Lease as provided hereunder or upon expiration of the Term, all assignments of Operating Contracts then in effect shall automatically terminate.

**ARTICLE 3**
**TERM; POSSESSION**

**Section 3.1     Term**

The term of this Lease (hereinafter referred to as the "**Term**") shall commence upon the completion of Landlord's Work, as set forth in Section 8.1 hereof, with Landlord providing written notice to Tenant to definitively establish the date on which the term commences, (hereinafter, as the same may be adjusted as hereinafter provided, referred to as the "**Commencement Date**") and end on the later of (i) December 31, 2046 or (ii) the 32nd anniversary of the Possession Date as defined below (hereinafter, as the same may be adjusted as hereinafter provided, referred to as the "**Expiration Date**"), unless sooner terminated as provided herein.  Tenant shall be entitled to possession of the Leased Property upon the completion of Landlord's Work, as set forth in Section 8.1 hereof (but not later than immediately prior to the Credit Commencement Date (as defined in the Operating Agreement of Tenant) with respect to any QRE's) or such earlier date agreed to by the parties (the "**Possession Date**").  The making of the Election with respect to a particular year shall conclusively evidence the occurrence of the Possession Date with respect to QRE's claimed in such tax year.  Upon request of the other, Landlord and Tenant each agrees to provide written confirmation of the date constituting the Possession Date.

**Section 3.2     Lease Year Defined**

As used in this Lease, the term "**Lease Year**" shall mean (i) if the Commencement Date is the first day of a calendar month, the twelve (12) month period commencing on the Commencement Date or (ii) if the Commencement Date is not the first day of a calendar month, the period commencing on the Commencement Date and ending on the last day of the twelfth (12th) full calendar month of the Term, and, in either case, each succeeding twelve (12) month period thereafter which falls in whole or in part during the Term.

### Section 3.3    Landlord's Termination Option

(a)    Notwithstanding the aforesaid Term, in the event of a sale or other direct or indirect transfer of all of Landlord's interest in the Leased Property to an unrelated buyer on arms' length terms, but in no other case, and except as set forth in the next paragraph, Landlord shall have the right to terminate this Lease upon the giving of notice thereof in writing to Tenant ("**Lease Termination Notice**").  The termination of the Lease shall be effective sixty (60) days from and after the giving of the Lease Termination Notice provided that Landlord shall have made to Tenant a payment (the "**Lease Termination Payment**") equal to thirty percent (30%) of the amount by which the proceeds received by Landlord from the sale or other transfer of its interest in the Leased Property (net of any transactional or closing costs paid to third parties in connection with such sale or other transfer) exceeds Forty-Eight Million Dollars ($48,000,000).  In the event that the consideration to be received by Landlord in connection with such sale or other transfer is to be paid over time, the Lease Termination Payment shall be paid in installments (and evidenced by a note setting forth Landlord's obligations in connection therewith) proportionate to such payments as are scheduled to be received from time to time.

(b)    Notwithstanding the preceding paragraph, the Property may not be sold or transferred and the Lease may not be terminated prior to the fifth anniversary of the date on which the last "qualified rehabilitation expenditures" as such term is defined in Section 47(c)(3) of the Code ("QRE") with respect to the Building are first placed in service without the prior written consent of Tenant signed by all the partners or members of Tenant.  In addition, the Lease may not be terminated during the period in which the Tenant's Investor Member remains as a member of Tenant.

### ARTICLE 4
### BASE RENT

### Section 4.1    Base Rent

(a)    Subject to and in accordance with Section 4.2, Tenant shall pay an annual base rent (hereinafter referred to as "**Base Rent**") to Landlord for the Leased Property per Lease Year, in the amounts set forth below, payable in equal monthly installments (hereinafter referred to as "**Monthly Base Rent**"), in the amounts set forth below, (pro rated for any month that is not full a month) payable in advance on the first day of each month:

| YEAR | BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| 2014 | $50,000 | $8,333.34 |

| YEAR | BASE RENT | MONTHLY BASE RENT |
|------|-----------|-------------------|
| 2015 | $1,613,137 | $268,856.16 |
| 2016 | $3,942,466 | $328,538.83 |
| 2017 | $4,993,456 | $416,121.33 |
| 2018 | $5,143,260 | $428,605 |
| 2019 | $5,297,558 | $441,463.16 |
| 2020 | $5,456,485 | $454,707.08 |
| 2021 | $5,620,179 | $468,348.25 |
| 2022 | $5,788,784 | $482,398.66 |
| 2023 | $5,904,560 | $492,046.66 |
| 2024 | $5,963,606 | $496,967.16 |
| 2025 | $6,112,696 | $509,391.33 |
| 2026 | $6,265,513 | $522,126.08 |
| 2027 | $6,422,151 | $535,179.25 |
| 2028 | $6,582,705 | $548,558.75 |
| 2029 | $6,747,273 | $562,272.75 |
| 2030 | $6,915,954 | $576,329.50 |
| 2031 | $7,088,853 | $590,737.75 |
| 2032 | $7,266,075 | $605,506.25 |
| 2033 | $7,447,726 | $620,643.83 |
| 2034 | $7,633,920 | $636,160.00 |
| 2035 | $7,824,768 | $652,064.00 |
| 2036 | $8,020,387 | $668,365.58 |
| 2037 | $8,220,896 | $685,074.66 |
| 2038 | $8,426,419 | $702,201.58 |
| 2039 | $8,637,079 | $719,756.58 |

| YEAR | BASE RENT | MONTHLY BASE RENT |
|------|-----------|-------------------|
| 2040 | $8,853,006 | $737,750.50 |
| 2041 | $9,074,331 | $756,194.25 |
| 2042 | $9,301,190 | $775,099.16 |
| 2043 | $9,533,719 | $794,476.58 |
| 2044 | $9,772,062 | $814,338.50 |
| 2045 | $10,016,364 | $834,697.00 |
| 2046 | $10,266,773 | $855,564.41 |

### Section 4.2    Manner of Payment

Base Rent and Tenant's Share of Impositions (as hereinafter defined) and all other amounts becoming due from Tenant to Landlord hereunder (hereinafter collectively referred to as "**Rent**") shall be paid in lawful money of the United States to Landlord at the office of Landlord, or as otherwise designated from time to time by written notice from Landlord to Tenant.  Payment of the Base Rent for the year in which the Possession Date occurs shall begin on the first day of the month following the month any portion of the Building is open for business and shall be prorated among the remaining months in that year based on the number of months it is payable.

### Section 4.3    Net Lease

This Lease is what is commonly called a "net lease," it being understood that Landlord shall receive the Base Rent set forth in Section 4.2 hereof free and clear, after the Possession Date, of any and all other Impositions (as defined in Section 5.2 below), taxes, assessments, liens, charges or expenses of any nature whatsoever in connection with the ownership, maintenance, repair and operation of the Leased Property, except as otherwise provided herein. From and after the Possession Date, Tenant shall be solely responsible for and shall pay all insurance premiums, operating charges, maintenance charges, construction costs, rental under equipment or similar leases, and any other charges, costs and expenses which arise or may be contemplated under any provisions of this Lease during the portion of the Term following the Possession Date.  All of such charges, costs and expenses when due shall constitute additional rent ("**Additional Rent**"), even though not necessarily payable to Landlord, and upon the failure of Tenant to pay any of such costs, charges or expenses, Landlord shall have the same rights and remedies as otherwise provided in this Lease for the failure of Tenant to pay Base Rent.  Base Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid (except as otherwise provided for herein) without notice or demand and without setoff, counterclaim, abatement, suspension, deduction or defense.  Nothing herein contained shall obligate Tenant for the payment of any expenses payable by Landlord pursuant to Section 7.4 hereinbelow or any income or franchise taxes payable by Landlord under applicable law.

### Section 4.4    No Termination

(a)    Except as otherwise expressly provided herein, this Lease shall not terminate, nor shall Tenant have any right to terminate this Lease, nor shall Tenant be entitled to any abatement or reduction of Rent hereunder, nor shall the obligations of Tenant hereunder be affected, by reason of any default on the part of Landlord under this Lease, or under any other agreement to which Landlord and Tenant may be parties.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent, and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.  Nothing herein shall preclude Tenant from pursuing or realizing upon its other remedies at law or in equity by reason of any default hereunder by Landlord.

(b)    Tenant agrees that it will remain obligated under this Lease in accordance with its terms, and that it will not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the Bankruptcy of Landlord or any assignee of Landlord (provided, however, Landlord hereby represents that no Event of Bankruptcy has occurred as to Landlord as of even date herewith), and (ii) any action with respect to the Lease which may be taken by any trustee or receiver of Landlord or of any assignee of Landlord in any such proceeding or by any court in any such proceeding; provided that this Lease is not effectively disaffirmed in such proceedings and Tenant receives reasonable assurance thereof within a reasonable period of time following the commencement of such proceedings.

(c)    Tenant waives all rights which may now or hereafter be conferred by law (except by a final and binding judicial determination by a court of competent jurisdiction) (i) to quit, terminate or surrender this Lease or the Leased Property or any part thereof, or (ii) to any abatement, suspension, deferment or reduction of Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein.

### ARTICLE 5
### IMPOSITIONS

### Section 5.1    Obligation To Pay Tenant's Share of Impositions

In addition to paying the Base Rent specified in Article 4 hereof, from and after the Possession Date, for so much of the Term as follows the Possession Date, Tenant shall also pay Landlord, as additional rent, the amounts determined in accordance with this Article 5 (hereinafter referred to as "**Tenant's Share of Impositions**").

### Section 5.2    Payment by Tenant

For each calendar year during which any portion of the Term following the Possession Date falls, Tenant shall pay Landlord, as additional rent for the Leased Property, "**Tenant's Share of Impositions**."  For purposes hereof, Tenant's Share of Impositions for any such calendar year shall mean all Impositions for such year (or portion of such year following the Possession Date).  The term "**Impositions**" shall mean all taxes and assessments, general and special, water rates and all other impositions, ordinary and extraordinary, of every kind and

nature whatsoever, which may be levied, assessed, charged or imposed during the Term of the Lease (following the Possession Date) upon the Leased Property, or any part thereof, or upon any improvements at any time situated thereon, including, without limitation, any assessment by any association of owners of property in the complex of which the Leased Property are a part. Impositions shall also include fees and costs incurred by Landlord pursuant to Section 5.6 hereinbelow during the Lease Term for the purpose of contesting or protesting tax assessments or rates, to the extent such fees and costs relate to savings anticipated by Landlord during the Term of the Lease.  Impositions "for" a given calendar year shall mean Impositions which are due for payment or paid in such calendar year, regardless of when the same are assessed.

### Section 5.3    <u>Alternative Taxes</u>

If at any time during the Term the method of taxation prevailing at the commencement of the Term hereof shall be altered so that any new tax, assessment, levy, imposition or charge, or any part thereof, shall be measured by or be based in whole or in part upon the Lease or the Leased Property or the Base Rent or Additional Rent or other income therefrom, and shall be imposed upon Landlord, then all such taxes, assessments, levies, impositions or charges, or the part thereof, to the extent that they are so measured or based, shall be deemed to be included within the definition of Impositions for the purposes hereof to the extent that such Impositions would be payable if the Leased Property were the only property of Landlord subject to such Impositions, and Tenant shall pay and discharge the same as herein provided in respect of the payment of Impositions.  There shall be excluded from Impositions all federal, state and local net income tax, federal excess profit taxes, transfer, franchise, capital stock and federal or state estate or inheritance taxes of Landlord.

### Section 5.4    <u>Estimates of Impositions</u>

Tenant's Share of Impositions for each calendar year during which any portion of the Term (following the Possession Date) falls shall be reasonably estimated by Landlord and shall be based upon the most recently ascertainable assessment and tax rate levels, and written notice of such estimate shall be given Tenant prior to the beginning of each such calendar year.  Tenant shall pay Landlord each month, at the same time as the Monthly Base Rent payment is due, an amount equal to one-twelfth (1/12) of said annual estimate of Tenant's Share of Impositions.  In the event Landlord's estimate of Tenant's Share of Impositions is not given to Tenant prior to the beginning of any applicable calendar year, Tenant shall continue to pay to Landlord, in monthly installments on account of Tenant's Share of Impositions, such amount estimated on the basis of the most current estimate by Landlord; provided, however, that on the first day of the calendar month following the month in which Landlord notifies Tenant of any change in such estimate, Tenant shall pay to Landlord a lump sum equal to the estimated Tenant's Share of Impositions as revised by Landlord minus (i) any previous monthly installments on account thereof made by Tenant for such calendar year and (ii) any monthly installments on account thereof which are not yet due and payable for the remainder of such calendar year.  Thereafter, Tenant shall pay Landlord monthly installments on account of Tenant's Share of Impositions based on the new revised estimate thereof given by Landlord.  Should any of Landlord's lenders require the deposit of taxes or any other Impositions relating to the Leased Property for any period beginning on or after the Possession Date, Tenant agrees to deposit with Landlord's lender the

amount required by such lender, and such deposit shall be credited toward the payment of Tenant's Share of Impositions hereunder.

### Section 5.5    Readjustments; Yearly Proration

Landlord shall deliver to Tenant a statement showing the actual Tenant's Share of Impositions for each calendar year as soon as reasonably feasible after same are determined, together with a copy of any tax bill or other evidence of the Impositions. Within thirty (30) days after delivery of such statement, Tenant shall pay to Landlord or Landlord shall credit against the next Rent payment or payments due from Tenant, as the case may be, the difference between the actual Tenant's Share of Impositions for such calendar year and the sum of the monthly installments on account of Tenant's Share of Impositions paid by Tenant during such calendar year. Tenant's obligation to pay Landlord such difference, if applicable, shall survive the expiration or termination of this Lease. If the Possession Date commences on any day other than the first day of January, or if the Term ends on any day other than the last day of December, the Tenant's Share of Impositions due Landlord for such partial calendar year shall be prorated so that Tenant shall pay a prorata share equal to said Tenant's Share of Impositions multiplied by a fraction, the numerator of which is the number of days of the Term falling within such partial calendar year and the denominator of which is three hundred sixty-five (365).

### Section 5.6    Right To Contest

Without limiting Tenant's obligation to pay Tenant's Share of Impositions under this Article 5, Tenant shall have the right, in good faith and with due diligence, to contest the amount of Impositions or the validity thereof by appropriate legal proceedings with the proper taxing authority or other body; provided that, pending any such legal proceedings, Tenant shall give Landlord such security as may be deemed reasonably satisfactory to Landlord to insure payment of the amount of all Impositions or charges and all interest and penalties thereon. If, at any time during the continuance of such contest, the Leased Property or any part thereof is, in the reasonable judgment of Landlord, in imminent danger of being forfeited or lost, Landlord may use such security, together with Tenant's monthly installments in account of Tenant's Share of Impositions, for the payment of such Imposition. Tenant shall notify Landlord of its intent to contest Impositions prior to initiating any such legal proceedings.

### Section 5.7    Representations and Warranties

Tenant agrees and acknowledges that Landlord has made no representation, warranty or guaranty relating to the amount of the Impositions. Tenant has had an opportunity to consult with Landlord with respect to the Impositions projected for the operation of the Leased Property but has not relied upon any statements or representations of Landlord or any agent or affiliate of Landlord in regard thereto in executing this Lease and agreeing to perform the terms and covenants hereof and shall make no claims against Landlord based thereon.

## ARTICLE 6
## USE OF LEASED PROPERTY

Tenant shall use and occupy the Leased Property for purposes of operation of a hotel (which shall include short-term rentals to guests as well as transient stays) with additional

commercial space, together with ancillary facilities thereto, and for incidental uses thereto and for no other use or purpose.  Tenant covenants and agrees to use and occupy the Leased Property in conformity with all federal, state and municipal statutes, laws, rules, ordinances, regulations and orders.  Tenant shall not use any Hazardous Materials, nor shall Tenant create any offensive or toxic emissions or effluents to emanate from the Leased Property, except to the extent reasonable or appropriate in connection with the lawful use of the Leased Property in the ordinary course of Tenant's business, and Tenant shall comply with all legal requirements in connection with such use.  At all times during the Term, Tenant shall cause all of the Leased Property to remain in compliance with all legal requirements and, to the extent that Tenant should fail to do so beyond any applicable grace or cure period permitted by the appropriate authority, Landlord shall have the right to take all actions required or necessary to bring the Leased Property into compliance with all legal requirements, and all sums paid by Landlord, including, without limitation, any legal fees and disbursements, incurred by Landlord as a result of Tenant's failure shall constitute Additional Rent.  The commercial space and a parking facility for the hotel will be constructed by Landlord by no later than December 1, 2016.  In addition, Landlord intends to construct a new building on property owned by Landlord located adjacent to the Leased Property, which building is anticipated to contain 25 additional guestrooms and related public hotel space.  Landlord and Tenant agree to negotiate the terms and conditions of the use, occupancy, and management of the commercial space, the parking facility, and the new building in good faith prior to completion of the build out of that space.

**ARTICLE 7**
**UTILITIES AND SERVICES;**
**OPERATING EXPENSES; FINANCING DOCUMENTS**

### Section 7.1    Utilities and Services

Tenant shall purchase all utility services for the Leased Property, including, but not limited to, fuel, water, sewerage and electricity, from the utility or municipality providing such service, and shall pay for such services when such payments are due.  Except in the case of willful actions or omissions of Landlord causing interruption of utility services, Landlord will not be liable to Tenant for any interruption in the provision of utility services to the Leased Property, nor will any interruption be construed as an eviction of Tenant or entitle Tenant to abatement of Rent.

### Section 7.2    Regulations Regarding Utilities and Services

(a)    Tenant agrees to cooperate fully, at all times, with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Leased Property.  Throughout the Term of this Lease, Landlord and its contractors shall have reasonable access after reasonable advance notice and in such manner as will minimize interference with the use and occupancy of the Leased Property to any and all mechanical installations, and Tenant agrees that there shall be no construction of partitions or other obstructions which might interfere with access to or the moving of servicing equipment to or from the enclosures containing said installations.  Tenant further agrees that neither Tenant nor

its agents, licensees, invitees or contractors shall at any time tamper with, adjust or otherwise in any manner affect Landlord's mechanical installations.

(b)      Nothing contained herein shall be deemed to impose any duty or obligation on Landlord to maintain or repair such mechanical installations.  Tenant shall be solely responsible for and shall maintain all such mechanical installations and shall repair and replace such items at Tenant's sole cost and expense.

### Section 7.3      Operating Expenses

Without limitation of any other provision herein and except as otherwise herein specified, from and after the Possession Date, Tenant shall pay all expenses of operation of the Leased Property including, without limitation, all utility charges, insurance premiums, operating charges, maintenance and repair charges, construction costs, costs for replacements and other charges, and all other charges, whether or not contemplated under this Lease. It is specifically acknowledged and agreed that Tenant shall be responsible for paying all amounts payable to the Hotel Manager under the Hotel Management Agreement.

### Section 7.3      Debt Service

Nothing contained herein shall obligate Tenant to pay any principal, interest, prepayment premiums or other amounts in connection with any loans of Landlord relating to the Leased Property, it being acknowledged that at all times the responsibility for payment of such loans (or any replacements, accretions or additions to such loans) shall remain the responsibility of Landlord.  In the event the failure by Landlord to pay any such debt-related payments within any applicable grace or cure period under any loan documents, Tenant shall have the right to pay such amounts on behalf of Landlord and Landlord shall be obligated to reimburse Tenant for the costs thereof and, in addition, Tenant shall have the right to set off against the next Rent payable hereunder such amounts as are advanced by Tenant on behalf of Landlord hereunder, together with interest from the date advanced until paid or set-off at the annual rate of one percent (1%) in excess of the Designated Prime Rate.

## ARTICLE 8

## CONDITION AND CARE OF LEASED PROPERTY

### Section 8.1      Possession.

(a)      The Building comprising a portion of the Leased Property is a "certified historic structure" within the meaning of Section 47 of the Code.  Landlord is rehabilitating the Building in a manner intended to qualify for the Historic Tax Credit and has agreed in the HTC Pass-Through Agreement to pass the Historic Tax Credit through to Tenant in accordance with the provisions of Section 50(d) of the Code.  The nature and scope of such rehabilitation work is more specifically described on **Exhibit D** attached hereto.  The aforesaid work is sometimes herein referred to as "**Landlord's Work**."  Landlord agrees to cause such work to be substantially completed in a good and workmanlike manner conforming to all applicable law  on or prior to December 31, 2014, in a lien-free manner.  The parties agree, however, that Landlord shall be entitled to contest any liens filed against the Premise in a manner permitted under the

laws of the State of California.  Other than as herein provided, Tenant acknowledges that no promises have been made by Landlord to alter, remodel, improve, repair, decorate or clean the Leased Property or any part thereof.  Tenant's taking possession of the Leased Property or any portion thereof, unless Tenant shall notify Landlord within twelve (12) months thereafter of any defective or incomplete work (in which event Landlord shall promptly remedy such work), shall be conclusive evidence against Tenant that the portion of the Leased Property taken possession of, including any portion of Landlord's Work therein, was then in good order and satisfactory condition.

(b)     Tenant grants to Landlord, Landlord's construction managers, contractors, subcontractors, materialmen and other parties the right to enter the Building and the other portions of the Leased Property as necessary to complete any punch-list items related to Landlord's Work.  Tenant shall be named as an additional insured on all insurance policies provided by such construction managers, contractors, subcontractors and other parties which name Landlord as an additional insured.

(c)     All material building, zoning, health, safety, business and other applicable permits necessary to permit the rehabilitation, use, occupancy and operation of the Leased Property have been or will, at the time required, be obtained and maintained (other than, prior to completion of the rehabilitation or a specified portion thereof, such as are issuable only on the completion of the rehabilitation or such specified portion thereof); and Landlord has not received any notice nor does Landlord have any knowledge of any violation with respect to the Leased Property of any law, rule, regulation, order or decree of any Governmental Authority having jurisdiction which would have a material adverse effect on the Leased Property or the construction, use or occupancy thereof, except for violations which have been cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction.

(d)     Landlord has a good and marketable fee simple interest in the Leased Property, free and clear of any liens, charges or encumbrances other than matters set forth in a title policy and encumbrances that Landlord is permitted to create under the terms of this Lease.  Landlord is not in default in any material respect in the observance or performance of any provision of the Lease or any document related to its rehabilitation of the Leased Property to be observed or performed by Landlord.

(e)     Landlord is not in default in any material respect in the observance or performance of any provision of the Lease or any document related to its rehabilitation to be observed or performed by Landlord.  To the best knowledge of Landlord, the Leased Property has no material design, maintenance or construction defects.

(f)     Except for the matter brought against Landlord under the California Environmental Quality Act, concerning the City of Pasadena's issuance of permits with respect to the rehabilitation of the Leased Property, no litigation, demand, investigation, claim or proceeding against Landlord or any litigation or proceeding directly affecting the Leased Property is pending or, to the best knowledge of Landlord, is threatened, before any court, administrative agency or other Governmental Authority.

### Section 8.2    Tenant Obligations

(a)    At its sole cost and expense throughout the Term following the Possession Date, Tenant shall (i) take good care of the Leased Property; (ii) keep the same in good order and condition; and (iii) make and perform all maintenance thereof and all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description, including, without limitation, any maintenance required under any loan documents that may be executed by Landlord or required of the landlord under the Commercial Leases.  When used in this Section, the term "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments.  All repairs made by Tenant shall be at least equal in quality and cost to the original improvements and shall be made by Tenant in accordance with all laws, ordinances and regulations whether heretofore or hereafter enacted.  The necessity for or adequacy of maintenance and repairs shall be measured by the standards that are appropriate for improvements of similar construction and class, provided that Tenant shall in any event make all repairs reasonably necessary to avoid any structural damage or other damage or injury to the Improvements.

(b)    Notwithstanding the provisions of Section 8.2(a) above, any repairs that are capital expenditures under the Code and which are made during the last three (3) years of the Term shall not be required to be made, unless Landlord and Tenant agree to an allocation of the costs thereof.  If the parties cannot so agree, Landlord shall have the right to cause such repairs to be made and the cost thereof shall be amortized over the useful life thereof, as determined and in accordance with the Code, and Tenant shall pay as Additional Rent its share of the costs thereof relating to the remainder of the Term.  Tenant shall be entitled to the tax benefits (including depreciation) attributable to repairs or capital expenditures made by it hereunder.

(c)    Landlord shall not be required to furnish any services or facilities or to make any repairs or alterations in, about or to the Leased Property or any improvements hereafter erected thereon.  Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Leased Property hereafter erected thereon.

(d)    Tenant shall not do or suffer any waste or damage, disfigurement or injury to the Leased Property, or to the fixtures or equipment therein, or permit or suffer any overloading of the floors or other use of the improvements that would place an undue stress on the same or any portion thereof beyond that for which the same was designed.

### Section 8.3    Compliance With Rules and Regulations; Compliance with Covenants.

Tenant shall at its sole cost and expense:

(a)    Comply with (i) all federal, state, county, municipal and other governmental and quasigovernmental statutes, laws, rules, orders, regulations and ordinances affecting the Leased Property or any part thereof, or the use thereof, including compliance with the requirements of the City of Pasadena, California, and the State of California (and any federal law to the extent applicable) relating to the operation of the Leased Property as a hotel with additional commercial

space, and further including those which require the making of any structural, unforeseen or extraordinary changes (except such changes in the nature of capital expenditures as are described in Section 8.2(b) above, which shall be made in accordance with the provisions of such Section), whether or not any such statutes, laws, rules, orders, regulations or ordinances which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same, and (ii) all rules, orders and regulations of the National Board of Fire Underwriters or other bodies exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions, which apply to the Leased Property; provided, however, that Tenant shall not be obligated to comply or cause the Leased Property to comply with any of the foregoing unless Tenant's use of the Leased Property shall cause a violation of clauses (i) or (ii) above.  Tenant shall comply with the requirements of all policies of public liability, fire and other insurance which at any time may be in force with respect to the Leased Property.

(b)     Comply with the requirements (the "Covenants") of the Hotel Management Agreement, the Commercial Leases and the Operating Contracts, in each case to the extent applicable to Tenant, certain of which shall be assigned to and assumed by Tenant concurrently with the execution of this Lease or as soon thereafter as is practicable.  In the event of its failure to do so (without limitation of any other rights or remedies of Landlord hereunder), Landlord may, if such failure continues beyond the applicable grace period thereunder,  pay such amounts or perform such obligations as are necessary in order to comply therewith.  The amounts reasonably expended by Landlord on account thereof shall constitute Additional Rent.

### Section 8.4    Existing Equipment

Tenant acknowledges that Tenant is accepting possession of the Leased Property inclusive of any and all equipment, personal property, furniture, fixtures, equipment and other moveable items (collectively, the "**Existing Equipment**") currently located therein or located therein as of the Possession Date.  Landlord makes no representations or warranties, whatsoever, as to the condition of the Existing Equipment, or as to Landlord's title or interest with respect thereto.  In the event that the Existing Equipment is removed, whether by Tenant or any other party, during or at the end of the Term hereof, Tenant shall be responsible for restoring any and all damage to the Leased Property caused by such removal, at Tenant's sole cost and expense, and, with respect to Building Systems Equipment, as hereinafter defined, Tenant shall replace any such equipment so removed with like equipment of equal or better quality that shall be in good working order and of sufficient size and capacity as is required to serve the Leased Property.  Tenant shall cause such Existing Equipment to be replaced as and when necessary or required under the Hotel Management Agreement.  Further, Tenant shall indemnify Landlord and its respective employees, agents and other representatives, from and against any and all cost, expenses, liens, damages, or other claims resulting from Tenant's removal of any such Existing Equipment.  As used herein, the term "**Building Systems Equipment**" shall mean all plumbing, electrical, mechanical, heating, ventilating and air conditioning and life safety equipment in or serving the Leased Property.

### Section 8.5    Tax Credits

Except as otherwise specifically provided in the HTC Pass-Through Agreement and in Section 8.1 or Section 8.2 hereof, Tenant expressly waives and relinquishes in favor of Landlord

any rights to claim the benefit of or to use any federal or state investment tax credits or depreciation benefits that are currently or may become, available during the Term as a result of the improvements constituting part of the Leased Property, or any installation of the Existing Equipment (excluding any FF&E purchased by Tenant) installed by Landlord on the Leased Property whether or not such items become a part of the realty, and Tenant agrees to execute and deliver to Landlord any election form required to evidence Landlord's right to claim investment tax credits or depreciation benefits on improvements made or property installed by Landlord. Landlord and Tenant agree that Tenant shall be entitled to any investment tax credits or depreciation attributable to improvements made or property installed by Tenant and paid for by Tenant (including, but not limited to the initial FF&E) following the Commencement Date.

### Section 8.6      Initial FF&E

Notwithstanding anything to the contrary herein, Landlord and Tenant agree that the initial furniture, fixtures and equipment ("**FF&E**") for the Leased Property will be provided by Tenant, as set forth in more detail in **Exhibit D** hereto.  No reduction in rent beyond that set forth in Article 4 hereof shall be payable by Tenant with respect to any FF&E provided by Landlord. Following the installation of the initial FF&E, all replacement FF&E shall be provided by Tenant as and when needed.

## ARTICLE 9

## RETURN OF LEASED PROPERTY

### Section 9.1      Surrender of Possession

At the termination of this Lease by lapse of time or otherwise or upon termination of Tenant's right of possession without termination of this Lease, Tenant shall surrender possession of the Leased Property to Landlord and deliver all keys to the Leased Property to Landlord and make known to Landlord the combination of all locks of vaults then remaining in the Leased Property, and shall, subject to Sections 9.2 through 9.4, return the Leased Property and all equipment and fixtures of Landlord therein to Landlord in as good condition as when Tenant originally took possession, ordinary wear, loss or damage by fire or other insured casualty, and damage resulting from the act of Landlord or its employees and agents excepted, failing which Landlord may restore the Leased Property and such equipment and fixtures to such condition and Tenant shall pay the reasonable cost thereof to Landlord on demand.

### Section 9.2      Installations and Additions

All installations, additions, partitions, hardware, light fixtures, nontrade fixtures and improvements, temporary or permanent, except FF&E, trade fixtures, movable furniture and equipment belonging to Tenant, in or upon the Leased Property, whether placed there by Tenant or Landlord, shall be Landlord's property and shall remain upon the Leased Property at the termination of this Lease, all without compensation, allowance or credit to Tenant; provided, however, that if prior to such termination or within ten (10) days thereafter Landlord so directs by notice, Tenant, at Tenant's sole cost and expense, shall promptly remove such of the installations, additions, partitions, hardware, light fixtures, nontrade fixtures and improvements

placed in the Leased Property by Tenant as are designated in such notice and repair any damage to the Leased Property caused by such removal, failing which Landlord may remove the same and repair the Leased Property, and Tenant shall pay the reasonable cost thereof to Landlord on demand. Tenant may request, prior to making the installations, additions or other improvements provided hereinabove that Landlord determine whether Tenant shall be obligated to remove such installations, additions or other improvements (in which case Landlord shall make such determination in a reasonable manner within five (5) days following such request); provided, however, that Landlord shall not be precluded from exercising its right to require such removal, notwithstanding a prior manifestation of contrary intent, if the condition of such installations, additions or other improvements has deteriorated and constitutes in Landlord's determination, unreasonable wear and tear.

### Section 9.3    Trade Fixtures and Personal Property

Tenant shall also remove Tenant's furniture, machinery, safes, trade fixtures and other items of movable personal property of every kind and description belonging to Tenant from the Leased Property and restore any damage to the Leased Property caused thereby, such removal and restoration to be performed prior to the end of the Term (whether by lapse of time or by earlier termination of this Lease) or Tenant's right of possession, whichever might be earlier. If Tenant fails to remove such items, Landlord may do so and thereupon the provisions of Section 19.6 shall apply, and Tenant shall pay to Landlord upon demand the reasonable cost of removal and of restoring the Leased Property.

### Section 9.4    Option To Acquire FF&E

At the termination of this Lease by lapse of time or otherwise or upon termination of Tenant's right of possession without termination of this Lease, Landlord or Landlord's designee shall have the option to purchase from Tenant the FF&E of Tenant employed in the operation of the Hotel in the Leased Property. If the parties cannot agree within thirty (30) days of the date of such termination to the purchase price for such FF&E, then the purchase price shall be the fair market value as determined by a Qualified Appraiser (as defined below) selected by Tenant. All appraisal costs shall be borne fifty percent (50%) by Tenant and fifty percent (50%) by Landlord. As used herein, "**Qualified Appraiser**" means an appraiser who specializes in appraising assets similar to the FF&E, has no less than five years' experience in the field, is recognized as ethical and reputable, does not have any personal or financial interest that would disqualify the appraiser from exercising an independent and impartial judgment as to the value of the assets, has the capability and capacity to perform appraisals on all assets to be appraised regardless of their location, and is a member of the Appraisal Institute (or any successor association or body of comparable standing if such institution is not then in existence), with the designation of "MAI" (or comparable designation of such successor association).

### Section 9.5    Survival

All obligations of Tenant under this Article 9 shall survive the expiration of the Term or sooner termination of this Lease.

## ARTICLE 10

## HOLDING OVER

Tenant shall pay Landlord for each day Tenant retains possession of the Leased Property or any part thereof after termination of this Lease, or of Tenant's right to possession of the Leased Property, by lapse of time or otherwise, an amount which is 150% of the amount of Rent for a day based on the annual rate of Base Rent set forth in Section 4.1 last payable and on the last amount of Tenant's Share of Impositions provided for in Article 5 for the period in which such possession occurs, calculated as though such period were within the Term, and, to the extent enforceable by law, Tenant shall also pay all damages, consequential as well as direct, sustained by Landlord by reason of such retention.  Nothing contained in this Section shall be construed or operate as a waiver of Landlord's right of reentry or any other right or remedy of Landlord.  Any such holding over shall be a tenancy at sufferance.

## ARTICLE 11

## COMPLIANCE BY TENANT

Tenant agrees, for itself, its agents, contractors, subtenants, invitees and licensees, (i) to observe and not to interfere with the rights reserved to Landlord contained in this Lease, and (ii) to comply with all terms and conditions set forth in any recorded easements, and, covenants, conditions or restrictions pertaining to the Leased Property at the present time or, if Tenant has consented thereto, thereafter.  Any violation of the foregoing agreements may be enjoined; but, whether or not so enjoined, Tenant acknowledges and agrees that it shall be and remain liable for all damages, loss, costs and expenses resulting therefrom.

## ARTICLE 12

## RIGHTS RESERVED TO LANDLORD

Landlord reserves the following rights, exercisable after reasonable advance notice and in such manner as will minimize interference with the use and occupancy of the Leased Property:

(a)     to change the name or street address of the Leased Property (but only if requested to do so by the U.S. postal service or the local municipality or any other Governmental Authority);

(b)     to retain at all times, and to use in appropriate instances, pass keys to the Leased Property, subject to the rights of any subtenants or hotel guests;

(c)     to exhibit the Leased Property at reasonable hours;

(d)     to enter the Leased Property at reasonable hours for inspection; and

(e)     to enter the Leased Property in the event of an emergency (without advance notice) and take all steps deemed reasonably necessary by it to respond to such emergency.

## ARTICLE 13

## MAINTENANCE

Subject to any limitation set forth in Section 8.2 hereof, Tenant shall keep and maintain the entire exterior and interior of the Leased Property, specifically including, without limitation, the roof, structural components of the Leased Property, the lighting systems, and the Building Systems Equipment in good condition and repair. Tenant specifically agrees to cause the requirements under the Commercial Leases, the Operating Contracts and any loan documents that may be entered into by Landlord with respect to the maintenance of the physical condition of the Leased Property that are the obligation of Tenant thereunder to be complied with at all times, at its sole cost and expense. Tenant shall keep the Leased Property from falling temporarily out of repair or deteriorating. Tenant shall further keep and maintain the improvements at any time situated upon the Leased Property and all sidewalks and areas adjacent thereto, and all landscaped areas adjacent thereto, safe secure, clean and sanitary (including, without limitation, snow and ice clearance, planting and replacing flowers and landscaping, and necessary interior painting and carpet cleaning), and in full compliance with all health, safety and police regulations in force.

## ARTICLE 14

## ALTERATIONS

### Section 14.1   Limitation

Tenant shall not, without the prior written consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned, make any alterations, additions or improvements to the Leased Property, other than such alterations, additions, or improvements to the Leased Property which are cosmetic in nature or which shall cost less than $10,000.00. Any alterations, additions or improvements which are consented to by Landlord shall continue to be subject to the remaining terms and conditions set forth in this Article.

### Section 14.2   Procedures for Alterations, Additions or Improvements

If Landlord consents to such alterations, additions or improvements, before commencement of the work or delivery of any materials onto the Leased Property, Tenant shall furnish to Landlord for approval plans and specifications, names and addresses of contractors, copies of contracts, necessary permits and licenses, and instruments of indemnification against any and all claims, costs, expenses, damages and liabilities which may arise in connection with such work, all in such form, substance and amount as may be reasonably satisfactory to Landlord. In addition, for any work which shall cost, in the aggregate, in excess of $100,000.00, prior to commencement of any such work or delivery of any materials into the Leased Property, Tenant shall provide Landlord with appropriate evidence of Tenant's ability to pay for such work and materials in full and, if requested by Landlord, shall deposit with Landlord at such time such security for the payment of said work and materials as Landlord may require. All alterations, additions and improvements shall be installed in a good, workmanlike manner, and only new, high-grade materials shall be used. All such work shall be done only by contractors or

mechanics reasonably acceptable to Landlord.  Tenant further agrees to hold Landlord harmless from any and all liabilities of every kind and description which may arise out of or be connected in any way with said alterations, additions or improvements.  Before commencing any work in connection with such alterations, additions or improvements, Tenant shall furnish Landlord with certificates of insurance from all contractors performing labor or furnishing materials insuring Landlord against any and all liabilities which may arise out of or be connected in any way with said alterations, additions or improvements.   Tenant shall permit Landlord to supervise construction operations at Landlord's sole cost in connection with the foregoing work if Landlord requests to do so.  Tenant shall pay the cost of all such alterations, additions and improvements and also the cost of decorating the Leased Property occasioned by such alterations, additions and improvements, including the cost of labor and materials, contractors' profit, overhead and general conditions.   Upon completing any alterations, additions or improvements, Tenant shall furnish Landlord with contractors' affidavits, in form required by law, and full and final waivers of lien and receipted bills covering all labor and materials expended and used.  All alterations, additions and improvements shall comply with all insurance requirements and with all city and county ordinances and regulations and with the requirements of all state and federal statutes and regulations.

## ARTICLE 15

## ASSIGNMENT AND SUBLETTING

### Section 15.1    Assignment and Subletting

Except as otherwise herein provided, Tenant shall not, without the prior written consent of Landlord in each instance, (i) assign, transfer, mortgage, pledge, hypothecate or encumber, or subject to or permit to exist upon or be subjected to any lien or charge, this Lease or any interest under it; (ii) allow to exist or occur any transfer of or lien upon this Lease or Tenant's interest herein by operation of law; (iii) sublet the Leased Property or any part thereof; or (iv) permit the use or occupancy of the Leased Property or any part thereof for any purpose not provided for under Article 6 of this Lease or by anyone other than Tenant and Tenant's and permitted subtenants.  In no event shall this Lease be assigned or assignable by voluntary or involuntary bankruptcy proceedings or otherwise, and in no event shall this Lease or any rights or privileges hereunder be an asset of Tenant under any bankruptcy, insolvency or reorganization proceedings. Notwithstanding the foregoing, Landlord hereby consents to the subleasing by Tenant of space in the commercial space (as opposed to the subleasing of the entire Leased Property) to various tenants selected by Tenant, including but not limited to the Commercial Leases, (and to the resubleasing of the same space to other tenants upon termination of any of such subleases or successor subleases) provided in each case that the sublease complies with all applicable requirements, including any consent provisions, of any of Landlord's loan documents.

### Section 15.2    Tenant To Remain Obligated

Consent by Landlord to any assignment, subletting, use, occupancy or transfer shall not operate to relieve Tenant from any covenant or obligation hereunder except to the extent, if any, expressly provided for in such consent, or be deemed to be a consent to or relieve Tenant from obtaining Landlord's consent to any subsequent assignment, transfer, lien, charge, subletting, use

or occupancy.   Tenant shall pay all of Landlord's costs, charges and expenses, including attorneys' fees, reasonably incurred in connection with any assignment, transfer, lien, charge, subletting, use or occupancy made or requested by Tenant.  Tenant agrees that all advertising by Tenant or on Tenant's behalf with respect to the assignment of this Lease or subletting of space must be approved in writing by Landlord prior to publication.

### Section 15.3    Landlord's Consent

Landlord will not unreasonably withhold or delay its consent to Tenant's assignment of this Lease or subletting the space leased hereunder wherever such consent is required hereunder. Landlord shall not be deemed to have unreasonably withheld its consent to a sublease of all or part of the Leased Property or an assignment of this Lease if its consent is withheld because: (i) Tenant is then in default beyond any applicable grace period hereunder or an event of default has occurred which, but for the giving of notice or passage of time or both, would constitute a default by Tenant; (ii) any notice of termination of this Lease or termination of Tenant's possession shall have been given under Article 19 hereof; (iii) the portion of the Leased Property which Tenant proposes to sublease, including the means of ingress to and egress from and the proposed use thereof, or the remaining portion of the Leased Property will violate any city, state or federal law, ordinance or regulation, including, without limitation, any applicable building code or zoning ordinances; (iv) the proposed use of the Leased Property by the subtenant or assignee does not conform with the uses permitted by this Lease; (v) in the reasonable judgment of Landlord, the proposed subtenant or assignee is of a character or is engaged in a business which would be deleterious to the reputation of the Leased Property, or the subtenant or assignee is not sufficiently financially responsible to perform its obligations under the proposed sublease or assignment; provided, however, that the foregoing are merely examples of reasons for which Landlord may withhold its consent and shall not be deemed to be exclusive of any permitted reasons for reasonably withholding consent, whether similar to or dissimilar from the foregoing examples.  Any consent by Landlord to a proposed assignment or sublease shall in any event be subject to the terms of Section 15.1 and Section 15.2 above.

### Section 15.4    Assignee To Assume Obligations

If Tenant shall assign this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder in a written instrument reasonably satisfactory to Landlord and furnished to Landlord not later than fifteen (15) days prior to the effective date of the assignment.  If Tenant shall sublease the Leased Property as permitted herein, Tenant shall obtain and furnish to Landlord, not later than fifteen (15) days prior to the effective date of such sublease and in form satisfactory to Landlord, the written agreement of such subtenant stating that the subtenant will attorn to Landlord, at Landlord's option and written request, in the event this Lease terminates before the expiration of the sublease.

### Section 15.5    Change of Ownership or Control of Tenant.

Notwithstanding anything to the contrary in this Article 15, if Tenant is a corporation, partnership or limited liability company, and if during the Term of this Lease, Tenant contemplates that the ownership of the shares of stock, partnership interests or membership interests in Tenant shall be changing, such proposed change shall not constitute a proposed

assignment of this Lease or otherwise be governed by the terms of this Article 15. Notwithstanding the foregoing, Tenant shall advise Landlord of any such changes.

## ARTICLE 16

## WAIVER OF CERTAIN CLAIMS; INDEMNITY BY TENANT

### Section 16.1   Waiver of Certain Claims; Release by Tenant

To the extent not expressly prohibited by law, Tenant releases Landlord and its beneficiaries, if any, and their agents, servants and employees, from and waives all claims for damages to person or property sustained by Tenant, or by any other person, resulting directly or indirectly from fire or other casualty, or any existing or future condition, defect, matter or thing in or about the Leased Property, or from any equipment or appurtenance therein, or from any accident in or about the Leased Property, or from any act or neglect of any other person, including Landlord's agents and employees and contractors; provided, however, that the foregoing release shall not operate in the event of the gross negligence or willful misconduct of Landlord's agents, employees or contractors.  This Section 16.1 shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, excessive heat or cold, sewerage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, broken glass, sprinkling or air conditioning devices or equipment, or flooding of basements, and shall apply without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the acts specifically enumerated above or from any other thing or circumstance, whether of a like nature or of a wholly different nature.

### Section 16.2   Damage Caused by Tenant's Neglect

If any damage, in excess of normal wear and tear, to the Leased Property, or any equipment or appurtenance thereon, results from any act or neglect of Tenant, its agents, contractors, licensees or invitees, Tenant shall be liable therefor, and Landlord may at its option following expiration of the applicable grace period repair such damage, and Tenant shall upon demand by Landlord reimburse Landlord for all reasonable costs of repairing such damage in excess of amounts, if any, paid to Landlord under insurance covering such damage.

### Section 16.3   Tenant Responsible for Personal Property

All personal property on the Leased Property belonging to Tenant shall be there at the risk of Tenant, and Landlord shall not be liable for damage thereto or theft or misappropriation thereof, except where the same is a result of Landlord's fraud or willful misconduct.

### Section 16.4   Indemnification

To the extent not expressly prohibited by law, Tenant agrees to hold Landlord and its beneficiaries, if any, and their agents, servants and employees, harmless and to indemnify each of them against Adverse Consequences arising from injuries to all persons and damage to or theft or misappropriation or loss of property occurring in or about the Leased Property arising from Tenant's occupancy of the Leased Property or the conduct of its business or from any activity, work or thing done, permitted or suffered by Tenant in or about the Leased Property or from any

breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or due to any other act or omission of Tenant, its agents, contractors, invitees, or licensees, but only to the extent of Landlord's liability, if any, in excess of amounts, if any, paid to Landlord under insurance covering such claims or liabilities.  Tenant's obligation to indemnify Landlord hereunder shall include the duty to defend against any claims creating such Adverse Consequences and to pay any judgments, settlements, costs, fees and expenses, including attorneys' fees, reasonably incurred in connection therewith.  For such purpose, Tenant shall be entitled to the use of an attorney designated by it or its insurer.

## ARTICLE 17

## DAMAGE OR DESTRUCTION BY CASUALTY

If the Leased Property shall be damaged by fire or other casualty and if such damage does not render all or a substantial portion of the Leased Property untenantable, then Landlord shall proceed to repair and restore the same with reasonable promptness, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control. If any such damage renders all or a substantial portion of the Leased Property untenantable (a "**Substantial Casualty**"), Landlord shall, with reasonable promptness after the occurrence of such damage, estimate the length of time that will be required to substantially complete the repair and restoration of such damage and shall by notice advise Tenant of such estimate.  If it is so estimated that the amount of time required to substantially complete the repair and restoration of a Substantial Casualty will exceed three hundred sixty (360) days from the latter of (i) the date of such notice or (ii) the date of collection of the insurance proceeds (the "**Start Date**"), then either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage upon giving notice to the other at any time within twenty (20) days after Landlord gives Tenant the notice containing said estimate (it being understood that Landlord may, if it elects to do so, also give such notice of termination together with the notice containing said estimate).  Unless this Lease is terminated as provided in the preceding sentence, Landlord shall proceed with reasonable promptness to repair and restore the Leased Property, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control, and also subject to zoning laws and building codes then in effect.  Landlord shall have no liability to Tenant, and Tenant shall not be entitled to terminate this Lease (except as hereinafter provided) if such repairs and restoration are not in fact completed within the time period estimated by Landlord, as aforesaid.  If the Leased Property are not repaired or restored within the time period estimated by Landlord (as the same may be extended for a period not to exceed one hundred fifty percent (150%) of the time period estimated by Landlord, to the extent that additional time is required on account of Landlord's inability to timely perform as more specifically provided in Section 30.11 below) after the Start Date , then either party may terminate this Lease, effective as of the date of such fire or other casualty, by written notice to the other party not later than thirty (30) days after the expiration of said period, but prior to substantial completion of repair or restoration.  Notwithstanding anything to the contrary herein set forth, (a) Landlord shall have no duty pursuant to this Article 17 to expend for any repair or restoration amounts in excess of insurance proceeds paid to Landlord and available for repair or restoration (without limiting Tenant's right to terminate this Lease as aforesaid); (b) Tenant shall not have the right to terminate this Lease pursuant to this Article 17 if the damage or destruction

was caused by the act or neglect of Tenant or its agents, contractors or employees; and (c) if any such damage rendering all or a substantial portion of the Leased Property untenantable shall occur during the last two (2) years of the Term, either party shall have the option to terminate this Lease by giving written notice to the other within sixty (60) days after the date such damage occurred, and, if such option is so exercised, this Lease shall terminate as of the date of such notice.

## ARTICLE 18

## EMINENT DOMAIN

If the Leased Property, or a substantial part thereof, shall be taken or condemned by any competent authority for any public or quasi-public use or purpose or transferred in lieu of condemnation, subject to the provisions of any loan documents and the rights of lenders set forth therein, the following shall apply. The Term of this Lease shall end upon and not before the earlier of (i) the date when the possession of the part so taken shall be required for such use or purpose or (ii) the effective date of the taking, and (except as otherwise herein provided) without apportionment of the award to or for the benefit of Tenant. In the event of the foregoing, Rent at the then current rate shall be apportioned as of the date of the termination. A "substantial part" of the Leased Property shall be deemed taken or condemned if, as Tenant may reasonably determine, such part taken shall materially interfere with the economic utilization of the Leased Property, taken as a whole. No money or other consideration shall be payable by Landlord to Tenant for the right of termination, and Tenant shall have no right to share in the condemnation award, whether for a total or partial taking, other than on account of compensation for the unamortized value of Tenant's leasehold improvements and on account of Tenant's interest hereunder in light of the below-market rental, if any, payable hereunder. In the event that the Term of this Lease shall not be terminated as aforesaid in the event of a taking or condemnation, Landlord shall utilize the net proceeds from condemnation for the purpose of restoring the Leased Property to an economic whole within such a period of time as shall be reasonably necessary under the circumstances.

## ARTICLE 19

## DEFAULT

### Section 19.1   Events of Default

The occurrence of any one or more of the following matters constitutes a default ("**Default**") under this Lease:

(a)      failure by Tenant to pay, within ten (10) days after notice of failure to pay on the due date from Landlord to Tenant, Rent or any Additional Rent or other moneys required to be paid by Tenant under this Lease or failure of Landlord to make any payment required of it hereunder within ten (10) days after notice of failure to pay;

(b)      failure by either party to cure within a reasonable time after receipt of notice from the other any Claim or hazardous condition which such party has created in violation of any Environmental Laws or of this Lease;

(c)      failure by either party to observe or perform any other covenant, agreement, condition or provision of this Lease, if such failure shall continue for thirty (30) days after notice thereof from the other party, or such longer period as is necessary for the failing party, acting diligently, to cure, if such failure cannot reasonably be corrected within said thirty (30) day period;

(d)      the levy upon under writ of execution or the attachment by legal process of the Leasehold Interest of Tenant, or the filing or creation of a lien in respect of such Leasehold Interest, which lien shall not be released or discharged within sixty (60) days from the date of such filing;

(e)      Tenant abandons the Leased Property whether or not Tenant thereafter continues to pay the Rent due under this Lease; or

(f)      An Event of Bankruptcy occurs as to either party.

By its execution hereof, Landlord hereby agrees to provide Tenant's Investor Member with written notice of any Default under the Lease, at the address set forth in Article 27 hereof, as such address may be updated from time to time.

### Section 19.2    Rights and Remedies of Landlord upon Tenant Default

(a)      If a Default by Tenant occurs, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by this Lease or by law or in equity:

(i)      Landlord may terminate this Lease by giving to Tenant notice of Landlord's election to do so, in which event the Term of this Lease shall end, and all right, title and interest of Tenant hereunder shall expire on the date stated in such notice;

(ii)      Landlord may terminate the right of Tenant to possession of the Leased Property without terminating this Lease by giving notice to Tenant that Tenant's right of possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Leased Property or any part thereof shall cease on the date stated in such notice;

(iii)      Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease;

(iv)    Landlord may proceed against the Collateral under the security interest granted to it under Section 19.8 and take any and all actions permitted to a secured party under the laws of California, including the Uniform Commercial Code as in effect in the State of California.

Notwithstanding anything herein to the contrary, Landlord shall not terminate the Lease until such time that Tenant's Investor Member is no longer a member of Tenant.

(b)    If a Default by Landlord occurs, Tenant shall have the rights and remedies hereinafter set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by this Lease or by law or in equity:

(i)    Tenant may terminate this Lease by giving to Landlord notice of Tenant's election to do so, in which event the Term of this Lease shall end, and all right, title and interest of Tenant hereunder shall expire on the date stated in such notice;

(ii)    Tenant may enforce the provisions of this Lease and may enforce and protect the rights of Tenant hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Landlord under any of the provisions of this Lease;

Notwithstanding anything herein to the contrary, Tenant may not terminate the Lease during the period in which Tenant's Investor Member remains as a member in Tenant.

### Section 19.3    Right To Re-enter

If Landlord exercises either of the remedies provided for in subparagraphs (a) and (b) of Section 19.2, Tenant shall surrender possession and vacate the Leased Property and immediately deliver possession thereof to Landlord, and Landlord may reenter and take complete and peaceful possession of the Leased Property, pursuant to applicable legal proceedings, full and complete license so to do being hereby granted to Landlord, and Landlord may remove all occupants and property therefrom, without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.

### Section 19.4    Current Damages

If Landlord terminates the right of Tenant to possession of the Leased Property without terminating this Lease if permitted by applicable law, Landlord shall have the right to immediate recovery of all amounts then due hereunder.  Such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay the Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent and any other sums accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term.  In any such case Landlord may relet the Leased Property or any part thereof for the account of Tenant for such rent, for such time (which may be for a term extending beyond the Term of this Lease) and upon such terms as Landlord shall reasonably determine and collect the

rents from such reletting. Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting. Also, in any such case, Landlord may make repairs, alterations and additions in or to the Leased Property and redecorate the same to the extent reasonably deemed by Landlord necessary or desirable and, in connection therewith, change the locks to the Leased Property, and Tenant shall upon demand pay the reasonable cost of all the foregoing together with Landlord's reasonable expenses of reletting. The rents from any such reletting shall be applied first to the payment of the reasonable expenses of reentry, redecoration, repair and alterations and the reasonable expenses of reletting, and second to the payment of Rent herein provided to be paid by Tenant. Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder, and the use of such offsetting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue, and any such excess or residue shall belong to Landlord solely, and in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum (including Base Rent and Tenant's Share of Impositions) which would have been paid by Tenant for the period for which the credit to Tenant is being determined, had no Default occurred. No such reentry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease, unless a written notice of such intention shall be given to Tenant, or shall operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, and Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting.

### Section 19.5    Final Damages

If this Lease is terminated by Landlord as provided for by subparagraph (a) of Section 19.2, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional sums payable by Tenant or for which Tenant is liable or in respect of which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease, which may be then owing and unpaid, and all costs and expenses, including court costs and attorneys' fees, reasonably incurred by Landlord in the enforcement of its rights and remedies hereunder, and, in addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty: (i) the aggregate sum which at the time of such termination represents the excess, if any, of the present value of the aggregate rents which would have been payable after the termination date had this Lease not been terminated, including, without limitation, Base Rent at the annual rate or respective annual rates for the remainder of the Term provided for in Article 4 of this Lease or elsewhere herein, over the then present value of the then aggregate fair rental value of the Leased Property for the balance of the Term, such present value to be computed in each case on the basis of a per annum discount rate equal to the default rate of interest on the termination date (as described in Section 30.8 below) from the respective dates upon which such rentals would have been payable hereunder had this Lease not been terminated; and (ii) any damages in addition thereto, including reasonable attorneys' fees and court costs, which Landlord shall have sustained by reason of the breach of any of the covenants of this Lease other than for the payment of Rent.

### Section 19.6    Removal of Personal Property

All property of Tenant removed from the Leased Property by Landlord pursuant to any provisions of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of Tenant, and Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses reasonably incurred by Landlord in such removal and storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control.  All such property not removed from the Leased Property by Tenant on or before the end of the Term, however terminated (i.e. whether by lapse of time or otherwise), or on or before the earlier termination of Tenant's right of possession of the Leased Property, shall, at Landlord's option, be conclusively deemed to have been conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

### Section 19.7    Attorneys' Fees

Tenant shall pay all of Landlord's costs, charges and expenses, including court costs and reasonable attorneys' fees, reasonably incurred in enforcing Tenant's obligations under this Lease, reasonably incurred by Landlord in any action brought by Tenant in which Landlord is the prevailing party, or reasonably incurred by Landlord in any litigation, negotiation or transaction in which Tenant causes Landlord, without Landlord's fault, to become involved or concerned. Landlord shall pay all of Tenant's costs, charges and expenses, including court costs and attorneys' fees reasonably incurred by Tenant in connection with the enforcement of Landlord's obligations under this Lease, reasonably incurred by Tenant in any action brought by Landlord in which Tenant is the prevailing party, or reasonably incurred by Tenant in any litigation, negotiation or transaction in which Landlord causes Tenant, without Tenant's fault, to become involved or concerned.

### Section 19.8    Grant of Security Interest by Tenant

(a)    To secure its obligations under this Lease, Tenant hereby grants to Landlord a security interest in all of Tenant's right, title and interest in, to and under the following-described property (the "**Collateral**"):

(i)    All of Tenant's interest (whether presently existing or hereafter acquired) in all FF&E which is or becomes attached to, installed in, or used on or in connection with the Leased Property;

(ii)    Tenant's right, title and interest to rent and other payments under any Commercial Leases that may be executed in the future;

(iii)    Tenant's right, title and interest in and under the Operating Contracts, the Hotel Management Agreement, and any other contracts to the extent they may be pledged or assigned;

(iv)    Tenant's revenues, incomes, proceeds, profits and other sums or benefits paid or payable to Tenant in connection with Tenant's operation of the Leased Property; and

(v)    All proceeds, including insurance or condemnation proceeds, that arise out of the sale, liquidation, or other transfer of, or damage to, condemnation of, or destruction of, or

sale, use or enforcement of the above-described Collateral, or any proceeds thereof, including cash proceeds.

(b)　　Tenant shall execute and deliver to Landlord, in form and substance satisfactory to Landlord, such financing statements as Landlord may consider reasonably necessary to create, protect and preserve Landlord's security interest herein granted, and Landlord may cause such statements to be recorded and filed at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest.

(c)　　The security interest granted pursuant to this Section 19.8 is a collateral security interest only, and Tenant shall have full use of and control over the Collateral prior to the occurrence of, and following the cure of, any Default by Tenant hereunder.

(d)　　If requested to do so by Landlord, Tenant shall enter into a separate security agreement with Landlord to provide in greater detail the details of the security interest in the Collateral.

### Section 19.9　　Rights and Remedies of Tenant Upon Landlord Default

(a)　　In addition to any remedies expressly set forth in this Lease, upon any Default by Landlord hereunder, Tenant shall have the right to terminate this Lease as well as all rights and remedies allowed it by law or in equity.

(b)　　In the event that Landlord fails to apply for Part 3 Approval within 30 days of the Possession Date, Tenant shall have the right to direct any Affiliate or member of Landlord to do so. In the event that such other entity fails to comply with this Subsection, Tenant (and/or Tenant's Investor Member) is authorized, on behalf of Landlord, to take such action and file such documents as are necessary to obtain Part 3 Approval, and Landlord hereby grants to Tenant and Tenant's Investor Member power of attorney coupled with an interest to execute any and all necessary documents in connection therewith.

## ARTICLE 20

### Financing

### Section 20.1    Existing Mortgages

Landlord may hereafter from time to time execute and deliver one or more mortgages or deeds of trust (hereinafter referred to as a "**Mortgage**") against the Leased Property or any interest therein.  Upon request by any such mortgagee, Landlord may grant a security interest to such mortgagee in Landlord's interest in the Collateral in which Landlord has a security interest pursuant to Section 19.8 as security for Landlord's obligations under loan documents.  In such case, in the event of any foreclosure under any such security interest, Park Place Commercial, L.P. (and no subsequent Landlord hereunder) shall be obligated to pay to Tenant any damages suffered by Tenant as a result of such foreclosure including, without limitation, the fair market value of all Collateral lost by Tenant in such transaction; provided, however, the amounts due Tenant under this paragraph shall be offset by any amounts owed by Tenant to Landlord as a result of any Default by Tenant under this Lease.

### Section 20.2    Liability of Holder of Mortgage; Attornment

It is further agreed that (i) if any Mortgage shall be foreclosed, (A) the holder of the Mortgage, ground lessor (or their respective grantees) or purchaser at any foreclosure sale (or grantee in a deed in lieu of foreclosure), as the case may be, shall not be (x) liable for any act or omission of any prior landlord (including Landlord), (y) subject to any offsets or counterclaims which Tenant may have against a prior landlord (including Landlord), or (z) bound by any prepayment of Rent that Tenant may have made in excess of the amounts then due for the next succeeding month; (B) the liability of the mortgagee hereunder or the purchaser at such foreclosure sale or the liability of a subsequent owner designated as Landlord under this Lease shall exist only so long as such mortgagee, purchaser or owner is the owner of the Leased Property, and such liability shall not continue or survive with respect to claims accruing after further transfer of ownership; and (C) upon request of the mortgagee, if the Mortgage shall be foreclosed, Tenant will attorn, as Tenant under this Lease, to the purchaser at any foreclosure sale under any Mortgage, and Tenant will execute such instruments as may be necessary or appropriate to evidence such attornment; and (ii) this Lease may not be modified or amended so as to reduce the Rent or shorten the Term provided hereunder or increase Landlord's obligations or decrease Tenant's obligations or so as to adversely affect in any other respect to any material extent the rights of Landlord and obligations of Tenant, nor shall this Lease be cancelled or surrendered, without the prior written consent, in each instance, of the mortgagee under any Mortgage.

### Section 20.3    Short Form Lease or Notice of Lease

Should any prospective mortgagee require execution of a short form or memorandum or notice of lease for recording (containing the names of the parties, a  description of the Leased Property and the Term of this Lease) or a certification from Tenant concerning this Lease in such form as may be reasonably required by a prospective mortgagee, Tenant agrees to promptly execute such short form of lease or certificate and deliver the same to Landlord within ten

(10) days following the request therefor, whereupon Landlord shall join in the execution of such short form lease and arrange for the recordation thereof.  In addition, at the request of Landlord or Tenant, the parties shall execute a short form of lease or notice of lease for recording containing the names of the parties, a description of the Leased Property and the Term of this Lease.

### Section 20.4    Tenant Protections

With respect to any Mortgage to which Tenant's interest under this Lease shall be subordinate, Landlord shall cause the mortgagee thereunder and its successors and assigns to agree to recognize and not disturb the interest of Tenant in the event of a default by Landlord under said Mortgage.  Notwithstanding the foregoing, Landlord shall agree to cause any notice of default under such Mortgage for the financing related thereto to be promptly given to Tenant and Landlord shall agree to cause Tenant to have a right to cure any default by Landlord under said Mortgage.

### Section 20.5    Limitation on Landlord's Rights To Refinance

Within the limitations set forth below, and provided Landlord provides documentation to Tenant's Investor Member that any such refinancing complies with the limitations set forth below, Landlord shall be free to encumber the Leased Property with any amount of mortgage indebtedness so long as (i) total mortgage debt of which the Leased Property is subject is less than seventy percent (70%) of fair market value of the Leased Property at the time such debt is incurred or on an as completed or rent stabilized basis if the mortgage lender uses such concepts in determining the amount of the mortgage indebtedness and (ii) Landlord is able to maintain a 1.25 debt service coverage ratio with the refinancing ("**Qualified Mortgage Debt**"), provided (a) Landlord provides documentation for review by Tenant's Investor Member to ensure that any such refinancing complies with the limitations set forth above and (b) each lender providing such mortgage indebtedness enters into a subordination, nondisturbance and attornment agreement with Tenant in a form satisfactory to Tenant's Investor Member.  Landlord shall not encumber the Leased Property with mortgage debt in excess of the Qualified Mortgage Debt without Tenant's prior written consent evidenced by a writing signed by all Members of Tenant.  No adjustments shall be made to the Rent payable under this Lease as a result of any increased debt service costs incurred by Landlord.  Landlord shall not refinance in a manner which would reduce the credit base by reason of the at-risk rules under Section 49 of the Internal Revenue Code or cause recapture of Historic Tax Credits.  Landlord shall pay legal expenses incurred by Tenant's Investor Member which are incurred in connection with a refinancing of the Leased Property by Landlord.

## ARTICLE 21

## MORTGAGEE PROTECTION

Tenant agrees to give any holder of any Mortgage (as defined in Section 20.1 hereof) against the Leased Property, or any interest therein, by registered or certified mail, a copy of any notice or claim of Default served upon Landlord by Tenant, provided that prior to such notice Tenant has been notified in writing (by way of service on Tenant of a copy of an

assignment of Landlord's interests in leases, or otherwise) of the address of such Mortgage holder.  Tenant further agrees that if Landlord shall have failed to cure such Default within twenty (20) days after such notice to Landlord (or if such Default cannot be cured or corrected within that time, then such additional time as may be necessary if Landlord has commenced within such twenty (20) days and is diligently pursuing the remedies or steps necessary to cure or correct such Default), then the holder of the Mortgage shall have an additional thirty (30) days within which to cure or correct such Default (or if such Default cannot be cured or corrected within that time, then such additional time as may be necessary if such holder of the Mortgage has commenced within such thirty (30) days and is diligently pursuing the remedies or steps necessary to cure or correct such Default, including the time necessary to obtain possession if possession is necessary to cure or correct such Default).

## ARTICLE 22

## ESTOPPEL CERTIFICATE

Tenant agrees that, from time to time upon not less than ten (10) days' prior request by Landlord or the holder of any Mortgage or any ground lessor, Tenant (or any permitted assignee, subtenant, licensee, concessionaire or other occupant of the Leased Property claiming by, through or under Tenant) will deliver to Landlord, or to the holder of any Mortgage or any ground lessor, a statement in writing signed by Tenant certifying (i) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease as modified is in full force and effect and identifying the modifications); (ii) the date upon which Tenant began paying Rent and the dates to which the Rent and other charges have been paid; (iii) that Landlord is not in Default under any provision of this Lease, or, if in Default, the nature thereof in detail; (iv) that (if applicable) the Leased Property have been completed in accordance with the terms hereof and Tenant is in occupancy and paying Rent on a current basis with no rental offsets or claims; (v) that there has been no prepayment of Rent other than that provided for in this Lease; (vi) that there are no actions, whether voluntary or otherwise, pending against Tenant under the bankruptcy laws of the United States or any state thereof; and (vii) such other matters as may be required by Landlord, the holder of the Mortgage or any ground lessor.  Landlord shall provide a statement of like tenor if and as requested by Tenant.

## ARTICLE 23

## SUBROGATION AND INSURANCE

### Section 23.1    Waiver of Subrogation

Landlord and Tenant agree to have all fire and extended coverage and other property damage insurance which may be carried by either of them endorsed with a clause (if commercially available) providing that any release from liability of, or waiver of claim for, recovery from the other party entered into in writing by the insured thereunder prior to any loss or damage shall not affect the validity of said policy or the right of the insured to recover thereunder and providing further that the insurer waives all rights of subrogation which such insurer might have against the other party.  Without limiting any release or waiver of liability or recovery set forth elsewhere in this Lease, and notwithstanding anything in this Lease which may

appear to be to the contrary, each of the parties hereto waives all claims for recovery from the other party for any loss or damage to any of its property insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance policies. Notwithstanding the foregoing or anything contained in this Lease to the contrary, any release or any waiver of claims shall not be operative, nor shall the foregoing endorsements be required, in any case where the effect of such release or waiver is to invalidate insurance coverage or invalidate the right of the insured to recover thereunder or to increase the cost thereof (provided that in the case of increased cost the other party shall have the right, within ten (10) days following written notice, to pay such increased cost keeping such release or waiver in full force and effect).

### Section 23.2    Tenant's Insurance

(a)    From and after the Possession Date, Tenant shall procure and maintain policies of insurance, including, without limitation, liability, casualty and rental interruption insurance for the Leased Property, at its sole cost and expense, during the entire Term hereof with terms and coverages and companies reasonably satisfactory to Landlord and with such increases in limits as Landlord may from time to time reasonably request,  including all insurance required under any loan documents entered into by Landlord and/or under the Hotel Management Agreement the Commercial Leases or the Operating Contracts.  Alternatively, Landlord may cause such policies to be procured and maintained, and Tenant shall reimburse Landlord for the cost thereof, upon demand.  If Landlord provides policies of insurance, such policies shall be all risk coverage exclusive of footings and foundation.

(b)    All policies of insurance required hereunder which insure against loss or damage to the Leased Property shall provide that the proceeds thereof (or so much of such proceeds as pertain to loss or damage to the Leased Property) shall be payable to Landlord, and if Landlord so requests, shall also be payable to any contract purchaser of the Leased Property and any holder of a Mortgage, as the interest of such purchaser or holder of a Mortgage appears pursuant to a standard additional insured or mortgagee clause.  Tenant shall not, on Tenant's own initiative or pursuant to request or requirement of any third party, take out separate insurance concurrent in form or contributing in the event of loss with that required hereunder, unless Landlord is included therein as an additional insured with loss payable as in this Section provided Tenant shall immediately notify Landlord whenever any such separate insurance is taken out and shall deliver to Landlord duplicate originals thereof or original certificates evidencing the same with true copies of such insurance policies attached.  All such policies of insurance shall provide that any loss shall be payable to Landlord notwithstanding any act or omission of Tenant which might otherwise result in a forfeiture or reduction of such insurance.

### Section 23.3    Certificates of Insurance

Prior to the commencement of the Term (unless Landlord has elected to procure the policies of insurance as provided above), Tenant shall furnish to Landlord policies or certificates evidencing such coverage, which policies or certificates shall state that such insurance coverage may not be reduced, cancelled or not renewed without at least thirty (30) days' prior written notice to Landlord and Tenant (unless such cancellation is due to nonpayment of premium, and, in that case, only ten (10) days' prior written notice shall be sufficient).

## ARTICLE 24

## NONWAIVER

No waiver of any condition expressed in this Lease shall be implied by any failure of either party to enforce any remedy on account of the violation of such condition whether or not such violation be continued or repeated subsequently, and no express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated.  Without limiting Landlord's rights under Article 10, it is agreed that no receipt of monies by Landlord from Tenant after the termination in any way of the Term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Term or affect any notice given to Tenant prior to the receipt of such monies.  It is also agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Leased Property, Landlord may receive and collect any monies due, and the payment of said monies shall not waive or affect said notice, suit or judgment.

## ARTICLE 25

## AUTHORITY OF TENANT AND LANDLORD

(a)     Tenant is a limited liability company and Tenant represents and warrants that all of the Persons who are managers or managing members in such limited liability company have executed this Lease on behalf of Tenant, or that this Lease has been executed and delivered pursuant to and in conformity with a valid and effective authorization therefor by all of the managers or managing members of such company and is and constitutes the valid and binding agreement of the company enforceable in accordance with its terms.

(b)     Landlord is a duly organized limited partnership validly existing under the laws of the State of California and has full power and authority to perform its obligations under the this Lease and all other documents related to the ownership and operation of the Leased Property to which it is a party.  The execution and delivery of this Lease and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to Tenant or the Leased Property by Landlord have been or will be duly authorized by all necessary corporate or other action, and the consummation of any such transactions with or on behalf of Tenant will not constitute a breach or violation of, or a default under, the charter or by-laws or other governing documents of Landlord or any agreement by which Landlord or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.

## ARTICLE 26

## REAL ESTATE BROKERS

Each party represents that it has not dealt with any broker in connection with this Lease, and agrees to indemnify and hold the other harmless from all Adverse Consequences arising from any claims or demands of any broker or brokers or finders for any commission alleged to be due such broker or brokers or finders in connection with its having introduced such party to the Leased Property or dealing with such party in the negotiation of this Lease.

## ARTICLE 27

## NOTICES

All notices and demands or requests required or desired to be given by either party to the other with respect to this Lease or the Leased Property shall be in writing and shall be sent by overnight courier service, prepaid, or sent by United States registered or certified mail, return receipt requested, postage prepaid, and addressed as herein provided.  Notices to or demands upon Tenant shall be addressed to Park Place Master Tenant LLC, Singpoli Corporate Center, 25 E. Foothill Boulevard, 2nd Floor, Arcadia, CA 91006, Attention:  William Cho with copies to East West Bancorp., Inc., 135 North Los Robles Avenue, 7th Floor, Pasadena, California  91101, Attention: Keith Kishiyama (Email: Keith.Kishiyama@eastwestbank.com), and, Bryan Cave LLP, 1155 F Street NW, Washington, D.C. 20004, Attention:  Jerome A. Breed, Esq.  Notices to or demands upon Landlord shall be addressed to Park Place Commercial, L.P. at Signpoli Corporate Center with a copy to Philip Kim, Esq. Singpoli Corporate Center, 25 E. Foothill Boulevard, 2nd Floor, Arcadia, CA 91006.  A copy of any notice sent by Tenant to Landlord or by Landlord to Tenant shall also be forwarded to Tenant's Investor Member and its counsel at the address noted above.  Notice demands shall be deemed given and served (i) upon receipt of or refusal to accept any such notice or demand, or (ii) one (1) business day after the deposit of any such notice or demand with an overnight courier service.  Either party may change its address for receipt of notices by giving notice of such change to the other party in accordance herewith.  Notices and demands from Landlord to Tenant may be signed by Landlord, its general partner, or its duly authorized agent.

## ARTICLE 28

## HAZARDOUS SUBSTANCES

**Section 28.1   Defined Terms.**

As used in this Lease, the following terms shall have the meanings set forth below:

(a)      "**Claim**" shall mean and include any demand, cause of action, proceeding or suit (i) for damages (actual or punitive), losses, injuries to person or property, damages to natural resources, fines, penalties, interest, contribution or settlement, (ii) for the costs of site investigations, feasibility studies, information requests, health or risk assessments or Response actions, and (iii) for enforcing insurance, contribution or indemnification agreements.

(b)      "**Environmental Laws**" shall mean and include all existing and future federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, health, safety, contamination and cleanup, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq., and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. Section 136 et seq.; the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Section 1401 et seq.; the National Environmental Policy Act, 42 U.S.C. Section 4321 et seq.; the Noise Control Act, 42 U.S.C. Section 4901 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.

Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right to Know Act, and the Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act ("TSCA"), 15 U.S.C. Section 2601 et seq.; the Atomic Energy Act, 42 U.S.C. Section 2011 et seq., the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 et seq. and the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq; and state superlien and environmental cleanup statutes, with implementing regulations and guidelines. Environmental Laws shall also include all existing and future state, regional, county, municipal and other local laws, regulations and ordinances insofar as they are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials.

(c)     "**Hazardous Materials**" shall mean and include the following, including mixtures thereof:   any hazardous substance, pollutant, contaminant, waste, byproduct or constituent regulated under any Environmental Laws; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides regulated under the FIFRA; asbestos and/or any material which contains any hydrated mineral silicate, including but not limited to chrysolite, amosite, crocidolite, tremolite, anthophylite, and/or actinolite, whether friable or non-friable, lead-based paint, PCBs and other substances regulated under the TSCA; source material, special nuclear material, byproduct material and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200 et seq.; and industrial process and pollution control wastes, whether or not hazardous within the meaning of RCRA, together with any and all other hazardous or toxic materials regulated from time to time under any other Environmental Laws.

(d)     "**Manage**" or "**Management**" means to generate, manufacture, process, treat, store, use, reuse, refine, recycle, reclaim, blend or burn for energy recovery, incinerate, accumulate speculatively, transport, transfer, dispose of or abandon Hazardous Materials.

(e)     "**Release**" or "**Released**" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of Hazardous Materials into the environment, as "environment" is defined in CERCLA.

(f)     "**Response**" or "**Respond**" shall mean action taken in compliance with Environmental Laws to correct, remove, remediate, cleanup, prevent, mitigate, monitor, evaluate, investigate, assess or abate the Release of a Hazardous Material.

## Section 28.2   Tenant's Obligations with Respect to Environmental Matters

During the Term of this Lease:   (i) Tenant shall at its own cost comply with all Environmental Laws; (ii) Tenant shall not conduct or authorize the Management of any Hazardous Materials on the Leased Property, including installation of any underground storage tanks, without prior written disclosure to and approval by Landlord, provided, however, that the use by Tenant of cleaning products and other materials used in the ordinary course of the

operation of the Leased Property shall be deemed disclosed to and approved by Landlord, as long as such use is not in violation of any Environmental Laws; (iii) Tenant shall not take or permit any action that would subject the Leased Property to permit requirements under RCRA or any other Environmental Laws for storage, treatment or disposal of Hazardous Materials; (iv) Tenant shall not dispose of or permit the disposal of Hazardous Materials in dumpsters (if any) provided by Landlord for Tenant use; (v) Tenant shall not discharge or permit the discharge of Hazardous Materials into drains or sewers; (vi) Tenant shall not cause or allow the Release of any Hazardous Materials on, to or from the Leased Property; and (vii) Tenant shall at its own cost arrange for the lawful transportation and offsite disposal of all Hazardous Materials that is generated by the operation of the Leased Property.

### Section 28.3    Copies of Notices

During the term of this Lease, Tenant shall promptly provide Landlord with copies of all summons, citations, directives, information inquiries or requests, notices of potential responsibility, notices of violation or deficiency, orders or decrees, Claims, complaints, investigations, judgments, letters, notices of environmental liens or Response actions in progress and other communications, written or oral, actual or threatened, from the United States Environmental Protection Agency, Occupational Safety and Health Administration, California Environmental Protection Agency or other federal, state or local agency or authority, or any other entity or individual, concerning (i) any Release of a Hazardous Material on, to or from the Leased Property; (ii) the imposition of any lien on the Leased Property; or (iii) any alleged violation of or responsibility under Environmental Laws.  Landlord and Landlord's agents, contractors, beneficiaries and employees (and the agents, contractors, employees or representatives of any such parties) shall have the right subject to the other applicable provisions of this Lease to enter the Leased Property and conduct appropriate inspections or tests in order to determine Tenant's compliance with Environmental Laws.

### Section 28.4    Tests and Reports

Upon written request by Landlord, Tenant shall provide Landlord with the results of appropriate reports and tests, with transportation and disposal contracts for Hazardous Materials, with any permits issued under Environmental Laws, and with any other applicable documents to demonstrate that Tenant complies with all Environmental Laws relating to the Leased Property, and if such reports, tests or other items reveal any failure of the Leased Property to so comply with all Environmental Laws, then, in addition to other rights and remedies of Landlord hereunder, Tenant shall reimburse Landlord, upon demand, for the reasonable cost of conducting reports, tests and other investigations as necessary to demonstrate compliance with all Environmental Laws.

### Section 28.5    Access and Inspection

Landlord and its agents and representatives shall have access to the Leased Property and to the books and records of Tenant (and any occupant of the Leased Property claiming by, through or under Tenant) relating to Hazardous Materials for the purpose of ascertaining the nature of the activities being conducted thereon and to determine the type, kind and quantity of all products, materials and substances brought onto the Leased Property or made or produced

thereon. Landlord and its agents and representatives shall have the right to take samples in quantity sufficient for scientific analysis of all products, materials and substances present on the Leased Property, including, but not limited to, samples of products, materials or substances brought onto or made or produced on the Leased Property by Tenant or an occupant claiming by, through or under Tenant or otherwise present on the Leased Property. And, further, notwithstanding any provision of this Lease or applicable statutes or judicial decisions to the contrary, with respect to any assignment, subletting, grant of license, concession or any other permission to use the Leased Property by any Person other than Tenant, Landlord shall have the right to withhold Landlord's consent thereto if, the assignee, subtenant, licensee, concessionaire or such other Person is not capable of performing or is not sufficiently qualified to perform in accordance with the requirements of this Lease. Any assignment, sublease, license or other permission to use the Leased Property from which Landlord withholds its consent as provided in this Section 28.5 shall be voidable at Landlord's sole option.

### Section 28.6    Tenant's Obligation To Respond

If Tenant's Management of Hazardous Materials at the Leased Property (i) gives rise to liability or to a Claim under any Environmental Law, (ii) causes a significant public health effect, or (iii) creates a nuisance, Tenant shall promptly take all appropriate action in Response.

### Section 28.7    Landlord's Obligations with respect to Environmental Matters

As part of Landlord's Work, Landlord shall cause the Leased Property to be in compliance with all Environmental Laws prior to the Possession Date and, without limitation of the foregoing, shall cause removal of all Hazardous Materials on or about the Leased Property required to be removed under applicable Environmental Laws and all Response work with respect to existing violation of Environmental Laws to be performed in accordance with the recommendations contained in the Environmental Reports.

### Section 28.8    Indemnification

(a)      Tenant shall indemnify, defend and hold harmless Landlord, its partners or members, its beneficiaries, its lenders, any managing agents and leasing agents of the Leased Property, and their respective beneficiaries, agents, partners, officers, directors and employees, from all Claims (other than those arising from a breach by Landlord of its obligation under Section 28.7) arising from or attributable to: (i) the presence of Hazardous Materials in or on the Leased Property or the subsurface thereof or the violation of any Environmental Laws (including, without limiting the generality thereof, any cost, Claim, liability or defense expended in Response required by a Governmental Authority or by reason of the Release, escape, seepage, leakage, discharge or migration of any Hazardous Material on or from the Leased Property or violation of any Environmental Laws), or (ii) any breach by Tenant of any of its obligations, warranties, representations or covenants in this Lease. Tenant's obligations hereunder shall survive the termination or expiration of this Lease.

(b)      Landlord shall indemnify, defend and hold harmless Tenant, its partners or members, its beneficiaries, its lenders, any managing agents and leasing agents of the Leased Property, and their respective beneficiaries, agents, partners, officers, directors and employers,

from all Claims arising from or attributable to any breach by Landlord of any of its representations, warranties or covenants in Section 28.7.  Landlord's obligations hereunder shall survive the termination or expiration of this Lease.

## ARTICLE 29

## TITLE AND COVENANT AGAINST LIENS

Landlord's title in and to the Leased Property is and always shall be paramount to the title of Tenant, and nothing in this Lease contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord in and to the Leased Property.  Tenant covenants and agrees not to suffer or permit any lien of mechanics or materialmen to be placed upon or against the Leased Property or against Tenant's Leasehold Interest in the Leased Property and, in case of any such lien attaching, to immediately pay and remove same.  Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law or otherwise, to attach to or be placed upon the Leased Property and any and all liens and encumbrances created by Tenant shall attach only to Tenant's Leasehold Interest in the Leased Property.  If any such liens so attach and Tenant fails to pay and remove or bond over same within ten (10) days after notice thereof, Landlord, at its election, may pay and satisfy the same, and in such event the sums so paid by Landlord shall accrue with interest from the date of payment at the rate set forth in Section 30.8 hereof for amounts owed to Landlord by Tenant.  Such sums shall be deemed to be additional rent due and payable by Tenant at once without notice or demand.  Nothing contained in this Article 29 shall obligate Tenant to pay and remove any lien of mechanics or materialmen imposed because of the action or inaction of Landlord.

## ARTICLE 30

## MISCELLANEOUS

### Section 30.1    Successors and Assigns

Each provision of this Lease shall extend to and shall bind and inure to the benefit not only of Landlord and Tenant, but also their respective heirs, legal representatives, successors and assigns, but this provision shall not operate to permit any transfer, assignment, mortgage, encumbrance, lien, charge or subletting contrary to the provisions of this Lease.

### Section 30.2    Modifications in Writing

No modification, waiver or amendment of this Lease or of any of its conditions or provisions shall be binding upon either party unless in writing signed by such party.

### Section 30.3    No Option; Irrevocable Offer

Submission of this instrument for examination shall not constitute a reservation of or option for the Leased Property or in any manner bind Landlord, and no lease or obligation of Landlord shall arise until this instrument is signed and delivered by Landlord and Tenant.

### Section 30.4    Definition of Tenant

The word "**Tenant**" whenever used herein shall be construed to mean Tenants or any one or more of them in all cases where there is more than one Tenant; and the necessary grammatical changes required to make the provisions hereof apply either to corporations or other organizations, partnerships or other Entities, or individuals, shall in all cases be assumed as though in each case fully expressed herein.  In all cases where there is more than one Tenant, the liability of each shall be joint and several.

### Section 30.5    Definition of Landlord

The term "**Landlord**" as used in this Lease means only the owner or owners at the time being of the Leased Property so that in the event of any assignment, conveyance or sale, once or successively, of said Leased Property, or any assignment of this Lease by Landlord, said Landlord making such sale, conveyance or assignment shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder accruing after such sale, conveyance or assignment, and Tenant agrees to look solely to such purchaser, grantee or assignee with respect thereto.  This Lease shall not be affected by any such assignment, conveyance or sale, and Tenant agrees to attorn to the purchaser, grantee or assignee.

### Section 30.6    Headings

The headings of Articles and Sections are for convenience only and do not limit, expand or construe the contents of the Sections.

### Section 30.7    Time of Essence

Time is of the essence of this Lease and of all provisions hereof.

### Section 30.8    Default Rate of Interest

All amounts (including, without limitation, Rent and Additional Rent) owed by Tenant to Landlord pursuant to any provision of this Lease and not paid within ten (10) days from the date when due shall bear interest from the date due until paid at the annual rate of one percent (1%) in excess of the Designated Prime Rate, unless a lesser rate shall then be the maximum rate permissible by law with respect thereto, in which event said lesser rate shall be charged.

### Section 30.9    Severability

The invalidity of any provision of this Lease shall not impair or affect in any manner the validity, enforceability or effect of the rest of this Lease.

### Section 30.10   Entire Agreement

All understandings and agreements, oral or written, heretofore made between the parties hereto are merged in this Lease and the HTC Pass-Through Agreement, which alone fully and completely expresses the agreements between Landlord (and its beneficiary, if any, and their agents) and Tenant.

### Section 30.11 <u>Force Majeure</u>

If either party fails to timely perform any of the terms, covenants and conditions of this Lease on its part to be performed (other than relating to the payment of money) and such failure is due in whole or in part to any strike, lockout, labor trouble, civil disorder, inability to procure materials, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, fuel shortages, accidents, casualties, acts of God, acts caused directly or indirectly by the other party (or the other party's agents, employees, contractors, licensees or invitees) or any other cause beyond the reasonable control of such party, then such party shall not be deemed in default under this Lease as a result of such failure and any time for performance by such party provided for herein shall be extended by the period of delay resulting from such cause.

### Section 30.12 <u>Signs</u>

Tenant may erect signs on the exterior or interior of the Leased Property, provided that such sign or signs (i) do not cause any structural damage or other damage to the Leased Property; (ii) do not violate applicable governmental laws, ordinances, rules or regulations; (iii) do not violate any covenants, conditions or restrictions affecting the Leased Property; and (iv) are compatible with the architecture of the Leased Property.

### Section 30.13 <u>Waiver of Trial by Jury</u>

It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use of or occupancy of the Leased Property or any claim of injury or damage and any emergency statutory or any other statutory remedy.  If Landlord commences any summary proceeding for nonpayment of Rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.

### Section 30.14 <u>Relationship of Parties</u>

Nothing contained in this lease shall be deemed or construed by the parties to this Lease, or by any third party, to create the relationship of principal and agent, partnership, joint venture, lender and borrower, or any association between Landlord and Tenant, it being expressly understood and agreed that neither the method of computing Rent hereunder nor any other provisions contained in this Lease nor any acts of the parties to this Lease shall be deemed to create any relationship between Landlord and Tenant, other than the leasehold relationship contemplated hereby.

### Section 30.15 <u>No Merger</u>

The parties agree that absent the express written consent of Landlord and Tenant, the fee estate and the leasehold estate created by this Lease shall not merge during the Term, regardless whether the same persons or entities are the owners of both estates.

*[Signatures appear on the following page]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Lease to be executed as of the date first written above.

<u>LANDLORD</u>:

**PARK PLACE COMMERCIAL, L.P.**, a
California limited partnership

By:    Singpoli Pacifica, LLC, its General
       Partner

       By: _____
           Kin Hui
           Manager

<u>TENANT</u>:

**PARK PLACE MASTER TENANT, LLC**, a
California limited liability company

By:    Manager of Park Place Master Tenant,
       LLC, its Managing Member

       By: _____
           Kin Hui
           Manager

# EXHIBIT A-1

## Legal Description of the Land

The land referred to herein is situated in the State of California County of Los Angeles, and described as follows:

A leasehold interest in and to the buildings and improvements located on

PARCEL 1:

Those portions of Lots 5, 6 and 7 of Thomas and Farris Subdivision of Lot 1 and a portion of Lot 4, in Block "L" of the San Pasqual Tract in the City of Pasadena, as per map recorded in Book 10 Page 100 of Miscellaneous Records, in the Office of the County Recorder of said County, described as a whole as follows:

Beginning at the intersection of the Southerly line of Colorado Street, 100 feet wide, with the Westerly line of Mentor Avenue, 60 feet wide; thence North 89° 59' West along said Colorado Street, 224.96 feet to the intersection of the Southerly line of said Colorado Street with the Westerly line of said Lot 5; thence South along said Westerly line, 175.35 feet to the Southwest corner of said Lot 5; thence along the Southerly line of said Lots 5, 6 and 7, South 89° 59' East 224.96 feet to the Westerly line of said Mentor Avenue; thence North along said Mentor Avenue, 175.35 feet to the point of beginning.

PARCEL 2:

The Northerly 2 feet of Lot 8 of Thomas and Farris Subdivision of Lot 1 and a portion of Lot 4 in Block "L" of San Pasqual Tract, in the City of Pasadena, as per map recorded in Book 10 Page 100 of Miscellaneous Records, in the Office of the County Recorder of said County.

EXCEPT the Westerly 65 feet thereof.

Also excepting therefrom any fee interest in the land hereinabove described.

APN:  5735-006-032

**EXHIBIT A-2**

**Legal Description of the Building**

COLORADO   BLVD.

10' 0'

50'

NEW RETAIL BUILDING

EXISTING HISTORIC BUILDING

EXISTING HOTEL

**SECTOR 3**

**SECTOR 2**

STAIR
#1

50'

LAKE   AVE.

**EXISTING BLDG.**
BANK OF AMERICA

**SECTOR 5**
**KITCHEN**

**SECTOR 1**
**HOTEL**
(PREVIOUSLY APPROVED UNDER CONSTRUCTION)

MENTOR   AVE.

6' 0'

30'   30'

ADJACENT BLDG.
RETAIL

**SECTOR 4**

**REFUSE**
**STORAGE**

STAIR
#2

ADJACENT BLDG.
APARTMENTS

PROPERTY LINE   S 89°59'43"W   184.96'

50'

PROPERTY LINE   S 89°59'43"W   168.96'

0'

50'

**EXISTING BLDG.**
BISTRO 45

**SITE PLAN**
SCALE: 1/32" = 1'-0"

NORTH

**LEGEND**

INDICATES NEW BUILDING STRUCTURE

INDICATES EXISTING CONCRETE WALLS AND COLUMNS TO REMAIN

PORTION OF EXISTING HOTEL BUILDING TO RECEIVE LIQUOR LICENSE PERMIT

NEW BUILDING ADDITION

NEW LANDSCAPING

NEW CONCRETE PLANTER

ACCESSIBLE PATH OF TRAVEL

| Project Area Data | |
|---|---|
| Area | Square Footage |
| Total parking stalls in parking garage | 214 |
| Existing courtyard | 1040 |
| Restaurant | 1515 |
| Bar/ Lounge | 1800 |
| Kitchen | 1085 |
| Lodges | 40190 |
| Pool Deck | 7467 |
| Service Bar (Pool Deck) | 164 |

NC:   DATE:   REVISION:

Applicant:
**Park Place Commercial, LP**
20E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

**LIQUOR LICENSE PERMIT SET**

**dusitD2 Pasadena Hotel**

906, 800, 804, 900 E. COLORADO BOULEVARD
PASADENA, CA 91106

**NEW SITE PLAN**

**VICINITY PLAN**



NORTH

| | |
|---|---|
| JOB NO: | LOGICAL |
| DRAWN BY: | FDG |
| ISSUE DATE: | 06/25/2021-4 |
| PLOT DATE: | Jun 25, 2021-4 |

SHEET NO:
**A0.1**



COLORADO   BLVD.

LAKE   AVE.

MENTOR   AVE.

PROPERTY LINE   N 89°59'43"E   226.00'

EXISTING BLDG.
BANK OF AMERICA

OPEN
SPACE

VACANT
RESTAURANT/
RETAIL

OPEN
SPACE

CONCRETE PAVING

HISTORIC
OPEN
COURTYARD

VACANT HOTEL

ADJACENT BLDG.
RETAIL

ADJACENT BLDG.
APARTMENTS

PROPERTY LINE   S 89°59'43"W   184.96'

EXISTING BLDG.
BISTRO 45

EXISTING SITE PLAN

NORTH

LIQUOR LICENSE PERMIT SET

Applicant:
Park Place Commercial, LP
20E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

PROJECT:
dustiD2 Pasadena Hotel

906, 920, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET TITLE:
EXISTING SITE PLAN

JOB NO.:

DRAWN BY:

ISSUE DATE:

PLOT DATE:

SHEET NO.:

AD1.0









ELEVATOR
LOBBY
340 SQ. FT.

ELEV. #1

ELEV. #2

STAIR
#1

FIRE PUMP
ROOM
B401
210 SQ. FT.

TURNAROUND STALL
NO PARKING

7    6

5    3

8

PARKING GARAGE
LEVEL B4.5
B400
3493 SQ. FT.

(20 PARKING STALLS)

1

23

16    17

ELEV. #3

STAIR
#2

COMPOSITE FLOOR PLAN - LEVELS B4.5

SCALE: 1/8" = 1'-0"

NORTH

LIQUOR LICENSE PERMIT SET

NO.   DATE:   REVISION:

Applicant
Park Place Commercial, LP
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

PROJECT:
dusitD2 Pasadena Hotel

906, 920, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET TITLE:
COMPOSITE FLOOR PLAN - LEVELS B4.5

JOB NO.:   1239CAL
DRAWN BY:   FDG
ISSUE DATE:   05/25/2014
PLOT DATE:   Jun 25, 2014

SHEET NO.:
A2.0

KEYPLAN

3-STORY
RETAIL
SECTOR #3

HISTORIC
RETAIL
SECTOR #2

KITCHEN
SECTOR #4

HOTEL
SECTOR #1

PARKING
GARAGE
SECTOR #5











**LIQUOR LICENSE PERMIT SET**

**COMPOSITE FLOOR PLAN - LEVELS B2 - B4**

**KEYPLAN**

**COMPOSITE FLOOR PLAN - LEVELS B2 - B4**

**A2.1**



**COMPOSITE FLOOR PLAN - LEVEL B1**

SCALE : 1/8" = 1'-0"

# LIQUOR LICENSE PERMIT SET

**LEGEND**

- LIQUOR SERVING AREA
- KITCHEN
- LIQUOR STORAGE AREA
- SERVICE BAR AREA
- POOL DECK WITH DRINK SERVICE
- — · — · —▶ SERVING CIRCULATION



Park Place Commercial, LP
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887



PROJECT:
**dusitD2 Pasadena Hotel**
906, 910, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET TITLE:
**COMPOSITE FLOOR PLAN - LEVEL B1**

| | |
|---|---|
| JOB NO.: | 1.078CAL |
| DRAWN BY: | PDG |
| ISSUE DATE: | 04/25/2014 |
| PLOT DATE: | Jun 20, 2014 |

SHEET NO.:
**A2.2**

**KEYPLAN**

RETAIL
SECTOR #3

RETAIL
SECTOR #2

KITCHEN
SECTOR #1

HOTEL
SECTOR #1

PARKING
GARAGE
SECTOR #4



**LIQUOR LICENSE PERMIT SET**

COMPOSITE FLOOR PLAN - LEVEL 1

**LEGEND**

- LIQUOR SERVING AREA
- KITCHEN
- LIQUOR STORAGE AREA
- SERVICE BAR AREA
- POOL DECK WITH DRINK SERVICE
- SERVING CIRCULATION

Park Place Commercial, LP
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

**PROJECT:**

**dusitD2 Pasadena Hotel**

906, 920, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

**COMPOSITE FLOOR PLAN - LEVEL 1**

**KEY PLAN**

RETAIL
SECTOR #3

RETAIL
SECTOR #2

KITCHEN
SECTOR #5

HOTEL
SECTOR #1

PARKING
GARAGE
SECTOR #4

| | |
|---|---|
| JOB NO.: | 1256CAL |
| DRAWN BY: | PDG |
| ISSUE DATE: | 06/25/2021-4 |
| PLOT DATE: | Jun 20, 2014 |

**SHEET NO.:**

**A2.3**





**COMPOSITE FLOOR PLAN - LEVEL 2**

SCALE: 1/8" = 1'-0"



## LIQUOR LICENSE PERMIT SET

### LEGEND

- LIQUOR SERVING AREA
- KITCHEN
- LIQUOR STORAGE AREA
- SERVICE BAR AREA
- POOL DECK WITH DRINK SERVICE
- SERVING CIRCULATION

| NO. | DATE: | REVISION: |
|-----|-------|-----------|

Applicant:
**Park Place Commercial, LP**
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

### KEY PLAN

RETAIL SECTOR #3
RETAIL SECTOR #2
KITCHEN SECTOR #4
HOTEL SECTOR #1
PARKING GARAGE SECTOR #4

PROJECT:
**dusitD2 Pasadena Hotel**
906, 920, 924, 926 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET FOR:
**COMPOSITE FLOOR PLAN - LEVEL 2**

| JOB NO: | 1202CAL |
|---------|---------|
| DRAWN BY: | PDG |
| ISSUE DATE: | 06/25/2021-4 |
| PLOT DATE: | Jun 25, 2021-4 |

SHEET NO:
**A2.4**





# LIQUOR LICENSE PERMIT SET

**COMPOSITE FLOOR PLAN - LEVEL 2.5**

SCALE: 1/8" = 1'-0"

NORTH



Applicant:
Park Place Commercial, LP
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

**KEY PLAN**

| RETAIL SECTOR #3 | RETAIL SECTOR #2 | |
| PARKING GARAGE SECTOR #4 | KITCHEN SECTOR #4 | HOTEL SECTOR #1 |

PROJECT:
**dustiD2 Pasadena Hotel**
906, 920, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET TITLE:
**FLOOR PLAN - LEVEL 2.5**

| JOB NO: | 1215LCXL |
| DRAWN BY: | FSG |
| ISSUE DATE: | 05/25/2021-4 |
| PLOT DATE: | Jun 25, 2014 |

SHEET NO:
**A2.5**



# LIQUOR LICENSE PERMIT SET

## LEGEND

- LIQUOR SERVING AREA
- KITCHEN
- LIQUOR STORAGE AREA
- SERVICE BAR AREA
- POOL DECK WITH DRINK SERVICE
- SERVING CIRCULATION

**COMPOSITE FLOOR PLAN - LEVEL 3**

SCALE: 1/8" = 1'-0"



**PROJECT:**
dustiD2 Pasadena Hotel

906, 920, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

**SHEET FOR:**
COMPOSITE FLOOR PLAN LEVEL 3

**KEY PLAN**

RETAIL SECTOR #3
RETAIL SECTOR #2
PARKING GARAGE SECTOR #4
KITCHEN SECTOR #4
HOTEL SECTOR #1

**SHEET NO:**

## A2.6

**4. ENLARGED PLAN - SERVICE BAR AT POOL DECK**

**1. ENLARGED KITCHEN PLAN**

KITCHEN
SECTOR #5

STAIR
#4

ELEV #4

CORR.

**2. ENLARGED BASEMENT PLAN - LIQUOR STORAGE**

STORAGE

ELEV #4

ELEV.
EQUIP.

CORRIDOR

WALK-IN
BEER COOLER

WALK-IN
FOOD COOLER

WALK-IN
FREEZER

KITCHEN
BASEMENT

STOR.

LIQUOR
STORAGE

DRY
STORAGE

STORAGE

STAIR #4

VEST.

**3. ENLARGED PLAN - SERVICE BAR AT HOTEL**

**5. SERVICE BAR ELEVATIONS AND SECTION**



# LIQUOR LICENSE PERMIT SET

NO.   DATE:   REVISION:

Applicant:
**Park Place Commercial, LP**
25E. Foothill Blvd.
Arcadia, CA 91006
Tel: 626-566-1888
Fax: 626-566-1887

PROJECT:
**dustID2 Pasadena Hotel**
908, 909, 924, 930 E. COLORADO BOULEVARD
PASADENA, CA 91106

SHEET TITLE:
**ENLARGED FLOOR PLANS**

JOB NO.:

DRAWN BY:   FSG

ISSUE DATE:

PLOT DATE:   Jun 20, 2014

SHEET NO.:

**A3.0**

**EXHIBIT B**

**Existing Leases**

**NONE**

Exhibit B

**EXHIBIT C**

**Operating Contracts**

Parking Use Agreement dated as of April 29, 2014, by and between Landlord and 2 North Lake JV, LLC, providing for the rental of 90 parking spaces by Landlord for use by the Leased Property, for a term of 24 months, which agreement has been assigned to Tenant pursuant to that certain Assignment and Assumption Agreement of Parking Agreement dated July 9, 2014.

## <u>EXHIBIT D</u>

**Landlord's Work**

Landlord is to complete all work described in that certain Construction Contract dated May 27, 2011 by and between Landlord and Singpoli (Hop Kin) Construction and Decoration (Nevada), Inc. and the plans and specifications referenced therein and in accordance with the Historic Preservation Certification Application Part 2 – Description of Rehabilitation for the Building as approved by the National Park Service.

[FF&E]

[list FF&E to be supplied by Landlord and
FF&E to be supplied by Tenant]

# LEASE

## TABLE OF CONTENTS

**Article**      **Page**

**ARTICLE 1** DEFINITIONS ........................................................................................ 1

**ARTICLE 2** GRANT OF LEASE; ASSIGNMENTS ................................................. 5

    **Section 2.1**    **Lease** ........................................................................................ 5
    **Section 2.2**    **Assignment of Existing Leases** ..................................... 5
    **Section 2.3**    **Assignment of Operating Contracts** ........................... 5
**ARTICLE 3** TERM; POSSESSION .......................................................................... 6

    **Section 3.1**    **Term** ......................................................................................... 6
    **Section 3.2**    **Lease Year Defined** .......................................................... 6
    **Section 3.3**    **Landlord's Termination Option** ................................... 7
**ARTICLE 4** BASE RENT .......................................................................................... 7

    **Section 4.1**    **Base Rent** .............................................................................. 7
    **Section 4.2**    **Manner of Payment** ......................................................... 9
    **Section 4.3**    **Net Lease** .............................................................................. 9
    **Section 4.4**    **No Termination** ................................................................ 10
**ARTICLE 5** IMPOSITIONS ................................................................................... 10

    **Section 5.1**    **Obligation To Pay Tenant's Share of Impositions** ............ 10
    **Section 5.2**    **Payment by Tenant** ......................................................... 10
    **Section 5.3**    **Alternative Taxes** ........................................................... 11
    **Section 5.4**    **Estimates of Impositions** ............................................. 11
    **Section 5.5**    **Readjustments; Yearly Proration** .............................. 12
    **Section 5.6**    **Right To Contest** ............................................................. 12
    **Section 5.7**    **Representations and Warranties** ............................... 12
**ARTICLE 6** USE OF LEASED PROPERTY ......................................................... 12

**ARTICLE 7** UTILITIES AND SERVICES; OPERATING EXPENSES; FINANCING
    DOCUMENTS ......................................................................................... 13

    **Section 7.1**    **Utilities and Services** ..................................................... 13
    **Section 7.2**    **Regulations Regarding Utilities and Services** ............ 13
    **Section 7.3**    **Debt Service** ....................................................................... 14
**ARTICLE 8** CONDITION AND CARE OF LEASED PROPERTY ..................... 14

    **Section 8.1**    **Possession.** ......................................................................... 14
    **Section 8.2**    **Tenant Obligations** ......................................................... 16
    **Section 8.3**    **Compliance With Rules and Regulations; Compliance with
    Covenants** ............................................................................................. 16
    **Section 8.4**    **Existing Equipment** ....................................................... 17

Section 8.5      **Tax Credits** ................................................................... 17
Section 8.6      **Initial FF&E** .................................................................. 18
**ARTICLE 9** RETURN OF LEASED PROPERTY ...................................... 18

Section 9.1      **Surrender of Possession** .............................................. 18
Section 9.2      **Installations and Additions** ....................................... 18
Section 9.3      **Trade Fixtures and Personal Property** ...................... 19
Section 9.4      **Option To Acquire FF&E** ........................................... 19
**ARTICLE 10** HOLDING OVER ................................................................ 20

**ARTICLE 11** COMPLIANCE BY TENANT ............................................. 20

**ARTICLE 12** RIGHTS RESERVED TO LANDLORD ............................. 20

**ARTICLE 13** MAINTENANCE ................................................................. 21

**ARTICLE 14** ALTERATIONS ................................................................... 21

Section 14.1      **Limitation** ................................................................. 21
Section 14.2      **Procedures for Alterations, Additions or Improvements** .......... 21
**ARTICLE 15** ASSIGNMENT AND SUBLETTING ................................ 22

Section 15.1      **Assignment and Subletting** ...................................... 22
Section 15.2      **Tenant To Remain Obligated** .................................. 22
Section 15.3      **Landlord's Consent** ................................................... 23
Section 15.4      **Assignee To Assume Obligations** ............................ 23
Section 15.5      **Change of Ownership or Control of Tenant** ............. 23
**ARTICLE 16** WAIVER OF CERTAIN CLAIMS; INDEMNITY BY TENANT ........... 24

Section 16.1      **Waiver of Certain Claims; Release by Tenant** .......... 24
Section 16.2      **Damage Caused by Tenant's Neglect** ...................... 24
Section 16.3      **Tenant Responsible for Personal Property** .............. 24
Section 16.4      **Indemnification** ........................................................ 24
**ARTICLE 17** DAMAGE OR DESTRUCTION BY CASUALTY .............. 25

**ARTICLE 18** EMINENT DOMAIN .......................................................... 26

**ARTICLE 19** DEFAULT ........................................................................... 26

Section 19.1      **Events of Default** ...................................................... 26
Section 19.2      **Rights and Remedies of Landlord upon Tenant Default** .......... 27
Section 19.3      **Right To Re-enter** ..................................................... 28
Section 19.4      **Current Damages** ....................................................... 28
Section 19.5      **Final Damages** ........................................................... 29
Section 19.6      **Removal of Personal Property** ................................... 29
Section 19.7      **Attorneys' Fees** ......................................................... 30
Section 19.8      **Grant of Security Interest by Tenant** ........................ 30
Section 19.9      **Rights and Remedies of Tenant Upon Landlord Default** ......... 31

**ARTICLE 20** Financing ................................................................................................ 32

    **Section 20.1**    **Existing Mortgages**.................................................................. 32
    **Section 20.2**    **Liability of Holder of Mortgage; Attornment** ........................... 32
    **Section 20.3**    **Short Form Lease or Notice of Lease** ........................................ 32
    **Section 20.4**    **Tenant Protections** ................................................................... 33
    **Section 20.5**    **Limitation on Landlord's Rights To Refinance** ......................... 33
**ARTICLE 21** MORTGAGEE PROTECTION ................................................................. 33

**ARTICLE 22** ESTOPPEL CERTIFICATE ..................................................................... 34

**ARTICLE 23** SUBROGATION AND INSURANCE ....................................................... 34

    **Section 23.1**    **Waiver of Subrogation** ............................................................. 34
    **Section 23.2**    **Tenant's Insurance** .................................................................. 35
    **Section 23.3**    **Certificates of Insurance** .......................................................... 35
**ARTICLE 24** NONWAIVER ......................................................................................... 36

**ARTICLE 25** AUTHORITY OF TENANT AND LANDLORD ........................................ 36

**ARTICLE 26** REAL ESTATE BROKERS ....................................................................... 36

**ARTICLE 27** NOTICES ............................................................................................... 37

**ARTICLE 28** HAZARDOUS SUBSTANCES ................................................................. 37

    **Section 28.1**    **Defined Terms.** ......................................................................... 37
    **Section 28.2**    **Tenant's Obligations with Respect to Environmental**
        **Matters**    38
    **Section 28.3**    **Copies of Notices**..................................................................... 39
    **Section 28.4**    **Tests and Reports** .................................................................... 39
    **Section 28.5**    **Access and Inspection** .............................................................. 39
    **Section 28.6**    **Tenant's Obligation To Respond** ............................................. 40
    **Section 28.7**    **Landlord's Obligations with respect to Environmental**
        **Matters**    40
    **Section 28.8**    **Indemnification**....................................................................... 40
**ARTICLE 29** TITLE AND COVENANT AGAINST LIENS............................................. 41

**ARTICLE 30** MISCELLANEOUS ................................................................................. 41

    **Section 30.1**    **Successors and Assigns** ............................................................ 41
    **Section 30.2**    **Modifications in Writing** .......................................................... 41
    **Section 30.3**    **No Option; Irrevocable Offer** ................................................... 41
    **Section 30.4**    **Definition of Tenant** ................................................................ 42
    **Section 30.5**    **Definition of Landlord** ............................................................. 42
    **Section 30.6**    **Headings** ................................................................................. 42
    **Section 30.7**    **Time of Essence** ...................................................................... 42
    **Section 30.8**    **Default Rate of Interest**........................................................... 42

**Section 30.9**    **Severability** ............................................................................... 42
**Section 30.10**   **Entire Agreement** ....................................................................... 42
**Section 30.11**   **Force Majeure** ............................................................................ 43
**Section 30.12**   **Signs** ............................................................................................ 43
**Section 30.13**   **Waiver of Trial by Jury** .............................................................. 43
**Section 30.14**   **Relationship of Parties** ............................................................... 43
**Section 30.15**   **No Merger** .................................................................................. 43

**<u>Exhibits:</u>**

EXHIBIT A -  Legal Description of the Premises

EXHIBIT B -  Existing Leases

EXHIBIT C -  Operating Contracts

EXHIBIT D -  Landlord's Work

## AMENDMENT OF LEASE

This AMENDMENT OF LEASE (this "Amendment") is executed as of April *16* , 2018, by and between Park Place Commercial SPE, LLC, a Delaware limited liability company ("Landlord"), and Park Place Master Tenant, LLC, a California limited liability company ("Tenant").

### RECITALS

1.      Park Place Commercial, L.P., a California limited partnership ("Prior Landlord") and Tenant entered into that certain lease dated July 28, 2014 (the "Lease") regarding property located at 908 to 940 E. Colorado Blvd., Pasadena, California 91106 (the "Property").

2.      Prior Landlord has made substantial improvements to the Property since the Lease execution ("Improvements").  The Improvements have caused the legal description to be revised to accurately depict current site and title conditions on the Property.

3.      Prior Landlord has assigned to Landlord its interest in the Property and the Improvements along with its right, title and interest under the Lease.

4.      Landlord and Tenant desire to replace the legal description initially attached as Exhibit A-1 to the Lease with the legal description attached as Exhibit A-1 to this Amendment (the "New Legal Description"), which is made a part hereof by this reference.

NOW THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend the Lease by replacing the legal description initially attached as Exhibit A-1 to the Lease with the New Legal Description.  Any reference in the Lease to the "Premises" shall hereafter include the land legally described in the New Legal Description.

Counterparts.  This Second Amendment may be executed in one or more counterparts, each of which is an original, but all of which shall constitute one and the same instrument.

Terms/Conflict:  All other terms of the Lease not amended herein shall remain in full force and effect as if fully incorporated herein.  If any terms in this Amendment conflict with any terms in the Lease, the terms in this Amendment shall prevail.

IN WITNESS WHEREOF, the undersigned, pursuant to proper authority, have duly executed, acknowledged and delivered this instrument as of the date first above written.

**LANDLORD:**

**PARK PLACE COMMERCIAL SPE, LLC,** a Delaware limited liability company

By:    Park Place Commercial, L.P., its Managing Member

By:    Singpoli Pacifica, LLC, a California limited liability company, its general partner

By: _____
Name: Kin Hui
Title: Manager

*[signatures continue on the following page]*

**TENANT:**

**PARK PLACE MASTER TENANT, LLC**, a California limited liability company

By:    Manager of Park Place Master Tenant, LLC, a
California limited liability company, its Manager

By: _____

   Name: Kin Hui
   Title: Manager

Consented to by:

**EAST WEST BANCORP, INC.**, a Delaware corporation

By: _____

   Name: Keith Kishiyama
   Title: Senior Vice President

**TENANT:**

**PARK PLACE MASTER TENANT, LLC**, a California limited liability company

By:     Manager of Park Place Master Tenant, LLC, a
         California limited liability company, its Manager

By: _____
         Name: Kin Hui
         Title: Manager

Consented to by:

**EAST WEST BANCORP, INC.**, a Delaware corporation

By: _____
         Name: Keith Kishiyama
         Title: Senior Vice President

## EXHIBIT A-1
### NEW LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 5 AND 6, AND PORTIONS OF LOTS 2, 4 AND 8 OF THOMAS AND FARRIS' SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100, OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 6;

THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 00° 00' 02" WEST, 192.35 FEET TO A LINE THAT IS PARALLEL WITH AND 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 8;

THENCE WESTERLY ALONG SAID PARALLEL LINE, SOUTH 89° 59' 43" WEST, 24.98 FEET TO THE EASTERLY LINE OF THE WESTERLY 65.00 FEET OF SAID LOT 8;

THENCE NORTHERLY ALONG SAID EASTERLY LINE, NORTH 00° 00' 05" EAST, 2.00 FEET TO SAID NORTHERLY LINE OF LOT 8;

THENCE WESTERLY ALONG SAID NORTHERLY LINE, SOUTH 89° 59' 43" WEST, 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT 8;

THENCE SOUTHERLY ALONG THE WESTERLY LINE OF SAID LOT 8, SOUTH 00° 00' 05" WEST, 38.00 FEET TO A LINE THAT IS PARALLEL WITH AND 38.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 2;

THENCE WESTERLY ALONG SAID PARALLEL LINE, SOUTH 89° 59' 43" WEST, 36.05 FEET TO A LINE THAT BEARS SOUTH 00° 00' 07" WEST AND WHICH PASSES THROUGH A POINT ON THE NORTHERLY LINE OF LOT 4, DISTANT THEREON SOUTH 89° 59' 43" WEST, 226.00 FEET FROM THE NORTHEAST CORNER OF LOT 7 OF SAID THOMAS AND FARRIS' SUBDIVISION;

THENCE NORTHERLY ALONG SAID LINE, NORTH 00° 00' 07" EAST, 228.35 FEET TO SAID NORTHERLY LINE OF THOMAS AND FARRIS' SUBDIVISION;

THENCE EASTERLY ALONG SAID NORTHERLY LINE, NORTH 89° 59' 43" EAST, 126.02 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION WITHIN COLORADO BOULEVARD, 100.00 FEET WIDE.

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 20, 2013 AS INSTRUMENT NO. 20130258379, OF OFFICIAL RECORDS.

PARCEL 2:

PORTIONS OF LOTS 7 AND 8 OF THOMAS AND FARRIS' SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF MISCELLANEOUS RECORDS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

## SECOND AMENDMENT OF LEASE DATED JULY 28, 2014

This SECOND AMENDMENT OF LEASE, is executed as of July 26, 2018, by and between Park Place Commercial SPE, LLC, a Delaware limited liability company ("PPSPE"), as the successor in interest to Park Place Commercial, LP, a California limited partnership ("PPC") pursuant to that assignment dated April 18, 2018 by and between PPSPE and PPC ("Landlord"), and Park Place Master Tenant, LLC, a California limited liability company ("Tenant").

### RECITALS

1.      Landlord and Tenant have entered into that certain lease dated July 28, 2014 and the first amendment dated April 18, 2018 (collectively referred to herein as the "Lease") regarding property located at 908 to 940 E Colorado Blvd., Pasadena, CA 91106 ("Property"). The Property is operated as a hotel ("Hotel").

2.      The base rent schedule of the Lease, Article 4, is based on the Forecasted Financial Statement and Schedules (And Supplementary Projection Information) for the Periods Beginning July 25, 2014 and Ending December 31, 2046 prepared by Ruben Brown ("Initial Income Statement"). The initial lease payment schedule was a function of the Initial Income Statement. Based on actual operation of the Hotel since September of 2014, the Hotel soft opening date, the parties agreed that the Initial Income Statement needs to be revised.

3.      The parties agree that it is in the best interest of all parties to update the Initial Income Statement to reflect actual Hotel operations. As such, Ruben Brown has updated the income statement as of July 3, 2018 ("Updated Income Statement").

4.      Landlord and Tenant desire to amend the base rent schedule per the Updated Income Statement.

NOW THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amendment the Lease as follows:

Section 4.1, Base Rent, is amended as follows:

| YEAR | BASE RENT | MONTHLY BASE RENT |
|------|-----------|-------------------|
| 2017 | $969,240.00 | $80,770.00 |
| 2018 | $998,317.00 | $83,193.08 |
| 2019 | $1,028,267.00 | $85,688.92 |
| 2020 | $1,059,115.00 | $88,259.58 |

| | | |
|------|----------------|--------------|
| 2021 | $1,090,888.00 | $90,907.33 |
| 2022 | $1,123,615.00 | $93,634.58 |
| 2023 | $1,146,087.00 | $95,507.25 |
| 2024 | $1,157,548.00 | $96,462.33 |
| 2025 | $1,186,487.00 | $98,873.92 |
| 2026 | $1,216,149.00 | $101,345.75 |
| 2027 | $1,246,553.00 | $103,879.42 |
| 2028 | $1,277,716.00 | $106,476.33 |
| 2029 | $1,309,659.00 | $109,138.25 |
| 2030 | $1,342,401.00 | $111,866.75 |
| 2031 | $1,375,961.00 | $114,663.42 |
| 2032 | $1,410,360.00 | $117,530.00 |
| 2033 | $1,445,619.00 | $120,468.25 |
| 2034 | $1,481,759.00 | $123,479.92 |
| 2035 | $1,518,803.00 | $126,566.92 |
| 2036 | $1,556,773.00 | $129,731.08 |
| 2037 | $1,595,693.00 | $132,974.42 |
| 2038 | $1,635,585.00 | $136,298.75 |
| 2039 | $1,676,475.00 | $139,706.25 |
| 2040 | $1,718,386.00 | $143,198.83 |
| 2041 | $1,761,346.00 | $146,778.83 |
| 2042 | $1,805,380.00 | $150,448.33 |
| 2043 | $1,850,514.00 | $154,209.50 |
| 2044 | $1,896,777.00 | $158,064.75 |
| 2045 | $1,994,197.00 | $166,183.08 |
| 2046 | $1,992,801.00 | $166,066.75 |

Counterparts.  This Second Amendment may be executed in one or more counterparts, each of which is an original, but all of which shall constitute one and the same instrument.

Terms/Conflict:  All other terms of the Lease not amended herein shall remain in full force and effect as if fully incorporated herein.  If any terms in this Amendment conflict with any terms in the Lease, the terms in this Amendment shall prevail.

[SIGNATURES ON THE FOLLOWING PAGES]

IN WITNESS WHEREOF, the undersigned, pursuant to property authority, have duly executed, acknowledged and delivered this instrument as of the date first above written.

**LANDLORD:**

**PARK PLACE COMMERCIAL SPEC, LLC,** a
Delaware limited liability company

By:    Park Place Commercial, LP a California
limited partnership

        By:    Singpoli Pacifica, LLC, a California limited
liability company, its general partner

              By: _____
Name: Kin Hui
Title: Manager

*[signatures continue on the following page]*

TENANT:

**PARK PLACE MASTER TENANT, LLC.**, a California
limited liability company

By:    Manager of Park Place Master Tenant, LLC, a
        California limited liability company, its Manager


By: _____
        Name: Kin Hui
        Title: Manager


**ACKNOWLEDGED BY:**


INVESTOR MEMBER:

EAST WEST BANCORP, INC., a Delaware corporation


By: _____
        Keith Kishiyama
        Senior Vice President

**EXHIBIT "3"**



**This page is part of your document - DO NOT DISCARD**



## 20180565959



**Pages:**
**0046**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**06/07/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 219.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 294.00 |



**L E A D S H E E T**



201806070130011

**00015339867**



009136389

**SEQ:**
**19**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**          T96

2

**CHICAGO TITLE COMPANY**
**COMMERCIAL DIVISION**

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME    Alston & Bird LLP

STREET
ADDRESS    333 S Hope Street, 16th Fl.

CITY, STATE &
ZIP CODE    Los Angeles, CA 90071

86575 + 86577 SG

06/07/2018

*20180565959*

SPACE ABOVE FOR RECORDER'S USE ONLY

Construction Deed of Trust, Assignment of Leases and Rents

Security Agreement + Fixture filing

**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from the fee per GC 27388.1 (a) (2); This document is subject to Documentary Transfer Tax

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☑ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

## MAIL TAX STATEMENTS TO THE RETURN ADDRESS NOTED ABOVE

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

190

*3*

*86575 + 86577 -SG*

**PARK PLACE COMMERCIAL SPE, LLC**, and **BOARDWALK CAPITAL SPE, LLC**,

(collectively, Borrower), as trustor

to

**CHICAGO TITLE COMPANY**, as trustee     *d 6*

(Trustee)

and

**COLUMN FINANCIAL, INC.**, as beneficiary

(Lender)

---

## CONSTRUCTION TRUST DEED, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

---

Dated:     As of June 6, 2018

Location:  880 & 940 East Colorado Blvd.
           Pasadena, California 91106

County:    Los Angeles

PREPARED BY AND UPON
RECORDATION RETURN TO:

Alston & Bird LLP
333 S. Hope St., 16th Floor
Los Angeles, California 90071
Attention: Jillian Song – REFIG Paralegal

## CONSTRUCTION TRUST DEED, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS CONSTRUCTION TRUST DEED, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Security Instrument**") is made as of this 6th day of June, 2018, by **BOARDWALK CAPITAL SPE, LLC**, a Delaware limited liability company, and **PARK PLACE COMMERCIAL SPE, LLC**, a Delaware limited liability company, each having their principal place of business at 25 E. Foothill Blvd., Arcadia, California 91006, (together with their permitted successors and assigns, collectively, "**Borrower**"), collectively, as trustor, to **CHICAGO TITLE COMPANY**, a California corporation, as trustee ("**Trustee**") having its principal place of business at 560 E. Hospitality Lane, San Bernardino, California 92408 for the benefit of **COLUMN FINANCIAL, INC.**, a Delaware corporation, having an address at 11 Madison Avenue, New York, New York 10010, as beneficiary (together with its successors and assigns, "**Lender**").

## W I T N E S S E T H:

WHEREAS, this Security Instrument is given to secure a loan (the "**Loan**") in the principal sum of Forty Two Million and No/100 Dollars ($42,000,000.00) advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower, Master Lessee (as defined below) and Lender, (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by (i) that certain Promissory Note A-1, dated as of the date hereof, made by Borrower in favor of Lender in the original principal amount of $30,000,000.00, (ii) that certain Promissory Note A-2, dated as of the date hereof, made by Borrower in favor of Lender in the original principal amount of $5,000,000.00, (iii) that certain Promissory Note A-3, dated as of the date hereof, made by Borrower in favor of Lender in the original principal amount of $4,000,000.00, and (iv) that certain Promissory Note A-4, dated as of the date hereof, made by Borrower in favor of Lender in the original principal amount of $3,000,000.00 (as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "**Note**");

WHEREAS, Borrower desires to secure the payment of the Debt and the performance of all of Borrower's obligations under the Note, the Loan Agreement and the other Loan Documents (as herein defined); and

WHEREAS, this Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement, the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument, and all other documents evidencing or securing the Debt (including all additional mortgages, deeds of trust, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the "**Loan Documents**").

**NOW THEREFORE,** in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

## ARTICLE 1 - GRANTS OF SECURITY

**Section 1.1    Property Mortgaged.**    Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, grant a security interest in, and convey to Lender and its successors and assigns the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    Land.  The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b)    Additional Land.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise, be expressly made subject to the lien of this Security Instrument;

(c)    Master Lease.  That certain Lease between Park Place Commercial, L.P., a California limited partnership, as landlord (the "**Initial Master Lessor**"), and Park Place Master Tenant, LLC, a California limited liability company, as tenant (the "**Master Lessee**"), dated as of July 28, 2014 (the "**Master Lease**"), as assigned by the Initial Master Lessor to Park Place Commercial SPE, LLC, a Delaware limited liability company (the "**Master Lessor**");

(d)    Assignments/Modifications.  All assignments, modifications, extensions and renewals of the Master Lease and all options, privileges and rights of Master Lessor as lessor under the Master Lease;

(e)    Improvements.    The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(f)    Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dowers and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower in and to the Land and the Improvements, including, but not limited to, those arising under and by virtue of the Master Lease, and every part and parcel thereof, with the appurtenances thereto;

(g)    Equipment.  All "goods" and "equipment," as such terms are defined in Article 9 of the Uniform Commercial Code (hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is

-2-

located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under Leases (hereinafter defined) except to the extent that Borrower shall have any right or interest therein;

(h)     Fixtures.  All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to Leases, except to the extent that Borrower shall have any right or interest therein;

(i)     Personal Property.  All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any (including, but not limited to, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, elevators, escalators, fittings, plants, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, conveyors, cabinets, lockers, shelving, spotlighting equipment, washers and dryers), other customary hotel equipment, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and

permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(j)    Leases and Rents.  All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, including, without limitation, the Master Lease, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "**Leases**"), whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements (including, without limitation, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges and vending machine sales) whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(k)    Condemnation Awards.  All Awards which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(l)    Insurance Proceeds.  All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and

USActive 21948984.3

apply the proceeds of any Policies, judgments, or settlements made in lieu thereof, in connection with a Casualty to the Property;

(m)    Tax Certiorari.    All refunds, rebates or credits in connection with reduction in Taxes or Other Charges charged against the Property;

(n)    Conversion.    All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(o)    Rights.    The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(p)    Agreements.    All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting or pertaining to any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(q)    Trademarks.    All tradenames, trademarks (including the trademark "Hotel Constance"), servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(r)    Accounts.    All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including, without limitation, all accounts established or maintained pursuant to (i) the Cash Management Agreement and (ii) the Lockbox Agreement; together with Borrower's rights to payment from any consumer credit/charge card organization or entities which sponsor and administer such cards as the American Express Card, the Visa Card and the Mastercard (each a "**Credit Card Company**"), and all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(s)    Letter of Credit.    All letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.1;

(t)    Tort Claims.    All commercial tort claims Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.1;

(u)    Collateral.    All of Borrower's security interest in the following items, as granted to Borrower by Master Lessee pursuant to Section 19.8 of the Master Lease:

(i)    All of Master Lessee's interest (whether presently existing or hereafter acquired) in all Fixtures, Equipment and other Personal Property which is or becomes attached to, installed in, or used on or in connection with the Property;

(ii)    Master Lessee's right, title and interest to rent and other payments under any Leases;

(iii)    Master Lessee's right, title and interest in and under any contracts relating to the operation of the Property, including, without limitation, that certain Parking Use Agreement dated as of April 29, 2014, by and between Park Place Commercial, L.P., a California limited partnership, and 2 North Lake JV, LLC, as assigned to Master Lessee;

(iv)    Master Lessee's revenues, incomes, proceeds, profits and other sums or benefits paid or payable to Master Lessee in connection with Master Lessee's operation of the Property; and

(v)    All proceeds, including insurance or condemnation proceeds, that arise out of the sale, liquidation, or other transfer of, or damage to, condemnation, of, or destruction of, or sale, use or enforcement of the collateral described in the Sections 1.1(u)(i)-(iv) hereof.

(v)    Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (u) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Borrower expressly grant to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

**Section 1.2    Assignment of Rents**.    Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the Cash Management Agreement and Section 7.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

**Section 1.3    Security Instrument**.    This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and

-6-

delivering this Security Instrument, Borrower hereby grant to Lender, as security for the Obligations (hereinafter defined), a security interest in the Fixtures, the Equipment and the Personal Property and other property constituting the Property, whether now owned or hereafter acquired, to the full extent that the Fixtures, the Equipment and the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**"). If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if tangible property) reasonably acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. Borrower's (debtor's) principal place of business is as set forth on page one (1) hereof and the address of Lender (secured party) is as set forth on page one (1) hereof.

      **Section 1.4**    **Fixture Filing**. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

      **Section 1.5**    **Pledges of Monies Held**. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender or on behalf of Lender, including, without limitation, any sums deposited in the Lockbox Account, the Cash Management Account, the Reserve Funds and Net Proceeds, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

## CONDITIONS TO GRANT

      **TO HAVE AND TO HOLD** the above granted and described Property unto Trustee for and on behalf of Lender and to the use and benefit of Lender and Trustee, and for their successors and assigns forever;

USActive 21948984.3

**IN TRUST, WITH POWER OF SALE**, to secure payment to Lender of the Debt at the time and in the manner provided for its payment in the Loan Agreement, the Note and in this Security Instrument.

**PROVIDED, HOWEVER**, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, shall well and truly perform the Other Obligations (hereafter defined) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

## ARTICLE 2 - DEBT AND OBLIGATIONS SECURED

**Section 2.1** **Debt**.  This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are given for the purpose of securing the Debt.

**Section 2.2** **Other Obligations**.  This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are also given for the purpose of securing the following (collectively, the "**Other Obligations**"):

(a)    the performance of all other obligations of Borrower contained herein;

(b)    the performance of each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and

(c)    the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.3** **Debt and Other Obligations**.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

## ARTICLE 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

**Section 3.1** **Payment of Debt**.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

**Section 3.2** **Incorporation by Reference**.  All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

-8-

**Section 3.3    Insurance**.  Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.4    Maintenance of Property**.  Borrower shall cause, or shall cause Master Lessee to cause, the Property to be maintained in a good and safe condition and repair. The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements) without the prior written consent of Lender or as otherwise permitted pursuant to the Loan Agreement.  Borrower shall, or shall cause Master Lessee to, promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Land.

**Section 3.5    Waste**.  Borrower shall not, and shall not permit Master Lessee to, commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument.  Borrower shall not, and shall not permit Master Lessee to, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 3.6    Payment for Labor and Materials**.  (a) Subject to Section 3.6(b) hereof, Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property, or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be

-9-

reasonably requested by Lender, to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

           **Section 3.7**   **Performance of Other Agreements**. Borrower shall observe and perform each and every term, covenant and provision to be observed or performed by Borrower pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

           **Section 3.8**   **Change of Name, Identity or Structure**. Borrower shall not change its name, identity (including its trade name or names) or, if not an individual, its corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, except as otherwise permitted pursuant to Section 5.2.10 of the Loan Agreement. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall, and shall cause Master Lessee to, execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or Master Lessee, as applicable, intends to operate the Property, and representing and warranting that Borrower and Master Lessee do business under no other trade name with respect to the Property.

           **Section 3.9**   **Title**. Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of such Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Property or Borrower's ability to repay the Loan. This Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority Lien on the Property, subject only to Permitted Encumbrances and the Liens created by the Loan Documents and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. There are no claims for payment for work, labor or materials affecting the Property which are past due and are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents unless such claims for payments are being contested in accordance with the terms and conditions of this Security Instrument.

           **Section 3.10**   **Letter of Credit Rights**. If Borrower is at any time a beneficiary under a letter of credit relating to the properties, rights, titles and interests referenced in Section 1.1 of this Security Instrument now or hereafter issued in favor of Borrower, Borrower shall promptly notify Lender thereof and, at the request and option of Lender, Borrower shall, pursuant to an agreement in form and substance satisfactory to Lender, either (a) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the

-10-

proceeds of any drawing under the letter of credit or (b) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case that the proceeds of any drawing under the letter of credit are to be applied as provided in Section 7.2 of this Security Instrument.

## ARTICLE 4 - OBLIGATIONS AND RELIANCES

**Section 4.1    Relationship of Borrower and Lender**.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

**Section 4.2    No Reliance on Lender**.    The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property.  Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

**Section 4.3    No Lender Obligations**.  (a)  Notwithstanding the provisions of Subsections 1.1(j) and (p) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)    By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any Officer's Certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or Policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

**Section 4.4    Reliance**.    Borrower recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Section 4.1 of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Section 4.1 of the Loan Agreement.

## ARTICLE 5 - FURTHER ASSURANCES

**Section 5.1    Recording of Security Instrument, etc**.  Borrower will forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time,

-11-

cause this Security Instrument and any of the other Loan Documents creating a Lien or security interest or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the Lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 5.2    **Further Acts, etc**.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower, or without the signature of Borrower, to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property.   Such financing statements may describe as the collateral covered thereby "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect.  Borrower grant to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to this Section 5.2.

Section 5.3    **Changes in Tax, Debt, Credit and Documentary Stamp Laws**. (a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will, or will cause Master Lessee to, pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower or Master Lessee, as applicable, would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable.

-12-

(b)    Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

**Section 5.4    Severing of Security Instrument**. The provisions of Section 8.2(c) of the Loan Agreement are hereby incorporated herein by reference.

**Section 5.5    Replacement Documents**. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 6 - DUE ON SALE/ENCUMBRANCE

**Section 6.1    Lender Reliance**. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

**Section 6.2    No Sale/Encumbrance**. Neither Borrower nor any Restricted Party shall Transfer the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be Transferred other than as expressly permitted pursuant to the terms of the Loan Agreement.

## ARTICLE 7 - RIGHTS AND REMEDIES UPON DEFAULT

**Section 7.1    Remedies**. Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued

-13-



concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)    declare the entire unpaid Debt to be immediately due and payable;

(b)    institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one (1) or more parcels or in several interests or portions and in any order or manner;

(c)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing Lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)    sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor, indemnitor with respect to the Loan or of any Person liable for the payment of the Debt;

(h)    the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agree to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents; (v) require Borrower to pay monthly in

-14-

advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premium and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)    exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment, the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment, the Personal Property and (ii) request Borrower at its expense to assemble the Fixtures, the Equipment, the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Fixtures, the Equipment, the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)    apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its sole discretion:

(i)    Taxes and Other Charges;

(ii)    Insurance Premiums;

(iii)    Interest on the unpaid principal balance of the Note;

(iv)    Amortization of the unpaid principal balance of the Note; or

(v)    All other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)    pursue such other remedies as Lender may have under applicable law; or

(l)    apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its sole and absolute discretion.

-15-

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.2    **Application of Proceeds**. The purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 7.3    **Right to Cure Defaults**. Upon the occurrence and during the continuance of any Event of Default, or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make any payment or do any act required of Borrower hereunder in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 7.4    **Actions and Proceedings**. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 7.5    **Recovery of Sums Required To Be Paid**. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 7.6    **Examination of Books and Records**. At reasonable times and upon reasonable notice, Lender, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Borrower which reflect upon its financial condition, at the Property or at any office regularly maintained by Borrower where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, at reasonable times and upon

-16-

reasonable notice, Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower where the books and records are located.  This Section 7.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

Section 7.7    **Other Rights, etc**.  (a)  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether the insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)    Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 7.8    **Right to Release Any Portion of the Property**.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 7.9    **Violation of Laws**.  If the Property is not in material compliance with Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

-17-



**Section 7.10   Recourse and Choice of Remedies**.  Notwithstanding any other provision of this Security Instrument or the Loan Agreement, including, without limitation, Section 9.4 of the Loan Agreement, to the fullest extent permitted by applicable law, Lender and other Indemnified Parties are entitled to enforce the obligations of Borrower, any guarantor and indemnitor contained in Sections 8.2 and 8.3 hereof and Section 9.4 of the Loan Agreement without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower.  The provisions of Sections 8.2 and 8.3 hereof and Section 9.4 of the Loan Agreement are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Security Instrument or the other Loan Documents, and Borrower is fully and personally liable for the obligations pursuant to Sections 8.2 and 8.3 hereof.  The liability of Borrower and any guarantor or indemnitor with respect to the Loan pursuant to Sections 8.2 and 8.3 hereof and Section 9.4 of the Loan Agreement is not limited to the original principal amount of the Note.  Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence.  A separate action or actions may be brought and prosecuted against Borrower pursuant to Sections 8.2 and 8.3 hereof and Section 9.4 of the Loan Agreement whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions.

**Section 7.11   Right of Entry**.  Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

## ARTICLE 8 - INDEMNIFICATION

**Section 8.1    General Indemnification**.  Borrower shall, at its sole cost and expense, protect (with legal counsel reasonably acceptable to Lender), defend, indemnify, release and hold harmless the Indemnified Parties (hereinafter defined) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including, but not limited, to reasonable attorneys' fees and other costs of defense) (collectively, the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one (1) or more of the following:  (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any amendment to, or restructuring of, the Debt, the Note, the Loan Agreement, this Security Instrument, or any other Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument, the Loan Agreement, the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any guarantor or indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any

-18-



accident, injury to, or death of, persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument, the Note, the Loan Agreement or any of the other Loan Documents; (g) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Party of the provisions of this <u>Article 8</u>; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone claiming through Borrower which may be payable in connection with the funding of the Loan or (m) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document. Any amounts payable to Lender by reason of the application of this <u>Section 8.1</u> shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid. For purposes of this Article 8, the term **"Indemnified Parties"** means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by this Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

**Section 8.2    <u>Security Instrument and/or Intangible Tax</u>**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes. Borrower hereby agrees that, in the event that it is determined that any documentary stamp taxes or intangible personal property taxes are due hereon or on any mortgage or promissory note executed in connection herewith (including, without limitation, the Note), Borrower shall indemnify and hold harmless the Indemnified Parties for all such documentary stamp and/or intangible taxes, including all penalties and interest assessed or charged in connection therewith.

-19-

**Section 8.3    ERISA Indemnification**.    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a breach of any of the representations made under Sections 4.1.9 of the Loan Agreement or a breach of any negative covenants contained in Section 5.2.9 of the Loan Agreement.

**Section 8.4    Duty to Defend; Attorneys' Fees and Other Fees and Expenses**.
Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, if the defendants in any such claim or proceeding include Borrower and any Indemnified Party, and Borrower and such Indemnified Party shall have reasonably concluded that there are any legal defenses available to it and/or other Indemnified Parties that are different from or additional to those available to Borrower, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such Indemnified Party, provided that no compromise or settlement shall be entered without Borrower's consent, which consent shall not be unreasonably withheld. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

**Section 8.5    Environmental Indemnity**.    Simultaneously with this Security Instrument, Borrower and Guarantor have executed that certain Environmental Indemnity. The obligations of Borrower and Guarantor under the Environmental Indemnity are not part of the Debt and are not secured by this Security Instrument.

## ARTICLE 9 - WAIVERS

**Section 9.1    Waiver of Counterclaim**.    To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

**Section 9.2    Marshalling and Other Matters**.    To the extent permitted by applicable law, Borrower hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to

-20-

the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

      **Section 9.3**    **Waiver of Notice**.  To the extent permitted by applicable law, Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

      **Section 9.4**    **Waiver of Statute of Limitations**.  To the extent permitted by applicable law, Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

      **Section 9.5**    **Survival**.  The indemnifications made pursuant to Sections 8.1, 8.2 and 8.3 herein shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by any of the following:  any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Loan Agreement, the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto.

## ARTICLE 10 - EXCULPATION

      The provisions of Section 9.4 of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## ARTICLE 11 - NOTICES

      All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 12 - APPLICABLE LAW

      **Section 12.1**  **Governing Law**.  This Security Instrument shall be governed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

**Section 12.2   Usury Laws**.  Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender, or if there is no such indebtedness, shall immediately be returned to Borrower.

**Section 12.3   Provisions Subject to Applicable Law**.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## ARTICLE 13 - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Lender**" shall mean "Lender and any subsequent holder of the Note," the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.

## ARTICLE 14 - MISCELLANEOUS PROVISIONS

**Section 14.1   No Oral Change**.  This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

USActive 21948984.3

**Section 14.2  Successors and Assigns**.  This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 14.3  Inapplicable Provisions**.  If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

**Section 14.4  Headings, etc**.  The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**Section 14.5  Number and Gender**.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**Section 14.6  Subrogation**.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

**Section 14.7  Entire Agreement**.  The Note, the Loan Agreement, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto.  Borrower hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Security Instrument and the other Loan Documents.

**Section 14.8  Limitation on Lender's Responsibility**.  No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

-23-



## ARTICLE 15 - DEED OF TRUST PROVISIONS

**Section 15.1  Concerning the Trustee.**  If directed by Lender to foreclose the lien and security interest of this Security Instrument, Trustee will either personally or by agent give notice of the foreclosure sale as required by applicable law as then in effect and sell and covey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Borrower, subject to the Permitted Encumbrances and without representation or warranty, express or implied by Trustee.  Trustee shall pay from the proceeds of the sale, in this order (a) expenses of foreclosure, including, a reasonable commission to Trustee; (b) to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid; (c) any amounts required by law to be paid before payment to Borrower and (d) to Borrower, any balance.  Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and Lender.  Lender may remove Trustee at any time or from time to time and select a successor trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

**Section 15.2  Trustee's Fees.**  Borrower shall pay all reasonable costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

**Section 15.3  Certain Rights.**  After an Event of Default, with the approval of Lender, Trustee shall have the right to take any and all of the following actions:  (a) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, and shall be fully protected in relying as to legal matters on the advice of counsel, (b) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his/her agents or attorneys and (c) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder.  Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine.

-24-

Trustee shall be entitled to reimbursement for actual reasonable expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered.

Section 15.4 **Retention of Money**. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

Section 15.5 **Perfection of Appointment**. Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

Section 15.6 **Succession Instruments**. Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his/her predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

## ARTICLE 16 - STATE-SPECIFIC PROVISIONS

Section 16.1 **Principles of Construction**. In the event of any inconsistencies between the terms and conditions of this Article 16 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 16 shall control and be binding.

Section 16.2 **Trustor**. The word "grantor" is hereby deleted wherever it appears in this Security Instrument and the word "Trustor" is substituted therefor.

Section 16.3 **Conditions to Grant**. The portion of the paragraph beginning with the words "PROVIDED, HOWEVER" appearing immediately above Article 2 is hereby deleted in its entirety and the following language is substituted therefor:

**PROVIDED, HOWEVER**, upon written request of Lender stating that all sums secured hereby have been paid, that Borrower has well and truly abided by and complied with each and every covenant and condition set forth herein and in the Note, and upon the surrendering of this Security Instrument and the Note to Trustee for cancellation and retention and upon payment by Borrower of Trustee's fees, Trustee shall reconvey to Borrower, or to the person or persons legally entitled thereto, without warranty, any portion of the estate hereby granted

-25-

and then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in any reconveyance may be described as "the person or persons legally entitled thereto".

Section 16.4 **Assignment of Leases and Rents**. Section 1.2 of this Security Instrument entitled "Assignment of Rents" is hereby deleted in its entirety and the following is substituted therefor:

> This Security Instrument constitutes a present, absolute assignment of the Leases and Rents from Borrower to Lender. The Leases and Rents are hereby absolutely and irrevocably assigned by Borrower to Lender. Lender is hereby granted and assigned by Borrower the right to enter the Property for the purpose of enforcing its right in the Leases and Rents. Nevertheless, subject to the terms of this Section 1.2, Lender grants to Borrower a revocable license to operate and manage the Property and to collect Rents. Upon or at any time after the occurrence of an Event of Default, the license granted to Borrower herein may be revoked by Lender, and Lender may enter upon the Property, and collect, retain and apply the Rents toward payment of the Debt in accordance with the Note. The foregoing assignment shall be fully operative without any further action on the part of either party and the Lender shall be entitled to the Leases and Rents whether or not the Lender takes possession of the Property or any part thereof.

Section 16.5 **Security Agreement**. The first two sentences of Section 1.3 of this Security Instrument entitled "Security Instrument" are hereby deleted and the following is substituted therefor:

> This Security Instrument is both a real property deed of trust and a "security agreement" within the meaning of the Uniform Commercial Code the State of California and is being recorded as a fixture filing. With respect to said fixture filing, (i) the debtor is Borrower, and Borrower's name and address appear in the first paragraph of this Security Instrument, and (ii) the secured party is Lender, and Lender's name and address appear in the first paragraph of the Security Instrument. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property, including, but not limited to, the Leases and Rents and all proceeds thereof and all fixtures.

**[DOCUMENT CONTINUES ON NEXT PAGE]**

-26-

**Section 16.6    Due on Sale/Encumbrance**.    The following is hereby added as Section 6.3 to this Security Instrument:

       **Section 6.3**.  Borrower expressly agrees that upon a violation of Article 6 of this Security Instrument by Borrower and acceleration of the principal balance of the Note because of such violation, Borrower will pay all sums required to be paid in connection with a prepayment, if any, as described in the Loan Agreement, herein imposed on prepayment after an Event of Default and acceleration of the principal balance.    Borrower expressly acknowledges that Borrower has received adequate consideration for the foregoing agreement.

**BORROWER:**

**[BORROWER SIGNATURE BLOCK]**

**[DOCUMENT CONTINUES ON NEXT PAGE]**

-27-

**Section 16.7  Remedies Not Exclusive; Waiver**.  Trustee and Lender shall have all powers, rights and remedies under applicable law whether or not specifically or generally granted or described in this Security Instrument.  Nothing contained herein shall be construed to impair or to restrict such powers, rights and remedies or to preclude any procedures or process otherwise available to trustees or beneficiaries under deeds of trust in the State of California.  Trustee and Lender, and each of them, shall be entitled to enforce the payment and performance of any indebtedness or obligations secured hereby and to exercise all rights and powers under this Security Instrument or under any other Loan Document or other agreement or any laws now or hereafter in force, notwithstanding the fact that some or all of the indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, lien, assignment or otherwise.  Neither the acceptance of this Security Instrument nor its enforcement, whether by court action or pursuant to the power of sale or other powers contained herein, shall prejudice or in any manner affect Trustee's or Lender's right to realize upon or enforce any other rights or security now or hereafter held by Trustee or Lender.  Trustee and Lender, and each of them, shall be entitled to enforce this Security Instrument and any other rights or security now or hereafter held by Lender or Trustee in such order and manner as they or either of them may in their absolute discretion determine.  No remedy herein conferred upon or reserved to Trustee or Lender is intended to be exclusive of any other remedy contained herein or by law provided or permitted, but each shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity.  Every power or remedy given by any of this Security Instrument or the other Loan Documents to Trustee or Lender, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Lender, and either of them may pursue inconsistent remedies.  By exercising or by failing to exercise any right, option or election hereunder, Lender shall not be deemed to have waived any provision hereof or to have released Borrower from any of the obligations secured hereby unless such waiver or release is in writing and signed by Lender.  The waiver by Lender of Borrower's failure to perform or observe any term, covenant or condition referred to or contained herein to be performed or observed by Borrower shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent failure of Borrower to perform or observe the same or any other such term, covenant or condition referred to or contained herein, and no custom or practice which may develop between Borrower and Lender during the term hereof shall be deemed a waiver of or in any way affect the right of Lender to insist upon the performance by Borrower of the obligations secured hereby in strict accordance with the terms hereof or of any other Loan Document.

**Section 16.8  Power of Sale**.

The Lender, its successors and assigns, may elect to cause the Property or any part thereof to be sold as follows:

(a)  Lender may proceed as if all of the Property were real property, in accordance with subparagraph (d) below, or Lender may elect to treat any of the Property which consists of a right in action or which is property that can be severed from the Land without

-28-

causing structural damage thereto as if the same were personal property, and dispose of the same in accordance with subparagraph (c) below, separate and apart from the sale of real property, the remainder of the Property being treated as real property.

(b)     Lender may cause any such sale or other disposition to be conducted immediately following the expiration of any grace period, if any, herein provided (or immediately upon the expiration of any redemption period required by law) or Lender may delay any such sale or other disposition for such period of time as Lender deems to be in its best interest. Should Lender desire that more than one such sale or other disposition be conducted, Lender may at its option, cause the same to be conducted simultaneously, or successively on the same day, or at such different days or times and in such order as Lender may deem to be in its best interest.

(c)     Should Lender elect to cause any of the Property to be disposed of as personal property as permitted by subparagraph (a) above, it may dispose of any part hereof in any manner now or hereafter permitted by Article 9 of the Uniform Commercial Code of the State of California or in accordance with any other remedy provided by law.  Borrower and Lender shall be eligible to purchase any part or all of such property at any such disposition.  Any such disposition may be either public or private as Lender may so elect, subject to the provisions of the Uniform Commercial Code of the State of California.  Lender shall give Borrower at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such property or of the time at or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Borrower as provided in subparagraph (k) hereof, it shall constitute reasonable notice to Borrower.

(d)     Should Lender elect to sell the Property which is real property or which Lender has elected to treat as real property, upon such election Lender or Trustee shall give such notice of default and election to sell as may then be required by law.  Thereafter, upon the expiration of such time and the giving of such notice of sale as may then be required by law, Trustee, at the time and place specified in the notice of sale, shall sell such Property, or any portion thereof specified by Lender, at public auction to the highest bidder for cash in lawful money of the United States, subject, however, to the provisions of subparagraph (i) hereof. Trustee for good cause may, and upon request of Lender shall, from time to time, postpone the sale by public announcement thereof at the time and place noticed therefor.  If the Property consists of several lots or parcels, Lender may designate the order in which such lots or parcels shall be offered for sale or sold.  Any person, including Borrower, Trustee or Lender, may purchase at the sale.  Upon any sale Trustee shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold, but without any covenant or warranty whatsoever, express or implied, whereupon such purchaser or purchasers shall be let into immediate possession.

(e)     In the event of a sale or other disposition of any such property, or any part thereof, and the execution of a deed or other conveyance, pursuant thereto, the recitals therein of facts, such as a default, the giving of notice of default and notice of sale, demand that such sale should be made, postponement of sale, terms of sale, sale, purchaser, payment of purchase money, and any other fact affecting the regularity or validity of such sale or disposition, shall be

-29-

conclusive proof of the truth of such facts; and any such deed of conveyance shall be conclusive against all persons as to such facts recited therein.

(f)      Lender and/or Trustee shall apply the proceeds of any sale or disposition hereunder to payment of the following:  (1)  the expenses of such sale or disposition together with Trustee's fees and reasonable attorneys' fees, and the actual cost of publishing, recording, mailing and posting notice; (2) the cost of any search and/or other evidence of title procured in connection therewith and transfer tax on any deed or conveyance; (3) all sums expended under the terms hereof, not then repaid, with accrued interest in the amount provided herein; (4) all other sums secured hereby; and (5) the remainder if any to the person or persons legally entitled thereto.

(g)      The acknowledgment of the receipt of the purchase money, contained in any deed or conveyance executed as aforesaid, shall be sufficient discharge from all obligations to see to the proper application of the consideration therefor.

(h)      Borrower hereby expressly waives any right which it may have to direct the order in which any of the Property shall be sold in the event of any sale or sales pursuant hereto.

(i)      Upon any sale of the Property, whether made under a power of sale herein granted or pursuant to judicial proceedings, if the holder of the Note is a purchaser at such sale, it shall be entitled to use and apply all or any portion of the indebtedness then secured hereby for or in settlement or payment of all or any portion of the purchase price of the property purchased, and, in such case, this Security Instrument, the Note and documents evidencing expenditures secured hereby shall be presented to the person conducting the sale in order that the amount of said indebtedness so used or applied may be credited thereon as having been paid.

(j)      No remedy herein conferred upon or reserved to Trustee or Lender is intended to be exclusive of any other remedy herein or by law provided, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by this instrument to Trustee or Lender, or to which either of them may be otherwise entitled, may be exercised from time to time and as often as may be deemed expedient by Trustee or Lender, and either of them may pursue inconsistent remedies.  If there exists additional security for the performance of the obligations secured hereby, the holder of the Note, at its sole option and without limiting or affecting any rights or remedies hereunder, may exercise any of the rights and remedies to which it may be entitled hereunder either concurrently with whatever other rights it may have in connection with such other security or in such order as it may determine.

(k)      Borrower hereby requests that every notice of default and every notice of sale be given in accordance with the provisions of Article 11 hereof except as otherwise required by statute. Borrower may, from time to time, change the address to which notice of default and sale hereunder shall be sent by both filing a request therefor, in the manner provided by the California Civil Code, Section 2924b, and sending a copy of such request to Lender, its successors or assigns in accordance with the provisions of Article 11 hereof.

-30-

Section 16.9  **Right of Rescission**.  Lender may from time to time rescind any notice of default or notice of sale before any Trustee's sale in accordance with the laws of the State of California.  The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default to satisfy the obligations of this Security Instrument or secured hereby, nor otherwise affect any provision, covenant or condition of this Security Instrument or any other Loan Document or any of the rights, obligations or remedies of Trustee or Lender hereunder or thereunder.

Section 16.10  **Full Reconveyance**.  Upon written request of Lender stating that all sums secured hereby have been paid in full without right of readvance, upon surrender to Trustee of the original or a certified copy of this Security Instrument for cancellation and retention, and upon payment of its fees, Trustee shall fully reconvey, without warranty, the entire remaining Property then held hereunder.  The recitals in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof.

Section 16.11  **Concerning the Trustee**:

(a)   Trustee accepts the trust created by this Security Instrument when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law.

(b)   Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Borrower, Lender or Trustee shall be a party, unless brought by Trustee.

(c)   Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.  Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.  Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender.  Lender may remove Trustee at any time or from time to time and select a successor trustee.  In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor without conveyance from the predecessor Trustee.  Such instrument must contain the name of the original Borrower, Trustee and Lender hereunder, the book and page where this Security Instrument is recorded, and the name and address of the new Trustee.  Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.  The procedure provided for in this paragraph for

USActive 21948984 3



substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

(d)      Trustee shall be entitled to reasonable compensation for all services rendered or expenses incurred in the administration or execution of the trusts hereby created and Borrower hereby agrees to pay same. Trustee and Lender shall be indemnified, held harmless and reimbursed by Borrower for any liability, damage or expense, including attorneys' fees and amounts paid in settlement, which they or either of them may incur or sustain in the execution of this trust or in the doing of any act which they, or either of them, are required or permitted to do by the terms hereof or by law.

**Section 16.12 Fixture Filing**.  This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the provisions of Article 9 of the Uniform Commercial Code of the State of California with respect to those portions of the Property consisting of goods which are or are to become fixtures relating to the Property.

**Section 16.13 Future Advances**.   In addition to the foregoing described Obligations, this Security Instrument also secures future advances to Borrower and obligations of Borrower to Lender, direct or indirect, absolute or contingent, including, without limitation, obligations under any Interest Rate Protection Agreement, to the same extent as if the future obligation and/or advance were made on the date of this Security Instrument.

**[NO FURTHER TEXT ON THIS PAGE]**

USActive 21948984.3

**IN WITNESS WHEREOF**, this Security Instrument has been executed by Borrower as of the day and year first above written.

**BORROWER:**

**PARK PLACE COMMERCIAL SPE, LLC,**
a Delaware limited liability company

By: Park Place Commercial, LP,
  Its Managing Member

  By: Singpoli Pacifica, LLC
    Its General Partner

    By: _____
      Kin Hui, Manager

**BOARDWALK CAPITAL SPE, LLC,**
a Delaware limited liability company

By: Boardwalk Capital, LP,
  Its Managing Member

  By: Singpoli Pacifica, LLC
    Its General Partner

    By: _____
      Kin Hui, Manager

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

State of California
County of _Los Angeles_ )

On _April 18, 2018_ before me, _____
(insert name and title of the officer)

personally appeared _Kin Hui_ _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Mary Morgan_ _____ (Seal)

MARY MORGAN
Commission # 2102628
Notary Public - California
Los Angeles County
My Comm. Expires Apr 7, 2019

**Section 16.6** **Due on Sale/Encumbrance**.  The following is hereby added as Section 6.3 to this Security Instrument:

**Section 6.3.**  Borrower and Master Lessee expressly agree that upon a violation of Article 6 of this Security Instrument by Borrower or Master Lessee and acceleration of the principal balance of the Note because of such violation, Borrower will pay all sums required to be paid in connection with a prepayment, if any, as described in the Loan Agreement, herein imposed on prepayment after an Event of Default and acceleration of the principal balance.  Borrower and Master Lessee expressly acknowledge that Borrower and Master Lessee has received adequate consideration for the foregoing agreement.

**BORROWER:**

**PARK PLACE COMMERCIAL SPE, LLC,**
a Delaware limited liability company

By:   Park Place Commercial, LP,
      Its Managing Member

      By:   Singpoli Pacifica, LLC
            Its General Partner

            By: _____
                Kin Hui, Manager

**BOARDWALK CAPITAL SPE, LLC,**
a Delaware limited liability company

By:   Boardwalk Capital, LP,
      Its Managing Member

      By:   Singpoli Pacifica, LLC
            Its General Partner

            By: _____
                Kin Hui, Manager

**[ADD ACKNOWLEDGMENTS]**

# ACKNOWLEDGMENT

A notary public or other officer completing this
certificate verifies only the identity of the
individual who signed the document to which this
certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

State of California
County of _Los Angeles_ )

On _April 18, 2018_ before me, _Mary Morgan_ Notary Public
(insert name and title of the officer)

personally appeared _Kin Hui_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

**MARY MORGAN**
Commission # 2102628
Notary Public - California
Los Angeles County
My Comm. Expires Apr 7, 2019

Signature _Marge Morgan_ (Seal)

## EXHIBIT A

## (Legal Description)

### 940 East Colorado Boulevard, Pasadena, California

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1

LOTS 5 AND 6, AND PORTIONS OF LOTS 2, 4 AND 8 OF THOMAS AND FARRIS' SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100, OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,
DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 6;

THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOT, SOUTH 00° 00' 02" WEST, 192.35 FEET TO A LINE THAT IS PARALLEL WITH AND 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 8;

THENCE WESTERLY ALONG SAID PARALLEL LINE, SOUTH 89° 59' 43" WEST, 24.98 FEET TO THE EASTERLY LINE OF THE WESTERLY 65.00 FEET OF SAID LOT 8,

THENCE NORTHERLY ALONG SAID EASTERLY LINE, NORTH 00° 00' 05" EAST, 2.00 FEET TO SAID NORTHERLY LINE OF LOT 8;

THENCE WESTERLY ALONG SAID NORTHERLY LINE, SOUTH 89° 59' 43" WEST, 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT 8;

THENCE SOUTHERLY ALONG THE WESTERLY LINE OF SAID LOT 8, SOUTH 00° 00' 05" WEST, 38.00 FEET TO
A LINE THAT IS PARALLEL WITH AND 38.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 2;

THENCE WESTERLY ALONG SAID PARALLEL LINE, SOUTH 89° 59' 43" WEST, 36 05 FEET TO A LINE THAT BEARS SOUTH 00° 00' 07" WEST AND WHICH PASSES THROUGH A POINT ON THE NORTHERLY LINE OF LOT
4, DISTANT THEREON SOUTH 89° 59' 43" WEST, 226.00 FEET FROM THE NORTHEAST CORNER OF LOT 7 OF
SAID THOMAS AND FARRIS' SUBDIVISION;

THENCE NORTHERLY ALONG SAID LINE, NORTH 00° 00' 07" EAST, 228.35 FEET TO SAID NORTHERLY LINE OF THOMAS AND FARRIS' SUBDIVISION,

THENCE EASTERLY ALONG SAID NORTHERLY LINE, NORTH 89° 59' 43" EAST, 126.02 FEET TO THE POINT OF BEGINNING

EXCEPTING THEREFROM THAT PORTION WITHIN COLORADO BOULEVARD, 100.00 FEET WIDE

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 20, 2013 AS INSTRUMENT NO. 20130258379, OF OFFICIAL RECORDS

PARCEL 2·

PORTIONS OF LOTS 7 AND 8 OF THOMAS AND FARRIS' SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF

EXH. A-1

MISCELLANEOUS RECORDS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 7;

THENCE SOUTHERLY ALONG THE EASTERLY LINE OF SAID LOTS 7 AND 8, SOUTH 00°00'00" EAST 255.35 FEET TO THE SOUTHEAST CORNER OF SAID LOT 8;

THENCE WESTERLY ALONG THE SOUTHERLY LINE OF SAID LOT 8, SOUTH 89°59'43" WEST 189.96 FEET TO THE SOUTHWEST CORNER OF SAID LOT 8;
THENCE NORTHERLY ALONG THE WESTERLY LINE OF SAID LOT 8, NORTH 00°00'05" EAST 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT 8;

THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT 8, NORTH 89°59'43" EAST 65.00 FEET TO A LINE PARALLEL WITH AND DISTANT 65.00 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT 8;

THENCE SOUTHERLY ALONG SAID PARALLEL LINE, SOUTH 00°00'05" WEST 2.00 FEET TO A LINE PARALLEL WITH AND DISTANT 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 8;

THENCE EASTERLY ALONG SAID PARALLEL LINE, NORTH 89°59'43" EAST 24.98 FEET TO THE SOUTHERLY PROLONGATION OF THE WESTERLY LINE OF SAID LOT 7;

THENCE NORTHERLY ALONG SAID SOUTHERLY PROLONGATION AND SAID WESTERLY LINE OF SAID LOT 7, NORTH 00°00'02" EAST 192.35 FEET TO THE NORTHWEST CORNER OF SAID LOT 7;

THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT 7, NORTH 89°59'43" EAST 99.98 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM THAT PORTION LYING WITHIN COLORADO BOULEVARD, 100.00 FEET WIDE.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING BELOW AN ELEVATION OF 822.80 FEET DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 8;

THENCE WESTERLY ALONG THE SOUTHERLY LINE OF SAID LOT, SOUTH 89°59'43" WEST 189.96 FEET TO THE SOUTHWEST CORNER OF SAID LOT;

THENCE NORTHERLY ALONG THE WESTERLY LINE OF SAID LOT, NORTH 00°00'05" EAST 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT;

THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT, NORTH 89°59'43" EAST 65.00 FEET TO A LINE PARALLEL WITH AND DISTANT 65.00 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID PARALLEL LINE, SOUTH 00°00'05" WEST 2.00 FEET TO A LINE PARALLEL WITH AND DISTANT 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT;

THENCE EASTERLY ALONG SAID PARALLEL LINE, NORTH 89°59'43" EAST 124.96 FEET TO THE EASTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID EASTERLY LINE, SOUTH 00°00'00" EAST 63.00 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING BELOW AN ELEVATION OF 824.97 FEET DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE EASTERLY LINE OF SAID LOT 8 AND LINE PARALLEL WITH AND DISTANT 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT 8;

THENCE WESTERLY ALONG SAID PARALLEL LINE, SOUTH 89°59'43" WEST 60.00 FEET;

THENCE SOUTH 00°00'00" WEST 18.06 FEET;

THENCE EASTERLY, PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 8, NORTH 89°59'43" EAST 60.00 FEET TO THE EASTERLY LINE OF SAID LOT 8;

THENCE NORTHERLY ALONG SAID EASTERLY LINE, NORTH 00'00'00" EAST 18.06 FEET TO THE POINT OF BEGINNING.

SAID ELEVATIONS BASED ON A CITY OF PASADENA BENCHMARK HAVING AN ELEVATION OF 815.41 FEET (2004 ADJUSTMENT, NATIONAL GEODETIC VERTICAL DATUM 1929), DESCRIBED AS FOLLOWS:

AN ALUMINUM MONUMENT 1.5 FEET SOUTH OF CURB RETURN BC, SOUTHEAST CORNER OF MENTOR AVENUE AND COLORADO BOULEVARD, CITY OF PASADENA LEVEL RUN, 9/28/2004.

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 9, 2015 AS INSTRUMENT NO. 20151255502, OF OFFICIAL RECORDS.

APN(s): PORTION OF 5735-006-032 AND PORTION OF 5735-006-031
NEW ASSESSOR'S PARCEL NUMBERS FOR SAID LAND ARE 5735-006-036 AND 5735-006-040 AND ARE PRESENTLY NOT ASSESSED

APN. 5735-006-32

USActive 21948984 3

## 880 East Colorado Boulevard, Pasadena, California

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF PASADENA, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

THE NORTH 38 FEET OF LOT 2 OF THOMAS AND FARRIS SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF MISCELLANEOUS RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION LYING EASTERLY OF A LINE THAT BEARS SOUTH 00°00'07" WEST AND WHICH PASSES THROUGH A POINT ON THE NORTHERLY LINE OF LOT 4 OF SAID THOMAS AND FARRIS' SUBDIVISION, DISTANT THEREON SOUTH 89°59'43" WEST 226 00 FEET FROM THE NORTHEAST CORNER OF LOT 7 OF SAID THOMAS AND FARRIS' SUBDIVISION.

EXCEPT THEREFROM THE WEST 6 FEET THEREOF, CONVEYED TO THE CITY OF PASADENA FOR STREET PURPOSES, BY DEED RECORDED IN BOOK 1164, PAGE 317 OF DEEDS.

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 20, 2013 AS INSTRUMENT NO. 20130258379, OF OFFICIAL RECORDS.

PARCEL 2:

LOT 4 OF THOMAS AND FARRIS SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF MISCELLANEOUS RECORDS OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION LYING EASTERLY OF A LINE THAT BEARS SOUTH 00°00'07" WEST AND WHICH PASSES THROUGH A POINT ON THE NORTHERLY LINE OF SAID LOT 4, DISTANT THEREON SOUTH 89°59'43" WEST 226.00 FEET FROM THE NORTHEAST CORNER OF LOT 7 OF SAID THOMAS AND FARRIS' SUBDIVISION.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN COLORADO STREET AS WIDEN TO 100 FEET.

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED FEBRUARY 20, 2013 AS INSTRUMENT NO. 20130258379, OF OFFICIAL RECORDS.

PARCEL 3:

LOT 3 OF THOMAS AND FARRIS SUBDIVISION, THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF MISCELLANEOUS RECORDS OF SAID COUNTY.

EXCEPT THEREFROM THE WEST 6 FEET THEREOF, CONVEYED TO THE CITY OF PASADENA FOR STREET PURPOSES, BY DEED RECORDED IN BOOK 1164, PAGE 317 OF DEEDS.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN COLORADO STREET AS WIDEN TO 100 FEET.

PARCEL 4:

THAT PORTION OF LOT 8 OF THOMAS AND FARRIS' SUBDIVISION, IN THE CITY OF PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 10, PAGE 100 OF MISCELLANEOUS RECORDS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 8;

USActive 21948984 3

THENCE WESTERLY ALONG THE SOUTHERLY LINE OF SAID LOT, SOUTH 89°59'43" WEST 189.96 FEET TO THE SOUTHWEST CORNER OF SAID LOT;

THENCE NORTHERLY ALONG THE WESTERLY LINE OF SAID LOT, NORTH 00°00'05" EAST 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT;

THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT, NORTH 89°59'43" EAST 65.00 FEET TO A LINE PARALLEL WITH AND DISTANT 65.00 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID PARALLEL LINE, SOUTH 00°00'05" WEST 2.00 FEET TO A LINE PARALLEL WITH AND DISTANT 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT;

THENCE EASTERLY ALONG SAID PARALLEL LINE, NORTH 89°59'43" EAST 124.96 FEET TO THE EASTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID EASTERLY LINE, SOUTH 00°00'00" EAST 63.00 FEET TO THE POINT OF BEGINNING

EXCEPT THEREFROM THAT PORTION LYING ABOVE AN ELEVATION OF 824.97 FEET.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING ABOVE AN ELEVATION OF 822.80 FEET DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 8,

THENCE WESTERLY ALONG THE SOUTHERLY LINE OF SAID LOT, SOUTH 89°59'43" WEST 189.96 FEET TO THE SOUTHWEST CORNER OF SAID LOT;

THENCE NORTHERLY ALONG THE WESTERLY LINE OF SAID LOT, NORTH 00°00'05" EAST 65.00 FEET TO THE NORTHWEST CORNER OF SAID LOT;

THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT, NORTH 89°59'43" EAST 65.00 FEET TO A LINE PARALLEL WITH AND DISTANT 65.00 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID PARALLEL LINE, SOUTH 00°00'05" WEST 2 00 FEET TO A LINE PARALLEL WITH AND DISTANT 2.00 FEET SOUTHERLY OF THE NORTHERLY LINE OF SAID LOT;

THENCE EASTERLY ALONG SAID PARALLEL LINE, NORTH 89°59'43" EAST 64.96 FEET TO A POINT ON SAID LINE DISTANT THEREON SOUTH 89°59'43" WEST 65.00 FEET FROM THE EASTERLY LINE OF SAID LOT;

THENCE SOUTH 00°00'00" WEST 18.06 FEET;

THENCE EASTERLY, PARALLEL WITH THE NORTHERLY LINE OF SAID LOT, NORTH 89°59'43" EAST 60.00 FEET TO THE EASTERLY LINE OF SAID LOT;

THENCE SOUTHERLY ALONG SAID EASTERLY LINE, SOUTH 00°00'00" WEST 44.96 FEET TO THE POINT OF BEGINNING.

SAID ELEVATIONS ARE BASED UPON A CITY OF PASADENA BENCHMARK HAVING AN ELEVATION OF 815 41 FEET (2004 ADJUSTMENT, NATIONAL GEODETIC VERTICAL DATUM 1929), DESCRIBED AS FOLLOWS:

AN ALUMINUM MONUMENT 1 5 FEET SOUTH OF CURB RETURN BC, SOUTHEAST CORNER OF MENTOR AVENUE AND COLORADO BOULEVARD, CITY OF PASADENA LEVEL RUN, 9/28/2004.

PURSUANT TO CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 9, 2015 AS INSTRUMENT NO. 20151255502, OF OFFICIAL RECORDS.

APN(s): PORTION OF 5735-006-031 AND 5735-006-32

NEW ASSESSOR'S PARCEL NUMBERS FOR SAID LAND ARE 5735-006-038 AND 5735-006-039 AND ARE PRESENTLY NOT ASSESSED.

APN. 5735-006-31

-6-

# EXHIBIT "4"



**This page is part of your document - DO NOT DISCARD**



## 20211326335



**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**08/30/21 AT 08:00AM**

**Pages:
0013**

| | |
|---|---|
| FEES: | 53.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 128.00 |



**L E A D S H E E T**



202108300110043

**00021091709**



012610245

**SEQ:
01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E442318

1694482CAD_Package_4.

RECORDING REQUESTED BY:
**Same as below**

AND WHEN RECORDED TO:
**KEYBANK NATIONAL ASSOCIATION**
**C/O FRANDZEL ROBINS BLOOM & CSATO, L.C.**
**1000 WILSHIRE BOULEVARD, 19TH FLOOR**
**LOS ANGELES, CA  90017**

**Forward Tax Statements to**
**the address given above**

---

SPACE ABOVE LINE FOR RECORDERS USE

APN: 5735-006-038, 5735-006-039, 5735-006-036, 5735-006-040          TS #: 2020-1992    Order #: 1694482CAD

NOTE: This Trustee's Deed Upon Sale is being recorded to add exhibit B which was erroneously omitted from
Trustee's Deed Upon Sale which recorded 8-27-2021 as instrument number 2021-1319383

## TRUSTEE'S DEED UPON SALE

A.P.N.: 5735-006-038, 5735-006-039, 5735-006-036, 5735-006-040    Transfer Tax: $0.00
"THIS TRANSACTION IS EXEMPT FROM THE REQUIREMENTS OF THE REVENUE AND TAXATION CODE, SECTION 480 3"
The Grantee Herein was the foreclosing Beneficiary
The Amount of The Unpaid Debt was $50,804,819.60
The Amount Paid By The Grantee Was  $42,000,000.00
Said Property Is In The City of **PASADENA**, County of Los Angeles

**S.B.S. TRUST DEED NETWORK, A CALIFORNIA CORPORATION**, as Trustee, (whereas so designated in the Deed of
Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

## COLORADO BOULEVARD-10212883 LLC, A DELAWARE LIMITED LIABILITY COMPANY

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now
held by it as Trustee under the Deed of Trust in and to the property situated in the county of **Los Angeles**, State of California,
described as follows:

**SEE EXHIBIT "A" LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF**
**SEE EXHIBIT "A" PERSONAL PROPERTY DESCRIPTION ATTACHED HERETO AND MADE A**
**PART HEREOF**
This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **BOARDWALK**
**CAPITAL SPE, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND PARK PLACE COMMERCIAL**
**SPE, LLC, A DELAWARE LIMITED LIABILITY COMPANY** as Trustor, dated **6/6/2018** of the Official Records in the
office of the Recorder of Los Angeles, California under the authority and powers vested in the Trustee designated in the Deed
of Trust or as the duly appointed Trustee, default having occurred under the Deed of Trust pursuant to the Notice of Default
and Election to Sell under the Deed of Trust recorded on **6/7/2018**, instrument number 20180565959, Book **XX**, Page **XX** of
Official records.  Trustee having complied with all applicable statutory requirements of the State of California and performed
all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its
recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person
entitled to notice in compliance with California Civil Code 2924b.

ACCOMODATION
This Document delivered to Recorder
As an accomodation only at the
Express request of the parties hereto.
It has not been examined as to
its effect or validity

1 of 12

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

# TRUSTEE'S DEED UPON SALE

TS #: **2020-1992**
Order #: **1694482CAD**

All requirements per California Statutes regarding the mailing, personal delivery and publication of copies of Notice of Default and Election to Sell under Deed of Trust and Notice of Trustee's Sale, and the posting of copies of Notice of Trustee's Sale have been complied with. Trustee, in compliance with said Notice of Trustee's sale and in exercise of its powers under said Deed of Trust sold said real property at public auction on **8/24/2021**. Grantee, being the highest bidder at said sale became the purchaser of said property for the amount bid, being **$42,000,000.00**, in lawful money of the United States, in pro per, receipt thereof is hereby acknowledged in full/partial satisfaction of the debt secured by said Deed of Trust.

In witness thereof, **S.B.S. TRUST DEED NETWORK, A CALIFORNIA CORPORATION**, as Trustee, has this day, caused its name to be hereunto affixed by its officer thereunto duly authorized by its corporation by-laws.

Dated: **8/27/2021**

**S.B.S. TRUST DEED NETWORK, A CALIFORNIA CORPORATION**

By: _____

Colleen Irby, Trustee Sale Officer

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF California
COUNTY OF Los Angeles

On 8/27/2021 before me, Tammy Steele, Notary Public, Personally appeared, COLLEEN IRBY who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Tammy Steele
Commission #2280995
Expires Mar 19, 2023



TAMMY STEELE
Notary Public - California
Los Angeles County
Commission # 2280995
My Comm. Expires Mar 19, 2023

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

2020-1992

EXHIBIT "A"

Parcel A:

The land referred to herein below is situated in the City of Pasadena, in the County of Los Angeles, State of California, and is described as follows:

Parcel 1

Lots 5 and 6, and portions of lots 2, 4 and 8 of Thomas and Farris' Subdivision, in the City of Pasadena, County of Los Angeles, State of California, as per Map recorded in Book 10, Page 100, of Miscellaneous Records, in the Office of the County Recorder of said County, described as follows:

Beginning at the northeast corner of said Lot 6;

Thence southerly along the easterly line of said Lot, south 00° 00' 02" west, 192.35 feet to a line that is parallel with and 2.00 feet southerly of the northerly line of said Lot 8;

Thence westerly along said parallel line, South 89° 59' 43" west, 24.98 feet to the easterly line of the westerly 65.00 feet of said Lot 8.

Thence northerly along said easterly line, north 00° 00' 05" east, 2.00 feet to said northerly line of Lot 8;

Thence westerly along said northerly line, south 89° 59' 43" west, 65.00 feet to the northwest corner of said Lot 8;

Thence southerly along the westerly line of said Lot 8, south 00° 00' 05" west, 38.00 feet to a line that is parallel with and 38.00 feet southerly of the northerly line of said Lot 2;

Thence westerly along said parallel line, south 89° 59' 43" west, 36.05 feet to a line that bears south 00° 00' 07" west and which passes through a point on the northerly line of Lot 4, distant thereon south 89° 59' 43" west, 226.00 feet from the northeast corner of Lot 7 of said Thomas and Farris' Subdivision;

Thence northerly along said line, North 00° 00' 07" east. 228.35 feet to said northerly line of Thomas and Farris' Subdivision.

Thence easterly along said northerly line, north 89° 59' 43" east, 126.02 feet to the point of beginning.

Excepting therefrom that portion within Colorado Boulevard, 100.00 feet wide

Pursuant to Certificate of Compliance recorded February 20, 2013 as Instrument No. 20130258379, of official records.

Parcel 2:

Portions of Lots 7 and 8 of Thomas and Farris' Subdivision, in the City of Pasadena, County of Los Angeles, State of California, as per Map recorded in Book 10, Page 100 of Miscellaneous records, records of said County, described as follows:

Beginning at the northeast corner of said Lot 7;

Thence southerly along the easterly line of said Lots 7 and 8, south 00°00'00" east 255. 35 feet to the southeast corner of said Lot 8;

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

Thence westerly along the southerly line of said Lot 8, south 89°59'43" west 189.96 feet to the southwest corner of said Lot 8;

Thence northerly along the westerly line of said Lot 8, north 00°00'05" east 65.00 feet to the northwest corner of said Lot 8;

Thence easterly along the northerly line of said Lot 8, north 89°59'43" east 65.00 feet to a line parallel with and distant 65.00 feet easterly of the westerly line of said Lot 8;
Thence southerly along said parallel line, south 00°00'05" west 2.00 feet to a line parallel with and distant 2.00 feet southerly of the northerly line of said Lot 8;

Thence easterly along said parallel line, north 89°59'43" east 24.98 feet to the southerly prolongation of the westerly line of said Lot 7;

Thence northerly along said southerly prolongation and said westerly line of said Lot 7, north 00°00'02" east 192.35 feet to the northwest corner of said Lot 7;

Thence easterly along the northerly line of said Lot 7, north 89°59'43" east 99.98 feet to the point of beginning.

Except therefrom that portion lying within Colorado Boulevard, 100.00 feet wide.

Also except therefrom that portion of said land lying below an elevation of 822.80 feet described as follows:

Beginning at the southeast corner of said Lot 8;

Thence westerly along the southerly line of said Lot, South 89°59'43" west 189.96 feet to the southwest corner of said Lot;

Thence northerly along the westerly line of said Lot, north 00°00'05" east 65.00 feet to the northwest corner of said Lot;

Thence easterly along the northerly line of said Lot, north 89°59'43" east 65.00 feet to a line parallel with and distant 65.00 feet easterly of the westerly line of said Lot;

Thence southerly along said parallel line, south 00°00'05" west 2.00 feet to a line parallel with and distant 2.00 feet southerly of the northerly line of said Lot;

Thence easterly along said parallel line, north 89°59'43" east 124.96 feet to the easterly line of said Lot:

Thence southerly along said easterly line, south 00°00'00" east 63.00 feet to the point of beginning.

Also except therefrom that portion of said land lying below an elevation of 824.97 feet described as follows:

Beginning at the intersection of the easterly line of said Lot 8 and line parallel with and distant 2.00 feet southerly of the northerly line of said Lot 8;

Thence westerly along said parallel line, south 89°59'43" west 60.00 feet;

Thence south 00°00'00" west 18.06 feet;

Thence easterly, parallel with the northerly line of said Lot 8, North 89°59'43" east 60. 00 feet to the easterly line of said Lot 8;

Thence northerly along said easterly line, north 00°00'00" east 18.06 feet to the point of beginning.

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

Said elevations based on a City of Pasadena Benchmark having an elevation of 815.41 feet (2004 adjustment, National Geodetic Vertical Datum 1929), described as follows:

An aluminum monument 1.5 feet south of Curb Return BC, southeast corner of Mentor Avenue and Colorado Boulevard, City of Pasadena Level Run, 9/28/2004.

Pursuant to Certificate of Compliance recorded October 9, 2015 as Instrument No. 20151255502, of official records.

Parcel B:

The land referred to herein below is situated in the City of Pasadena, in the County of Los Angeles, State of California, and is described as follows:

Parcel 1:

The north 38 feet of Lot 2 of Thomas and Farris Subdivision, in the City of Pasadena, County of Los Angeles, State of California, as per Map recorded in Book 10 Page 100 of Miscellaneous records in the Office of the County Recorder of said County.

Excepting therefrom that portion lying easterly of a line that bears south 00°00'07" west and which passes through a point on the northerly line of Lot 4 of said Thomas and Farris' Subdivision, distant thereon south 89°59'43" west 226.00 feet from the northeast corner of Lot 7 of said Thomas and Farris' Subdivision.

Except therefrom the west 6 feet thereof, conveyed to the City of Pasadena for street purposes, by Deed recorded in Book 1164, Page 317 of deeds.

Pursuant to Certificate of Compliance recorded February 20, 2013 as Instrument No. 20130258379, of official records.

Parcel 2:

Lot 4 of Thomas and Farris Subdivision, in the City of Pasadena, County of Los Angeles, State of California, as per Map recorded in Book 10, Page 100 of Miscellaneous records said County.

Excepting therefrom that portion lying easterly of a line that bears south 00°00'07" west and which passes through a point on the northerly line of said Lot 4, distant thereon south 89°59'43" west 226.00 feet from the northeast corner of Lot 7 of said Thomas
and Farris' Subdivision.

Except therefrom that portion thereof included within Colorado Street as widen to 100 feet.

Pursuant to Certificate of Compliance recorded February 20, 2013 as Instrument No. 20130258379, of official records.

Parcel 3:

Lot 3 of Thomas and Farris Subdivision, the City of Pasadena, County of Los Angeles,
State of California, as per Map recorded in Book 10, Page 100 of Miscellaneous records of said County.

Except therefrom the west 6 feet thereof, conveyed to the City of Pasadena for street purposes, by Deed recorded in Book 1164, Page 317 of deeds.

Also except therefrom that portion thereof included within Colorado Street as widen to 100 feet.

Parcel 4:

5 of 12

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

That portion of Lot 8 of Thomas and Farris' Subdivision, in the City of Pasadena, County of Los Angeles, State of California, as per Map recorded in Book 10, Page 100 of Miscellaneous records, records of said County, described as follows:

Beginning at the southeast corner of said Lot 8;

Thence westerly along the southerly line of said lot, South 89°59'43" west 189.96 feet to the southwest corner of said Lot;

Thence northerly along the westerly line of said lot, north 00°00'05" east 65.00 feet to the northwest corner of said Lot;

Thence easterly along the northerly line of said Lot, north 89°59'43" east 65.00 feet to a line parallel with and distant 65.00 feet easterly of the westerly line of said Lot;

Thence southerly along said parallel line, south 00°00'05" west 2.00 feet to a line parallel with and distant 2.00 feet southerly of the northerly line of said Lot;

Thence easterly along said parallel line, north 89°59'43" east 124.96 feet to the easterly line of said Lot;

Thence southerly along said easterly line, south 00°00'00" east 63.00 feet to the point of beginning.

Except therefrom that portion lying above an elevation of 824.97 feet.

Also except therefrom that portion of said land lying above an elevation of 822.80 feet described as follows:

Beginning at the southeast corner of said Lot 8,

Thence westerly along the southerly line of said Lot, south 89°59'43" west 189.96 feet to the southwest corner of said Lot;

Thence northerly along the westerly line of said Lot, north 00°00'05" east 65.00 feet to the northwest corner of said Lot;

Thence easterly along the northerly line of said Lot, north 89°59'43" east 65.00 feet to a line parallel with and distant 65.00 feet easterly of the westerly line of said Lot;

Thence southerly along said parallel line, south 00°00'05" west 2.00 feet to a line parallel with and distant 2.00 feet southerly of the northerly line of said Lot;

Thence easterly along said parallel line, north 89°59'43" east 64.96 feet to a point on said line distant thereon south 89°59'43" west 65.00 feet from the easterly line of said Lot;

Thence south 00°00'00" west 18.06 feet;

Thence easterly, parallel with the northerly line of said Lot, North 89°59'43" east 60.00 feet to the easterly line of said Lot;

Thence southerly along said easterly line, south 00°00'00" west 44.96 feet to the point of beginning.

Said elevations are based upon a City of Pasadena Benchmark having an elevation of 815.41 feet (2004 Adjustment, National Geodetic Vertical Datum 1929), described as follows:

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

An aluminum monument 1 5 feet south of Curb Return BC, Southeast corner of Mentor Avenue and Colorado Boulevard, City of Pasadena Level Run, 9/28/2004.

Pursuant to Certificate of Compliance recorded October 9, 2015 as Instrument No. 20151255502, of official records.

S.B.S. is a debt collector attempting to collect a debt and any information will be used for that purpose.

T.S. No. **2020-1992**          Order No. **1694482CAD**          Loan No. **10212883, 884, 885, 886**

## EXHIBIT 'B'

## NOTICE OF TRUSTEE'S SALE

## PERSONAL PROPERTY COLLATERAL

All right, title, interest and estate of Trustor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Land, the Improvements, and all right, title, interest and estate of Trustor in and to the property, rights, interests and estates hereinafter described are collectively referred to herein as the "Property"):

    a.    Land. The real property described in the attached Notice Of Trustee's Sale (the "Land");

    b.    Additional Land. All additional lands, estates and development rights hereafter acquired by Trustor for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise, be expressly made subject to the lien of that certain Construction Trust Deed, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by the Trustor to and for the benefit of the Beneficiary, dated as of June 6, 2018 (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "Security Instrument");

    c.    Master Lease. That certain Lease between Park Place Commercial, L.P., a California limited partnership, as landlord (the "Initial Master Lessor"), and Park Place Master Tenant, LLC, a California limited liability company, as tenant (the "Master Lessee"), dated as of July 28, 2014 (the "Master Lease"), as assigned by the Initial Master Lessor to Park Place Commercial SPE, LLC, a Delaware limited liability company (the "Master Lessor");

    d.    Assignments/Modifications. All assignments, modifications, extensions and renewals of the Master Lease and all options, privileges and rights of Master Lessor as lessor under the Master Lease;

    e.    Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "Improvements");

    f.    Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dowers and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Trustor in and

T.S. No. **2020-1992**          Order No. **1694482CAD**          Loan No. **10212883, 884, 885, 886**

to the Land and the Improvements, including, but not limited to, those arising under and by virtue of the Master Lease, and every part and parcel thereof, with the appurtenances thereto;

g.    Equipment. All "goods" and "equipment," as such terms are defined in. Article 9 of the Uniform Commercial Code (hereinafter defined), now owned or hereafter acquired by Trustor, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Trustor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "Equipment"). Notwithstanding the foregoing. Equipment shall not include any property belonging to tenants under Leases (hereinafter defined) except to the extent that Trustor shall have any right or interest therein;

h.    Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Trustor which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Trustor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "Fixtures"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to Leases, except to the extent that Trustor shall have any right or interest therein;

i.    Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any (including, but not limited to, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, Venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating

T.S. No. **2020-1992**          Order No. **1694482CAD**          Loan No. **10212883, 884, 885, 886**

equipment, private telephone systems, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, elevators, escalators, fittings, plants, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, conveyors, cabinets, lockers, shelving, spotlighting equipment, washers and dryers), other customary hotel equipment, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, other than Fixtures, which are now or hereafter owned by Trustor and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "Personal Property"), and the right, title and interest of Trustor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of the Security Instrument and all proceeds and products of the above;

      j.    <u>Leases and Rents</u>. All. leases, subleases or subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, including, without limitation, the Master Lease, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "Leases"), whether before or after the filing by or against Trustor of any petition for relief under 11 U.S.C. § 101 et seq,, as the same may be amended from time to time (the "Bankruptcy Code") and all right, title and interest of Trustor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements (including, without limitation, all revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Trustor or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges and vending machine sales) whether paid or accruing before or after the filing by or against Trustor of any petition for relief under the Bankruptcy Code (collectively, the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

T.S. No. **2020-1992**            Order No. **1694482CAD**            Loan No. **10212883, 884, 885, 886**

     k.     Condemnation Awards. All Awards which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

     l.     Insurance Proceeds. All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the. proceeds of any Policies, judgments, or settlements made in lieu thereof, in connection with a Casualty to the Property;

     m.     Tax Certiorari. All refunds, rebates or credits in connection with reduction in Taxes or Other Charges charged against the Property;

     n.     Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation. Insurance Proceeds and Awards, into cash or liquidation claims;

     o.     Rights. The right, in the name and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Beneficiary in the Property;

     p.     Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting or pertaining to any business or activity conducted on the Land and any part thereof and all right, title and interest of Trustor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Trustor thereunder;

     q.     Trademarks. All tradenames, trademarks (including the trademark "Hotel Constance"), servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

     r.     Accounts. All reserves, escrows and deposit accounts maintained by Trustor with respect to the Property, including, without limitation, all accounts established or maintained pursuant to (i) the Cash Management Agreement and (ii) the Lockbox Agreement; together with Trustor's rights to payment from any consumer credit/charge card organization or entities which sponsor and administer such cards as the American Express Card, the Visa Card and the Mastercard (each a "Credit Card Company"), and all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

     s.     Letter of Credit. All letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Trustor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in Section 1.1 of the Security Instrument;

T.S. No. **2020-1992**          Order No. **1694482CAD**          Loan No. **10212883, 884, 885, 886**

t.    Tort Claims. All commercial tort claims Trustor now has or hereafter acquires relating to the properties, rights, titles and interests referred to in Section 1.1 of the Security Instrument;

u.    Collateral. All of Trustor's security interest in the following items, as granted to Trustor by Master Lessee pursuant to Section 19.8 of the Master Lease:

(i)    All of Master Lessee's interest (whether presently existing or hereafter acquired) in all Fixtures, Equipment and other Personal Property which is or becomes attached to, installed in, or used on or in connection with the Property;

(ii)    Master Lessee's right, title and interest to rent and other payments under any Leases;

(iii)    Master Lessee's right, title and interest in and under any contracts relating to the operation of the Property, including, without limitation, that certain Parking Use Agreement dated as of April 29, 2014, by and between Park Place Commercial, L.P., a California limited partnership, and 2 North Lake JV, LLC, as assigned to Master Lessee;

(iv)    Master Lessee's revenues, incomes, proceeds, profits and other sums or benefits paid or payable to Master Lessee in connection with Master Lessee's operation of the Property; and

(v)    All proceeds, including insurance or condemnation proceeds, that arise out of the sale, liquidation, or other transfer of, or damage to, condemnation, of, or destruction of, or sale, use or enforcement of the collateral described in Sections 1.1 (u)(i)-(iv) of the Security Instrument,

v.    Other Rights. Any and all other rights of Trustor in and to the items set forth in Subsections a. through, u. above.

Capitalized terms not defined herein shall have the meanings set forth in that certain Loan Agreement between Trustor and Beneficiary dated of even date with the Security Instrument (the **"Loan Agreement").**

Notwithstanding the foregoing, this Notice of Trustee's Sale does not include, and specifically excludes, the following: All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Beneficiary pursuant to the Deed of Trust/Security Instrument, or any other of the Loan Documents, including, but not limited to the Loan Agreement (as defined in the Deed of Trust/Security Instrument), including, without limitation, all funds now or hereafter on deposit in the Required Repair Account, the Tax and Insurance Escrow Fund (and any related account), the Replacement Reserve Account, the Construction Work Account, the Interest Reserve Account, the Excess Cash Flow Reserve Account, and any other reserve, suspense or escrow account established pursuant to the terms of the Deed of Trust/Security Agreement or of any other Loan Documents, including but not limited to the Loan Agreement (collectively, the "Reserves").

12 of 12

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **CHAPTER 7 TRUSTEE'S MOTION TO APPROVE COMPROMISE OF CONTROVERSY AND TO COMPEL TURNOVER OF POSSESSION OF ITEMS RELATED TO REAL PROPERTY; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **November 23, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Hal D Goldflam    hgoldflam@frandzel.com, dmoore@frandzel.com**
- **Rosendo Gonzalez (TR)    rgonzalez@ecf.axosfs.com, rossgonzalez@gonzalezplc.com;jzavala@gonzalezplc.com;zig@gonzalezplc.com**
- **Dare Law    dare.law@usdoj.gov**
- **Jeffrey B Smith    jsmith@cgsattys.com, vphillips@cgsattys.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Reed S Waddell    rwaddell@frandzel.com, sking@frandzel.com**
- **Craig A Welin    cwelin@frandzel.com, bwilson@frandzel.com**

**2.  SERVED BY UNITED STATES MAIL**: On **November 23, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Park Place Master Tenant, LLC
940 East Colorado Blvd
Pasadena, CA 91106

*Attorney for Debtor*
Jeffrey B. Smith
301 E Ocean Blvd Ste 1700
Long Beach, CA 90802

Office of the United States Trustee
Attn: Dare Law
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **November 23, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

None.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 23, 2021 | Stephanie Reichert | */s/ Stephanie Reichert* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**